THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JAKE LEE,

              Plaintiff,

      -against-

ACCESSORIES BY PEAK, RAJESH SHAH,

              Defendants.

**CERTIFICATE OF SERVICE**

Civil No. 07-CV 0338C(SR)

JUSTIN S. WHITE, ESQ., an attorney at law, affirms under the penalties of perjury:

1. That I am over 18 years of age.

2. That I am not a party to this action.

3. That on January 5, 2009, your affiant served a copy of the within Reply Affidavit upon Darius Keyhani, Esq., attorney for the Plaintiff in the following manner, to wit:

4. By delivering both a paper copy and PDF formatted copy upon a CD-ROM disk of said Affidavit to his office at 330 Madison Avenue, Sixth Floor, New York, New York by overnight courier service and by sending him a PDF formatted version to his articulated e-mail delivery address.

Affirmed this 5th day of January, 2009.

_____
JUSTIN S. WHITE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JAKE LEE,

                          Plaintiff,

                                                    Civil No. 07-CV-0338C

vs.

ACCESSORIES BY PEAK and
RAJESH SHAH,

                          Defendants.


        PLEASE TAKE NOTICE that pursuant to Local Rule 56.1 and Federal Rules of Civil

Procedures Rule 56, the Defendants, Accessories by Peak and Rajesh Shah, ask this Court to deny

partial Summary Judgment against them for alleged willful infringement of United States Patent

No. 6,418,936. In support of such denial, Defendant's submit an Attorney Affidavit with exhibits.

Dated: January 2, 2009


                                        Yours, etc.



                                        _____
                                        JUSTIN S. WHITE, ESQ.
                                        Attorney for the Defendants
                                        Office and PO Address
                                        5662 Main Street
                                        Williamsville, NY 14221
                                        (716) 631-9100


TO: DARIUSH KEYHANI, ESQ.
      Attorney for Plaintiff
      Office and P.O. Address
      330 Madison Avenue, 6th Floor
      New York, NY 10017
      (212) 760-0098

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JAKE LEE,

               Plaintiff,

vs.

               Civil No. 07-CV-0338C (SR)

ACCESSORIES BY PEAK and
RAJESH SHAH,

               Defendants.

---

## DEFENDANTS REPLY AFFIDAVIT TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Justin S. White, being duly sworn, deposes and says:

1.      That I am attorney at law licensed to practice in this Court and within the Courts of the State of New York.

2.      Plaintiff has moved for partial summary judgment alleging infringement of U.S. Patent No. 6,418,936, "the 936 Patent." As understood by the Defendants, this patented item is a pipe commonly used by the public for the consumption of narcotics, (e.g., hashish, crack cocaine, marijuana, etc.)

3.      Upon information and belief, moreover, the Plaintiff is a manufacturer and distributor of items items commonly sold in "head shops" and include paraphernalia that pretend to be used for the consumption of legal tobacco and "herbal products." (See Deposition of Jake Lee at pp. 12-13 attached as Exhibit A [hereinafter "Lee Depo."]) Boiled down to its essence and actual usage, however, the patented "six-shooter pipe" and the subject of this lawsuit, is a species of the genus "dope pipe," and suggestions that it is used to consume legitimate tobacco or herbal

products should not be taken seriously.[1]

4.      Notwithstanding such allegations, and regardless of what usage to which the "six shooter" pipe is put, the Defendant, Rajesh Shah, and his company, Accessories by Peak, a corporation of which he is the President and sole shareholder (Deposition of Rajesh Shah at p. 9 attached a Exhibit B [hereinafter "Shah Depo."]) are a jobber or wholesaler of imported goods, mainly from India, and his of version of factual events involving alleged notice of infringement is quite different from that of the Plaintiff.

5.      It is *not* being contested that the Plaintiff is the holder of the 936 Patent. It would waste this Court's time to deny that, as a prior Consent Order creates an estoppel from the Defendants making such claims.

## ADEQUATE NOTICE CANNOT BE ESTABLISHED AS A MATTER OF LAW (35 USC SECTION 287)

6.      What is contested, however, and what stands in the Plaintiff's way of partial summary judgment, is the allegation that the Defendants had adequate, legal notice of the Plaintiff's patent and therefore willfully infringed such patent by selling "knock-offs."

7.      Defendant, Rajesh Shah, has admitted being at an ASD show, as mentioned by the Plaintiff in his Memorandum, in his deposition (Shah Depo. at p. 6). With him were product samples of items that he sells as an importer of goods from India. Among the items there

---

1.      Upon information and belief, no reasonable person would use this "six-shooter" device as a means of smoking legitimate tobacco products because the receptacle area(s) for the smoking material are so small that one would not gain but perhaps a puff of tobacco prior to the alloted measure being consumed. In short, the device does not appear to serve the alleged legitimate purpose suggested by the Plaintiff.

was an apparent knock-off of the Plaintiff's so-called "six shooter" pipe. According to Shah, this item was sent to him from an agent in India who forwards samples to him for the sake of soliciting orders. (Shah Depo. at pp. 50-51)

8.      Shah admits that individuals came up to him at the ASD Show in Las Vegas in 2004 and became exercised over his displaying the six-shooter pipe for sale and were yelling, "How can you sell this product . . .?" (Shah Depo. at pp. 26-27.)

9.      Significantly, however, Shah denies that he was shown any patent or letters patent by anyone. (Shah Depo. at pp. 31-32) The Defendants believe that this is a fiction (i.e., that he was shown a patent) being submitted to the Court with an eye to shoring up the Plaintiff's chances of proving notice and/or to obtain a finding of *willful* infringement. At best, the Plaintiff gave inadequate notice, and these methods have been held to be inadequate as a matter of law. See Hazeltine Corp. vs. Radio Corp. of America, 1 F. Supp. 758 (DC NY, 1932).

10.      A credibility question also arises in the context of what occurred at the ASD Show: how likely is it that the Plaintiff, or his representative, would carry around or have at the ready a copy of letters patent, a so-called "spare copy" to bring out and show the Defendant or anyone else at such a trade show?  Why would the Plaintiff be carrying around copies of his letters patent?[2] Whether he did or did not is a question of fact that precludes the granting of summary judgment.

11.      What is more likely is the Plaintiff and/or his representative went to the Defendant's

---

[2]      At page 11 of his submission, the Plaintiff makes the following remark, "It is highly unlikely that Plaintiff went to the trouble to confront Defendant at the ASD Trade Show without showing him his patent or at least giving him the patent number." When given greater opportunity, however, to give the Plaintiff such information, the Plaintiff sent an e-mail that provided virtually no information, and this is in evidence. See *infra*. para 18.

11.    What is more likely is the Plaintiff and/or his representative went to the Defendant's booth at the ASD Show and started remonstrating at him, saying, "Hey, you can't sell those, that's ours," as the Defendant Shah suggests. (Shah Depo. at p. 31) To put it another way, the Plaintiffs probably did *not* have letters patent and did not take steps necessary to perfect notice. With Shah denying that the Plaintiff or anyone else provided him with a patent or somehow established ownership of a patent, there is a material issue of fact for the Court to decide and summary judgment is, again, not appropriate. See <u>Bazz, Inc. vs. Catalina Lighting, Inc.</u>, 49 USPQ 2d 2009 (DC Cal., 1992) (Since material issue of fact existed on whether actual notice of design patent infringement had been given, court was constrained to deny summary judgment.)

12.    Upon information and belief, the Plaintiff did not take steps necessary to establish its ownership of the patent as and against the alleged willful infringer, i.e., he failed to give legal notice. See 35 USC Section 287(b)(5)(A):

"For the purposes of this subsection, notice of infringement means actual knowledge, or receipt by a person of a ***written notification***, or a combination thereof, of information sufficient to persuade a reasonable person that it is likely that the product was made by a process patented in the United States." 35 USC Section 287(b)(5)(A).

13.    Plaintiff goes onto suggest that the provision of notice occurred when an e-mail was allegedly sent to Mr. Shah in February, 2004. When asked by whom the e-mail was sent, Mr. Lee said, "infoatsixshooterpipes.com." (Lee Depo. at p. 28) Rajesh Shah was asked whether he received an e-mail at <u>rajesh33@hotmail.com</u>. The e-mail was allegedly sent to him on February 24, 2004. Mr. Shah denied receiving it, i.e., could not recall receiving such an e-mail. (Shah Depo.

at p. 56) The e-mail address to which communication was allegedly sent was a *Shah family* e-mail

address where more than three people had access to the e-mail. (Shah Depo. at p. 59)

14.    Shah responded at his deposition regarding alleged receipt of an e-mail from Lee, to

wit:

"Okay, see in the e-mail, 100 e-mails comes every day.  If you don't know the people, you just delete.  Okay.  It might, he might have sent me, I might have deleted it because I don't look at each and every e-mail, then it would take five hours and six hours every day.  It might have gone to junk e-mail too.  So it's not necessary that I got this e-mail.  That's my answer." (Shah Depo. at p. 57)

"Because I don't open my e-mail, sometimes my son open (sic) my e-mail, sometimes my daughter, my e-mail opened by everybody in my family.  If somebody else open, I am not good in computer, so if somebody else open and he don't feel like telling me, then it might be, you may be right it was open and not seen by me or not informed to me.  I am not good in computer, so it's possible what he's saying, so I don't, I am not surprised in that." (Shah Depo. at p. 59)

15.    Plaintiff's attorney, Mr. Keyhani, says: "The e-mail that was sent to Shah was

received by him, despite his testimony that his son or daughter might have opened it." (Keyhani

memo at p. 10) How is Mr. Keyhani able to assert this? Does he have personal knowledge?  Mr.

Keyhani goes on to argue that, "The *objective* evidence is clear: Defendant, Shah, was given actual

notice of Plaintiff's 936 Patent but chose to ignore it."  What is hard to ignore is the *lack* of

"objective evidence."

16.    A closer look at the e-mail, received or not, leads one to the legal conclusion that

the written notice requirements of 35 USC Section 287 were never met in this case, to wit:

A written notification from the patent holder charging a person with infringement shall specify the patented process alleged to have been used and the reasons for the good faith belief that such process was used. The patent holder shall include in the notification such information as is reasonably necessary to explain fairly the patent holder's belief, except that the patent holder is not required to disclose any trade secret information. 35 USC 287(b)(5)(B).

17.     In its place, we have the following e-mail communication from "Jake Lee" (which

Rajesh Shah denies receiving):

> From:  "Six Shooter Pipes" <info@sixshooterpipes.com>
> To:      <rajesh33@hotmail.com>
> Sent:   Tuesday, February 24, 2004 6:07 PM
> Subject: Fake Six Shooter Pipes
> Dear Rajesh,

> I just received word that you are still selling knockoffs of my "Patented" pipe.  You agreed that you would stop selling them and you are not keeping to your agreement.  Therefore, you leave me no choice but to take legal action against you.  You will be receiving a letter from my attorney and a lawsuit will soon follow.  In America, we take Patent infringement very seriously.[3]
> Sincerely,

> Jake Lee

18.     This e-mail (reproduced and attached as Exhibit C) cannot be taken for notice under

35 USC Section 287. None of the requirements are met. The document is not written (it is

electronic); it does not reference the patent number; it accuses the alleged infringer of "selling

knockoffs" of "my patented pipe." The question of asserting the good faith belief that the patented

process is violated does not even arise in this e-mail. The communique does not provide the

recipient with reliable contact information, e.g., the name of the company holding the patent, the

place where the alleged infringer can be contacted, a telephone number, nothing.

---

3   The latter comment appears to be a swipe at Mr. Shah's ethnicity.

See <u>Butterfield vs. Oculus Contact Lens Co.</u>, 332 F. Supp. 896 (ND Ohio, 1968), 171

USPQ 527, aff'd 177 USPQ 33 (CA 7). *Butterfield* stands for the proposition that *written* letters

must "*clearly identify the patent.*" Plaintiff Lee did not even write letters.

19.     At best, we have the testimony of Mr. Jake Lee and a declaration of his sidekick

suggesting that they confronted Shah at a trade show and created a stir over his marketing their

pipe. We then have Mr. Lee claiming that he sent Rajesh Shah a warning e-mail on the Shah family

home computer.

20.     Can a reasonable mind conclude that this was actual and sufficient legal notice of

the patent and alleged infringement of the subject patent? If one believes the version of events

Rajesh Shah gives, two strangers walked up to him at a trade show and said that he shouldn't be

marketing the "six-shooter pipe" because it was theirs.  If you further believe Jake Lee, he sent a

follow-up e-mail to Mr. Shah which said, in essence, "Don't you remember, I told you to stop doing

that, i.e., selling 'knock-offs' of my patented six shooter."

21.     What is lacking is the adequate, statutory "objective notice" that one would rely

upon to impute  Mr. Shah with notice of the actual patent and its alleged infringement. A written or

certified letter, *with details of the patent*, etc, would have sufficed under the case law.  The service

of a letter by process service.  Some such objective, third-party controlled procedure whereby the

Responding party would have no "wiggle room" within which to say, as Mr. Shah does, "I never

really received the type of notice that you are suggesting." In Shah's case, however, this is not

"wiggle room;" it is his version of what happened. In a motion for summary judgment, the burden lies on the moving party to prove  that their version is the only version of the facts which can be sustained. Whether Mr. Shah did, in fact, receive such notice is a question of fact and does not warrant the granting of partial summary judgment.

22.      Failure to give proper notice means that the commencement of the action is the notice which starts the damages clock ticking. See Wayne Gossard Corp. vs. Sondra, Inc., 434 F. Supp. 1340 (ED Pa, 1977), 195 USPQ 777, aff'd 579 F2d 41, 200 USPQ 11. "Lack of any infringement notice letter and failure to mark patented footsocks with patent number results in notice as of commencement of action relative to damages for infringement of patent on footsocks." Failure to mark and failure to give notice before commencement of case limits damages to those incurred after commencement of suit. Ellipse Corp. vs. Ford Motor Co., 461 F. Supp. 1354 (ND Ill, 1978), 201 USPQ 455, cert den 446 US 939, 206 USPQ 288.

## FINDING WILLFUL INFRINGEMENT
## AS A MATTER OF LAW MUST FAIL

23.      One then turns to the question of "willful" infringement which Plaintiff seeks as a matter of law.  Interestingly, the Plaintiff segues in his Memorandum to *manufacturers'* cases, citing Church & Dwight Co., Inc. v. Abbott Laboratories, 2008 WL 2565550 at 2 (D.N.J. 2008) where nine factors considered in determining the issue of willful infringement are recited. Let *us* consider the factors raised in *Church & Dwight.*

I.      Whether the infringer deliberately copied the ideas or design of another.

INSTANT CASE:      Mr. Shah was *not* a manufacturer of the pipes and didn't copy anything.  He was a jobber working out of a one room office in New York City.  Therefore, there was no question of his having spent time and energy devising a design that would mimic or deceptively shadow the design and appearance of any "six-shooter" device.

II.      Whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed.

INSTANT CASE:      Shah knew nothing of any protection prior to mention of it at the ASD trade show.  I believe that has been conceded in this litigation.  When accosted by two strangers and told that he had items for sale that he should not be selling, one wonders how that constitutes notice necessary for him to do any form of investigation. Where would Mr. Shah have started his investigation?  How would he have determined that there was any patent?  Was it his obligation to make the Plaintiff's claimed patent manifest? (On the other hand, had the Plaintiff sent Defendants written notice by certified mail or legal process that the "six-shooter" pipe in the hands of the Defendant infringed upon the Plaintiffs '936 patent, an investigation might have been warranted and, indeed, possible. However, the e-mail Lee sent doesn't give enough information.)

III.      The infringer's behavior as a party to the litigation.

INSTANT CASE:      Shah consented to a permanent injunction, and it has not been alleged that he violated its terms since entry. He has been exemplary.

IV.     Defendant's size and financial condition.

INSTANT CASE:     Here one really needs to digress and discuss the Defendant and who this Court dealing with.  In his deposition, Mr. Shah describes himself as a wholesaler whose office is located in New York City and who is a one man show. (Shah Depo. at p. 11) He is a wholesaler who, according to his testimony, received the offending items from someone in India.[4] This one man importer of goods outside the United States, mainly India, is being penalized. Moreover, his financial condition is such that he would not really be in a position to benefit from the alleged misconduct.

V.      Closeness of the case.

INSTANT CASE:     N/A

VI.     Duration of Defendants' misconduct.

INSTANT CASE:     By all appearances, the alleged misconduct occurred two or three times over a period of a year or two. According to Shah, by mistake (not knowing that he was involved with any infringing pipe), and possessing the pipes as a lot of samples, he may have distributed as many as three hundred.)  According to the Plaintiff these pipes cost approximately $13.00 a piece to make. (Lee Depo. at p. 50). Therefore, we are talking about a sample lot of Three Thousand Nine Hundred Dollars ($3,900.00) worth of merchandise.

VII.    Remedial action by the Defendant.

INSTANT CASE:     The Defendant once confronted with the legal notice of the patent

---

4   If there is a real culprit, it is the manufacturer in India to whom the Plaintiff can not reach or has chosen not to reach.

agreed to a cease and desist order granted by this Court.

VIII.   Defendant's motivation for harm.

INSTANT CASE:      It does not appear that based upon the financial stakes involved that

Mr. Shah had any motivation.  These were samples that he received.

IX.   Whether Defendant attempted to conceal its misconduct.

INSTANT CASE:      There is no evidence of concealment whatsoever.

Citing L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F. 2d 1117, 1127 (Fed. Cir. 1993)

holding that the infringer's deliberate copying "was strong evidence of willful infringement

without any exculpatory evidence to balance the weight," the Plaintiff herein seeks to compare

Shah to such a wrongdoer. That is preposterous.

24.    A finding of willful infringement must be established by clear and convincing

evidence. Comark Communications, Inc. vs. Harris Corp, 156 F. 3rd 1182, 48 U.S.P.Q. 1001 (Fed.

Cir., 1998) (Opinion of counsel was involved.)

25.    In contrast to that tall requirement, Plaintiff urges the following argument, citing

L.A. Gear vs. Thom McAn Shoe, "infringer's deliberate copying 'was strong evidence of willful

infringement with exculpatory evidence to balance the weight.'" Plaintiff's Brief at p. 11. Again,

Shah was a *jobber*, a wholesaler who received these sixshooter-like pipes as a sample lot from

India, and he did not even solicit their receipt. He stated they came to him at the whim of his

supplier as did other products. One cannot attribute the acts of the manufacturer to the non-aligned

wholesaler.

26.     With the burden of showing willful infringement so high, it is the Defendants'

contention that summary judgment is *not* an entirely appropriate remedy.

_____
JUSTIN S. WHITE

Sworn to before me this 4th
day of January, 2009

_____
Notary Public
            CHRISTINE M. KIFFER
    NOTARY PUBLIC, STATE OF NEW YORK
            QUALIFIED IN ERIE COUNTY
    MY COMMISSION EXPIRES FEBRUARY 7, 20__

1

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NEW YORK

3    -----------------------------------------------------

4    **JAKE LEE,**

5                              Plaintiff,

6
     -vs-                      Civil No. 07-CV.0338C(SR)
7
     **ACCESSORIES BY PEAK, RAJESH SHAH,**

8

9                              Defendants.

10   -----------------------------------------------------

11

12       Telephonic Examination Before Trial of **JAKE LEE**, taken

13   pursuant to the Federal Rules of Civil Procedure, at the

14   Law Offices of Justin S. White, 5662 Main Street,

15   Williamsville, New York on Tuesday, September 16, 2008

16   commencing at 2:00 P.M., before Wendy Royce McCann,

17   Registered Professional Reporter.

18

19

20

21

22

23

2

| | |
|---|---|
| 1 | **APPEARANCES:** |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |

1   **APPEARANCES:**          **MEREDITH & KEYHANI, PLLC.**
                              **BY:  DARIUSH KEYHANI, ESQ.**
2                             330 Madison Avenue
                              6th Floor
3                             New York, New York  10017
                              Attorneys for the Plaintiff.

4

5                             **JUSTIN S. WHITE, ESQ.**
                              5662 Main Street
6                             Williamsville, New York  14221
                              Attorney for the Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

3

1                          **E X H I B I T S**

2    **EXHIBIT NO:**                                        **PAGE**

3    12 - Six shooter pipe on alibaba.com                    39

4    13 - Interrogatories                                    40

5    14 - Plaintiff's Responses to Interrogatories           43

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**_WENDY ROYCE McCANN - COURT REPORTER_**

4

1              (Whereupon, the following stipulation

2              was entered upon the record:  "It is

3              hereby stipulated by and between

4              counsel for the respective parties

5              hereto that the oath of the Referee

6              is waived, that signing, filing and

7              certification of the transcript are

8              waived; and that all objections

9              except as to the form of the

10             questions are reserved until the time

11             of the trial.")

12

13  Whereupon, **JAKE LEE**, after first being duly sworn, was

14  examined and testified as follows:

15

16  **EXAMINATION VIA TELEPHONE BY MR. WHITE:**

17  Q.     State your full name, please?

18  A.     Jake Lee, J-a-k-e  L-e-e.

19  Q.     What is your present address, sir?

20  A.     My present address is 7911 and one quarter Norton,

21         N-o-r-t-o-n Avenue, that's West Hollywood,

22         California 90046.

23  Q.     Where were you born?

5

1   A.      Los Angeles, California.

2   Q.      How far did you go in school?

3   A.      I went to college and a trade school.

4   Q.      Where did you go to college?

5   A.      Santa Monica City College.

6   Q.      Did you graduate?

7   A.      I did not graduate.

8   Q.      Were did you go to trade school?

9   A.      I went to the National Association of Tooling and

10          Machinists.

11  Q.      How old are you today?

12  A.      38.

13  Q.      Do you have a business or occupation?

14  A.      I do have a business.

15  Q.      What is that?

16  A.      My business is designing various products and

17          inventions that I take to the market place and

18          manufacture smoking accessories and herbal products.

19  Q.      Are you employed by any person?

20  A.      No, I am self-employed.

21  Q.      Do you have a company, a d/b/a or a limited

22          liability company?

23  A.      I have a S Corporation.

6

1   Q.   What is the name?

2   A.   SSP.

3   Q.   SSP, Inc.?

4   A.   No, it's SSP Trading, T-r-a-d-i-n-g, Inc.

5   Q.   And where was that company formed?

6   A.   Los Angeles, California.

7   Q.   So it's a California corporation?

8   A.   That's correct.

9   Q.   And for how long has it been in existence?

10  A.   The corporation was established in 2005 and before

11       that it was -- I was operating it as a sole

12       proprietorship.

13  Q.   As a d/b/a, just as an assumed name?

14  A.   Yes.

15  Q.   What was the assumed name?

16  A.   Six Shooter Pipes.

17  Q.   So was there any company before Six Shooter Pipes?

18  A.   No sir.

19  Q.   How long was Six Shooter Pipes in business before

20       you formed SSP Trading, Inc.?

21  A.   I believe it was 1999.

22  Q.   Now in either connection with Six Shooter Pipes or

23       SSP, Inc., did you ever have a catalog of products

1      that you sold?

2  A.      Yes sir.

3  Q.      Do you have a catalog today of the products you

4          sell?

5  A.      Yes sir.

6

7  MR. WHITE:              I make a document demand.  Please

8                          note on the record a document demand,

9                          Mr. Keyhani, I would like a copy of

10                         any catalog he has presently.

11

12 MR. KEYHANI:            No problem, absolutely.

13

14 BY MR. WHITE:

15 Q.      Now are you the sole shareholder of SSP Trading,

16         Inc.?

17 A.      Yes, I am.

18 Q.      Have you ever been in business with any other person

19         meaning this herbal smoking accessories and

20         designing products for sale, have you ever been in

21         business with a partner or co-shareholder?

22 A.      No, I have not.

23 Q.      Now you say you manufacture, you design and

1    manufacture the products, where do you design them?

2  A.    I have various locations, various machine shops that

3        I sub the parts out to.

4  Q.    Where do you do the design work, do you have a

5        design studio and do you have an office, where do

6        you do your design work?

7  A.    I do the design work out of my home office.

8  Q.    And once you have designed the product you wish to

9        sell, do you have machine shops manufacture it for

10       you?

11 A.    Yes, that's correct.  A prototype is made and if I

12       feel that it's good enough, then I have the machine

13       shops manufacture them for me.

14 Q.    And once they are manufactured, how do you

15       distribute the products?

16 A.    I have a list of accounts that I have.  I send

17       catalogs out.  I put advertisements in the form of

18       direct mailing and I have a salesman making phone

19       calls and I also do trade shows twice a year where I

20       display the products and take orders.

21 Q.    Are you on the internet?

22 A.    No, I am not on the internet.

23 Q.    Is there a reason you are not on the internet?

9

1    A.    No, there is no reason why I am not on the internet.

2    Q.    And once the products are sold by ads, direct mail,

3          your salesmen or trade shows, how do you distribute

4          them?

5    A.    I have an 800 number and I take orders and I ship

6          the orders to the appropriate accounts.

7    Q.    I understand that.  How do you actually distribute,

8          do you drop ship, do you collect the manufactured

9          items yourself, do you have a warehouse from which

10         you send them, those are the possibilities I want to

11         know about.

12   A.    Okay, yes, I have a little warehouse.

13   Q.    Where is that located?

14   A.    It's located at my residence.

15   Q.    And how do you do your shipping?

16   A.    I ship through UPS.

17   Q.    Okay, now do you have a system of bookkeeping?

18   A.    I do.

19   Q.    What is that system?

20   A.    Quickbooks.

21   Q.    And is that a system that you run or someone runs

22         for you?

23   A.    I have a bookkeeper.

1  Q.   Is this someone who is dedicated to you or someone

2       you employ to do part time bookkeeping?

3  A.   She is part time.

4  Q.   Does she come to you or do you take the information

5       to her?

6  A.   Both.  She comes to my office and also we send her

7       information as well.

8  Q.   Does she prepare your tax returns or does someone

9       else prepare your tax returns?

10  A.   She prepares my tax returns.

11  Q.   What is her name?

12  A.   Teresa Mackey, M-a-c-k-e-y.

13  Q.   Is she a CPA or an accountant?

14  A.   She is neither.

15  Q.   What is she?

16  A.   She -- well, I guess she would be an accountant.  I

17       have a separate CPA who does my actual tax returns.

18  Q.   Is Ms. Mackey --

19  A.   She takes care of the books for me.

20  Q.   Is she a relation of yours?  Do you have any

21       relationship to her other than professional?

22  A.   No.

23  Q.   Relative, girlfriend, fiancée?

1   A.      No.

2   Q.      Are you single or married?

3   A.      I am engaged.

4   Q.      Now the Quickbooks that you maintain to track your

5           finances, do you print out the Quickbooks annually,

6           weekly, monthly, daily to give your accountant, Ms.

7           Mackey, information?

8   A.      I believe she does it electronically, but I can't be

9           certain.

10  Q.      Back up a step.  How many products, separate

11          products today are you marketing out of SSP Trading,

12          Inc.?

13  A.      Approximately 25.

14  Q.      Who would be your typical customer?

15  A.      A gift shop, a smoke shop, a novelty shop.

16  Q.      Of the states in American, how many states do you

17          send products to for sale?

18  A.      I would say, I can't be certain, but I would say the

19          majority of the states.

20  Q.      Are there any states to which you do not send your

21          products?

22  A.      I can't recall.  I can't recall that answer.

23  Q.      Are you familiar with the term head shop?

1   A.      Yes, I am familiar with the term head shop.

2   Q.      I am going to define it for today's purposes as a

3           retail establishment that sells smoking devices that

4           can be put to the use of smoking marijuana, I am

5           also going to define it as a retail establishment

6           that sells gifts and paraphernalia that that can be

7           linked to the drug culture, despite being legal,

8           perfumes incense --

9

10  MR. KEYHANI:        I am sorry, despite being illegal or

11                      legal?

12

13  MR. WHITE:          Despite being legal.

14

15  BY MR. WHITE:

16  Q.      Psychedelic items, certain types of clothing, that's

17          the definition I am going to give to head shops.  Do

18          you sell your product to head shops?

19  A.      Well, I can't answer yes or no.

20

21  MR. KEYHANI:        One second.  I am going to object to

22                      that question, but you can go ahead

23                      and answer the question.  I object to

1          the definition and the relevance, but

2          you can go ahead and answer the

3          question.   Go ahead.

4

5    THE WITNESS:          Some of my accounts that I sell to

6          have the name smoke shop in them,

7          however, none of them have ever

8          referred to themselves as a head shop

9          meaning that word head shop has not

10         been used in any of the names of

11         accounts that I sell to, whether

12         somebody has an opinion or not that

13         they are head shops, it's up to them.

14         I don't go to the stores that I sell

15         to and as I know the word head shop

16         was referred to certain stores in the

17         60's and 70's that sold

18         counter-culture items such as tie-dye

19         and incense and smoking accessories

20         that you mentioned earlier in your

21         description of head shop.

22

23   BY MR. WHITE:

14

```
 1   Q.      Do you sell to any retail establishments in the city

 2           of Los Angeles, California?

 3   A.      Yes I do.

 4   Q.      Do you have a list of those off the top of your

 5           head?

 6

 7   MR. KEYHANI:            No pun intended.

 8

 9   THE WITNESS:            No, I do not.

10

11   BY MR. WHITE:

12   Q.      Approximately, how many shops do you sell to in

13           L.A.?

14   A.      Approximately, I can't tell you -- I couldn't tell

15           you off the top of my head.

16   Q.      Was it more than five, more than ten, more than two?

17   A.      Probably between ten and twelve.

18   Q.      Now is back to the products that you sell, are all

19           of them related to smoking something?

20   A.      No, they are not.

21   Q.      What besides things that can be used to smoke do you

22           sell?

23   A.      Well, for instance, I sell spice mills which are
```

**WENDY ROYCE McCANN - COURT REPORTER**

```
 1        objects that are used to shred herbal material and

 2        other spices that you can be used for aroma therapy

 3        and smoking.  I sell storage containers, air tight

 4        and water tight storage containers to maintain the

 5        freshness of various spices and herbs as well as

 6        pocket size key chain type containers that you can

 7        use to put medicine and vitamins and medication

 8        inside, so you have it with you when you travel.

 9   Q.   Okay, now last year, I am talking about calendar

10        year -- by the way, do you do your accounting on a

11        fiscal or calendar year basis?

12   A.   I am not sure.  I don't handle the books.

13   Q.   Well, do you file your income taxes, do you close

14        your books and file income taxes after December or

15        do you do it at some other time?

16

17   MR. KEYHANI:          Objection to form.

18

19   MR. WHITE:            Go ahead, answer the question.

20

21   MR. KEYHANI:          Answer the question.

22

23   THE WITNESS:          You would like to me to answer the
```

1           question?

2

3   MR. KEYHANI:          Yes, you can answer the question.

4

5   THE WITNESS:          Again, I don't know.  I am not

6                         involved in that aspect of the

7                         company.

8

9   BY MR. WHITE:

10  Q.      Last year in the 2007, talking about from January 1,

11          2007 to 12/31/07, what were your gross sales for the

12          SSP, Inc.?

13  A.      I do not recall the number offhand.

14  Q.      Well, take a stab at it for me, estimate, if you

15          recall, your gross sales?

16  A.      I would estimate approximately $225,000.

17  Q.      And can you estimate for me your gross profit on the

18          sales of $225,000?

19

20  MR. KEYHANI:          Mr. Lee, if you cannot give an

21                        accurate number, don't provide a

22                        number, we can produce records if

23                        they want, but if you can, then do

1                              so.

2

3    THE WITNESS:          I am not going to guess on that

4                          because I just don't know.   It

5                          varies, the profit varies from year

6                          to year, so I have to, I have to say,

7                          yeah, I don't know.

8

9    BY MR. WHITE:

10   Q.     Well, I want to talk about the six shooter device

11          that you have a patent for now, okay?

12   A.     Okay.

13   Q.     By the way, aside from the six shooter device, do

14          you have a patent for any other article or piece of

15          equipment?

16   A.     I have a patent pending right now.

17   Q.     What is that for?

18   A.     It's for another smoking accessory.

19   Q.     And is it similar to the six shooter or is it

20          different?

21   A.     No, it's separate, it's different.

22   Q.     So up to the time that you applied for this

23          different patent, you had only one patent, is that

```
 1          correct?
 2   A.     That's correct.
 3
 4   MR. KEYHANI:          Objection to form.  I am not quite
 5                         sure I understand the question, but
 6                         if you understand it, you can answer
 7                         it.  You referred to this patent, I
 8                         don't which patent you are referring
 9                         to.
10
11   BY MR. WHITE:
12   Q.     Other than this patent, meaning the one pending.
13          Sir, have you ever been convicted of a crime?
14   A.     No, I have not.
15   Q.     When you applied for the patent and received the
16          patent -- let me take that question back.  Did you
17          ever sell the six shooter before you had the patent
18          on it?
19   A.     Did I sell, I am sorry, say that again.
20   Q.     Did you sell the six shooter device before you
21          obtained the patent for it?
22   A.     Yes.
23   Q.     And what was the first year during which you sold
```

19

| | | |
|---|---|---|
| 1 | | the patent, I am sorry, you sold the six shooter |
| 2 | | without the patent? |
| 3 | A. | Sometime in the year 2000. |
| 4 | Q. | Last year what portion of your approximately |
| 5 | | $225,000 sales was comprised of selling the six |
| 6 | | shooter device for which you have the patent? |
| 7 | A. | Let me see. |
| 8 | Q. | Before you answer that question, let me pose a |
| 9 | | different question.  Do you keep a breakdown in your |
| 10 | | accounting records of what you sell? |
| 11 | A. | Yes, I do. |
| 12 | Q. | So do you have records today that relate to the |
| 13 | | number of six shooters that you have sold since you |
| 14 | | have sold them? |
| 15 | A. | Yes, I do. |
| 16 | Q. | A breakdown year by year, is that how it's |
| 17 | | maintained? |
| 18 | A. | Yes, I do.  That's how it is maintained.  I also |
| 19 | | want to hopefully make you realize the fact that |
| 20 | | people come to me specifically as the six shooter |
| 21 | | guy knowing that I am the originator.  I make the |
| 22 | | six shooter and people don't just buy the six |
| 23 | | shooter from me, they buy the six shooter from me |

**WENDY ROYCE McCANN - COURT REPORTER**

1          and then they place orders for other merchandise in

2          the catalogs that sometimes others offer, as well,

3          so if I lose sales from the six shooter because

4          somebody is knocking it off, then I lose sales from

5          other items that they would normally buy from me

6          that other people who are selling the knockoffs sell

7          as well, so it doesn't just hurt my business by them

8          not buying the six shooter, I also lose the whole

9          sale of other merchandise that they would buy as

10         well.

11   Q.    It's vertical and horizontal.  So the six shooters

12         that you had sold last year, can you estimate the

13         percentage of your product line 25 different

14         products, how much of it is the six shooter product?

15

16   MR. KEYHANI:          Objection to form.  You can answer

17                         the question.

18

19   THE WITNESS:          I don't recall offhand how many.

20                         It's a nice percentage of them.  I

21                         just don't know, I don't have a

22                         number for you.  I am sorry, I didn't

23                         understand what you meant regarding

1                        vertical and horizontal.

2

3   BY MR. WHITE:

4   Q.     Well, vertical would be loss of the revenue

5          associated with six shooters because somebody is

6          "knocking it off" as you used the phrase, okay,

7          horizontal would be loss of applied revenue from

8          other products that you sell because people are

9          there because you are the six shooter guy, that's

10         the reference to vertical and horizontal, do you

11         understand?

12  A.     Yes, I understand.

13  Q.     Okay, good.  Now when you obtain the patent for the

14         six shooter device, did there ever come, after you

15         obtained the patent for the six shooter device, did

16         there ever come a time when the sale of a non six

17         shooter like item was brought to your attention?

18

19  MR. KEYHANI:              Objection to form.  You can answer

20                            the question, Jake.

21

22  THE WITNESS:              Yes.

23

BY MR. WHITE:

Q.     And how was it first brought to your attention?

A.     I was doing a trade show in Vegas called the ASD
       show and I am not sure what the ASD stands for, but
       it's the largest merchandise show in the world.   It
       was in March of 2003 and I had a booth there and one
       of my customers walked up to my booth and said
       there's a guy a few rows up selling your identical
       pipe and I said really.   And when I do these shows,
       I have in my suitcase, I always keep in a manilla
       folder a copy of my patent, the front page of it in
       there, just because.   So I took a walk, I left one
       of my salesman at the booth and I took a walk with
       one of my associates from England who was there
       helping me run the booth.   We found the guy which
       happened to be Rajesh Shah who owns Accessories by
       Peak and right there on the table was an exact
       replica of my pipe, so I introduced myself and I
       opened up my manilla folder and I showed him the
       patent and I said, I just want you to know, I am
       Jake, this is my name right here, this is from the
       United States of America and this number right here
       means that I own the rights to this pipe that you

23

1      are selling the knockoff of and I showed him the

2      illustration on the patent and I said you cannot

3      sell these.  And he looked at me and he said okay.

4  Q.  Is that the only word he uttered to you that day?

5  A.  That was the only word that he uttered.

6  Q.  And what did you do after he said okay?

7  A.  What did I do after he said okay -- um, I took the

8      replica off the table and I walked away with it.

9  Q.  Whose table, Rajesh Shah's table?

10 A.  Yes.

11 Q.  How many did he have displayed on this replica you

12     are claiming, from now on we are going to use the

13     word replica to imply it's the knockoff six shooter,

14     all right?

15 A.  Right.

16 Q.  How many replicas did he have on the table?

17 A.  I only remember seeing one replica.

18 Q.  And you took it?

19 A.  I took it because I didn't want him to keep selling

20     the item.  I didn't want my customers being confused

21     when I had my original authorized pipe for sale at

22     the show to take orders.

23 Q.  Once you walked away, did you ever go back to his

**WENDY ROYCE McCANN - COURT REPORTER**

| | |
|---|---|
| 1 | booth again during that show? |
| 2 | A. I had my associate from England named Robert McCloud |
| 3 | walk by several times throughout the process of the |
| 4 | show to see if he had put another one out there. |
| 5 | Q. Did you ever talk to Mr. McCloud about what he saw? |
| 6 | A. Yes. |
| 7 | Q. What did Mr. McCloud tell you, if anything, about |
| 8 | Rajesh Shah's activity after you deprived him of the |
| 9 | replica? |
| 10 | A. He told me that he had not seen it replaced with |
| 11 | another one. |
| 12 | Q. Now when you had this experience with Mr. Shah, did |
| 13 | you make note of who he was, meaning did you take |
| 14 | his address and phone number down or not? |
| 15 | A. I took a business card, yes, did I. |
| 16 | Q. And after that day in Las Vegas, did you ever |
| 17 | contract Mr. Shah and/or Accessories by Peak? |
| 18 | A. Yes, I did. |
| 19 | Q. Did you ever do a phantom shopping with Mr. Shah? |
| 20 | |
| 21 | MR. KEYHANI:          Objection.  Objection to the term |
| 22 | phantom shopping. |
| 23 | |

**WENDY ROYCE McCANN - COURT REPORTER**

1  BY MR. WHITE:

2  Q.  Do you know what a phantom shopping is, sir?

3  A.  No, I do not.

4  Q.  Where you pretend to be a customer when you are not

5      really a customer, but you want to find something

6      out about the merchant, that's a phantom shopper?

7  A.  Yes, I did.

8  Q.  You did do a phantom shopping?

9  A.  Yes, I did.

10 Q.  When was the first time you did it?

11 A.  The first time I did a phantom shopping was, I

12     believe, January 4th of 2007.

13 Q.  Was this prompted by the happening of anything?

14 A.  Yes.

15 Q.  What prompted the phantom shopping on January 4,

16     2007?

17 A.  Well, around Christmastime of 2006 while I was

18     making sales calls to the East coast, I had spoken

19     to the owner of one of my shops that used to readily

20     buy merchandise from me and I had asked him why the

21     sales have almost gone from $6,800 a year to zero

22     and he replied well I have been buying the knockoff

23     from a guy locally here and I asked him if he would

**WENDY ROYCE McCANN - COURT REPORTER**

1      be willing to share with me who the guy was and he

2      replied it was Accessories by Peak.

3   Q.   And who was this person in Christmas of 2006 that

4      you spoke with?

5   A.   He was one of the owners of Village Cadeau, I am not

6      sure, C-a-d-e-a-u.

7   Q.   Like French for cake, right?  Do you understand that

8      to mean cake in French?

9   A.   Cake?

10  Q.   Yes, cadeau?

11  A.   Yes, I didn't know that, I am sorry, I don't speak

12     French.

13  Q.   Okay, fine.  Well, that's doesn't matter.  One of

14     the owners of Village Cadeau said he was buying from

15     Accessories by Peak?

16  A.   That's correct.

17  Q.   So this was what prompted your phantom shopping in

18     January of 2007, correct?

19  A.   That's correct.

20  Q.   How did you conduct the phantom shopping?

21  A.   I had a brother of mine call up a Accessories by

22     Peak and asked them if they had a pipe called the

23     six shooter pipe and they replied that they did and

1       I had him place an order for five of them and I had

2       them shipped to my father's battery store in Los

3       Angeles COD and he sent me five of the replicas and

4       he even put on the invoice six shooter pipes.

5 Q.    Did anyone -- strike that.  Do you know who your

6       brother spoke to you in making this telephone order

7       in January of 2007?

8 A.    I do not know who he spoke to.

9 Q.    Female, male, any idea of the identity?

10 A.    I don't know.

11 Q.    After you received the -- was that the only occasion

12       after the ASD show in Las Vegas that you phoned

13       Accessories by Peak or caused someone else to phone

14       Accessories by Peak?

15 A.    No sir.

16 Q.    When did you do it prior to then?

17 A.    Approximately at the beginning of the year, 2004, I

18       sent Mr. Shah an e-mail notifying him that I had

19       received word from a confidential client of mine

20       that he was still engaging in the sale of my

21       patented pipe and that I put in the e-mail that he

22       had agreed at the ASD show to stop selling them and

23       that's he is not abiding by his word and that I

28

1           would seek legal action if he did not stop.

2   Q.      And did you sir use your company or personal e-mail

3           to send that letter or send that e-communication?

4

5   MR. KEYHANI:              Objection to form.  Can you restate

6                            the question.

7

8   BY MR. WHITE:

9   Q.      Did you use company or a personal e-mail site to

10          send that communication to Mr. Shah?

11  A.      The e-mail address that I used was

12          infoatsixshooterpipes.com.

13  Q.      Did you print out the e-mail before or after you

14          sent it to Accessories by Peak?

15  A.      No, I did not.

16  Q.      Do you have a copy of it today?

17  A.      I do have a copy of it, yes.

18  Q.      My question was did you print it out before or after

19          you sent it to Accessories by Peak?

20  A.      Oh, I am sorry, I didn't understand the question.  I

21          printed it out afterwards.

22  Q.      Okay.  How long afterwards after sending it did you

23          print it out?

**WENDY ROYCE McCANN - COURT REPORTER**

29

1   A.      I don't recall.  I don't recall.

2   Q.      Was it a matter of days, weeks, months or years?

3   A.      Probably a couple of months.

4   Q.      Did you save that electronically anywhere?

5   A.      Yes, it's in my hard drive still.  I don't throw --

6           I don't erase any of my outgoing e-mails.

7   Q.      Now when you e-mail it to an address, to what

8           address did you send it?

9   A.      I don't know offhand, but it's -- I -- my attorney

10          should have a copy of the actual e-mail that was

11          sent, so it's on, it should be on the e-mail, the

12          printout.

13

14  MR. KEYHANI:            I don't have it on me, but it was one

15                          of the exhibits at Rajesh Shah's

16                          deposition.

17

18  MR. WHITE:              We are a little handicapped today

19                          because we don't have the ability to

20                          mark an exhibit and have you look at

21                          it, that will be ten years from now

22                          when we will be doing that.

23

**WENDY ROYCE McCANN - COURT REPORTER**

1  MR. KEYHANI:              You can read the e-mail address.

2

3  BY MR. WHITE:

4  Q.    It will be ten years from now --

5  A.    Yeah.

6  Q.    But anyway in the meantime while I look for it,

7        there was a time then after you e-mailed him that

8        you made the phantom shopping, right?

9  A.    That's correct.

10 Q.    Now after you did the phantom shopping and he sent

11       you five replicas, what did you do about this sale?

12 A.    I started seeking legal advice immediately to take

13       on the case to go after him.

14 Q.    And do you know if on your behalf an attorney

15       contacted Mr. Shah?

16 A.    You mean a lawyer representing me?

17 Q.    Yes sir.

18 A.    I am not sure how the process went, but I believe

19       Mr. Shah was served by my attorney who is

20       representing me.  Now I believe that was the only

21       contact that occurred.

22 Q.    Meaning the institution of a lawsuit?

23 A.    Correct.

1   Q.   Not a cease and desist letter from the lawyer?

2   A.   No.

3   Q.   Now all throughout this period of time, namely from

4        the time that you obtained the patent through today,

5        have you continued to sell the six shooter like

6        device?

7   A.   Yes, I have.

8   Q.   Now have you ever observed the six shooter device

9        being used by a customer?

10  A.   Yes, I have.

11  Q.   Where have you seen that?

12  A.   I have seen that by myself and by a customer, I am

13       sorry, not a customer, I have not seen it be used by

14       a customer.  I have seen it used by myself and

15       various friends of mine.

16  Q.   Are you in a car today or what's that noise, is that

17       a car?

18  A.   No.

19  Q.   Sounds like you are at a gas station.  Now so have

20       you taken any other action besides the instant

21       action namely against Accessories·by Peak and/or

22       Rajesh Shah to enforce your patent?

23  A.   I am sorry, can you repeat the question?

1   Q.   Yes sir, have you taken any other action besides

2       this lawsuit against Accessories by Peak and/or

3       Rajesh Shah to enforce your patent?

4   A.   The only action that I have done was to verbally ask

5       him to stop in March of 2003 at the ASD show and

6       through my e-mail which was my version of a cease

7       and desist order.

8   Q.   Okay, but listen to my question, I was interested in

9       whether you have taken any other actions?

10   A.   Oh, other actions, no I have not.

11   Q.   To enforce your patent? Eg: Brought claims against

12       any other person, written cease and desist letters

13       against any other person, had contact with any other

14       entity that you accuse of making replicas of your

15       six shooter device?

16   A.   Not that I can recall.

17   Q.   Are you aware that your six shooter replica is being

18       sold on the internet?

19   A.   Yes, I am aware of that.

20   Q.   How are you aware of that?

21   A.   Occasionally I do a google search to monitor who,

22       what and where is selling my pipe.

23   Q.   And have you observed any other persons selling

1        replicas of your pipe?

2  A.    It's hard for me to determine if they are in fact

3        replicas or not strictly from a picture on the

4        internet since it's so easy for someone these days

5        to copy a picture of the original, put it on their

6        site and then actually be selling a replica of the

7        unit.

8  Q.    Well, except sir, that you know who you sell to,

9        isn't that right?

10  A.    I am sorry.

11  Q.    You know who you sell to?

12  A.    Yes, I know who I sell to.

13  Q.    So if a seller of a six shooter device is not a

14        seller that you are familiar with, is that not an

15        indication to you that the item is a replica?

16  A.    It's very hard to determine, because I have three

17        authorized distributors that I sell my unit to and I

18        can't keep track of who they sell the authorized

19        items to, whether they sell it online or they have

20        stores that they sell to.

21  Q.    Who are your authorized distributors?

22  A.    My authorized distributors are, I have one in

23        England, his name is Robert McCloud, who I mentioned

|     |     |     |
| --- | --- | --- |
| 1   |     | earlier.  I have another one on the East coast named |
| 2   |     | Garden State Mall and Dr. Greens in California. |
| 3   | Q.  | Dr. Who? |
| 4   | A.  | Greens. |
| 5   | Q.  | Greens like G-r-e-e-n-s? |
| 6   | A.  | Yes. |
| 7   | Q.  | And is that a medical doctor or chiropractor, a |
| 8   |     | psychiatrist or PhD? |
| 9   | A.  | It's a gentleman by the name of Matt Greens and he |
| 10  |     | makes a pipe cleaner.  He's not a doctor, it's just |
| 11  |     | the name of his company. |
| 12  | Q.  | Dr. Greens.  So how was Mr. Shah, explain to me how |
| 13  |     | is Mr. Shah to know, if you are claiming that you |
| 14  |     | lost revenue because of this replica sold my |
| 15  |     | Mr. Shah, how is Mr. Shah to figure out what profits |
| 16  |     | you claim to lose? |
| 17  |     |     |
| 18  | MR. KEYHANI: | Objection to the form of the |
| 19  |     | question.  If you can understand the |
| 20  |     | question, Mr. Lee, you can answer. |
| 21  |     | It's a very convoluted question. |
| 22  |     |     |
| 23  | MR. WHITE: | Thanks for the compliment.  Go ahead, |

1              answer it sir if you can understand

2              it.

3

4    THE WITNESS:        I do not expect Mr. Shah to

5              understand the impact that he has on

6              the sales of my other products when

7              he is not involved with my

8              bookkeeping.

9

10   BY MR. WHITE:

11   Q.   Well, but --

12   A.   But anybody with a brain could understand that

13        somebody with a company called six shooter pipes who

14        has a patent called the six shooter pipe who shows

15        the patent, that's obviously somebody that names the

16        company off of their patented pipe would mean that

17        that pipe is their bread and butter and that is what

18        attracts people to come shop with them.

19   Q.   Well okay.  I guess I can pose the question a

20        different way.

21   A.   Okay, please.

22   Q.   You have brought a lawsuit against Mr. Shah and

23        claimed that as a result of his activities selling

1          the replica, you have lost money?

2    A.    Correct.

3    Q.    How is anyone to know how much money you lost?

4    A.    Well --

5

6    MR. KEYHANI:          Well, wait one second.  I object to

7                         the question to the extent that the

8                         question asks for some kind of a

9                         legal conclusion regarding damages.

10                        If you can answer, to the extent that

11                        you can answer the question as a

12                        layperson, you can go ahead, Mr. Lee.

13

14   THE WITNESS:         Well, when I do a report on the one

15                        store that notifies me that they were

16                        buying the replicas from Mr. Shah and

17                        I look at the gross sales from 2003

18                        being approximately $6,800 of which

19                        approximately one third of this

20                        $6,800 hundred was revenues sold

21                        through six shooter pipes and I see

22                        in '04, the number was $6,200 in

23                        gross sales and again the amount that

**WENDY ROYCE McCANN - COURT REPORTER**

1              reflects the six shooter pipe sales
2              was one third and then in 2005 and
3              2006, the number went to zero which
4              means no sales of anything
5              whatsoever, then from a business
6              perspective, I can look at that and
7              go yeah, of course the guy came to me
8              to buy six shooters and placed sales
9              for other items and now he's not
10             buying the six shooters from me, well
11             that's enough proof right there to go
12             hey, not selling the six shooters to
13             this guy has effected all this other
14             business that I previously sold and
15             did with this guy.  That makes sense,
16             right?

17

18   BY MR. WHITE:

19   Q.     Now --

20   A.     No?

21   Q.     I can't answer that.  Did you have a study done of

22          the losses, at least on paper that you suffered as a

23          result of the six shooter sales, the replica sales

1          by Mr. Shah?

2

3    MR. KEYHANI:              I object to this question to the

4                             extent it involves any kind of

5                             communications that you have had with

6                             me, Mr. Lee, regarding damages that

7                             you sustained in this case.  If you

8                             have done something independent of

9                             our conversations, you can testify to

10                            that, Mr. Lee.

11

12   THE WITNESS:             No, I have not.

13

14   BY MR. WHITE:

15   Q.     Sir, did you receive a request to answer certain

16          questions from your attorney?

17   A.     I need you to elaborate on that.  Regarding what?

18   Q.     Regarding your lawsuit that Accessories by Peak

19          served demands on you to provide information to

20          Peak's attorneys?

21   A.     There was a deposition, yes.  I answered questions

22          that I was able to answer and I had them notarized

23          and I sent them to my attorney, yes.

39

1   Q.      We are going to go back a step.  I will mark this as

2           an exhibit today and we will send it out to him and

3           ask him -- I am going to have an exhibit marked and

4           it's a printout of an internet web site where

5           apparently six shooter replicas are being sold and

6           it's going to be marked today and then in a letter

7           to you we will say --

8

9   MR. WHITE:            Well, let's mark it.

10

11                        (Whereupon, Internet document re: Six

12                        shooter pipe was then marked Exhibit

13                        12 for identification.)

14

15  BY MR. WHITE:

16  Q.      We have marked Exhibit 12 and I will give a copy to

17          your lawyer before he leaves.  It's a web site

18          called alibaba.com.  Is alibaba.com a customer of

19          yours?

20  A.      No, they are not.

21  Q.      Do you know whether their sale of a six shooter pipe

22          which they identify as quote six shooter pipe is

23          authorized or unauthorized?

**WENDY ROYCE McCANN - COURT REPORTER**

1   A.      I would have to say that it's unauthorized.

2   Q.      Well, I will send this to you.  We'll do it by

3           interrogatories.  I will ask you to look at it and

4           satisfy yourself that this is either a bonafide sale

5           or what we call legally an ultra vires sale, you

6           know, a fake sale, all right?

7   A.      Okay.

8   Q.      The second thing we are going to mark today is

9           interrogatories of the defendant to you.

10

11  MR. WHITE:              Mark that, please.

12

13                         (Whereupon, Interrogatories were then

14                         marked Exhibit 13 for

15                         identification.)

16

17  THE WITNESS:           It would be safe to say that any six

18                         shooter pipe that is not made in the

19                         United States would be a replica.

20

21  BY MR. WHITE:

22  Q.      And again, you are giving us your best guess without

23          seeing the thing, it's a little unfair to you, but

41

1          --

2

3   MR. KEYHANI:          I would hold your responses until

4                        after you see it and you can put your

5                        responses in an interrogatory after

6                        you take a look at it, okay?

7

8   THE WITNESS:          Right.

9

10  BY MR. WHITE:

11  Q.    Do you have any reason to believe that a six -- let

12        me just take a step back, so all the six shooter

13        pipes that you have sold since day one are made in

14        the United States of America?

15  A.    Correct.

16  Q.    And do you have any reason to believe it would be

17        commercially feasible for someone to take your six

18        shooter pipe, export it to a different country and

19        then sell it, meaning your genuine six shooter, send

20        it to another country and then sell it?

21

22  MR. KEYHANI:          Objection.  That's a hypothetical

23                        question.

42

1   MR. WHITE:              It is, very hypothetical.

2

3   MR. KEYHANI:            If you want to answer it, you can

4                          answer, but I object to it.  You can

5                          go ahead and answer.

6

7   THE WITNESS:           Can you repeat the question?

8

9   BY MR. WHITE:

10  Q.    Would it be commercially feasible for any person to

11        export your America made six shooter to another

12        country and then sell it?

13  A.    Sure.

14  Q.    To what countries do you export your six shooters?

15  A.    I export six shooters to London and they in turn

16        distribute across Europe and then I get smaller

17        orders from Tokyo, Japan, you know, people in places

18        that appreciate quality manufacturing and want the

19        original.

20  Q.    Okay, now I am going to point to these

21        interrogatories that have been marked 13, they will

22        be sent to you, I told your lawyer sir that we are

23        probably going to be going at this at most for

1        another ten or fifteen minutes, okay?

2   A.    Okay.

3   Q.    And then you are going to go about your business.

4   A.    I will probably have lunch.  It's about lunchtime

5        here.

6

7   MR. KEYHANI:          That sounds nice.

8

9   THE WITNESS:          What?

10

11  MR. KEYHANI:          That sounds nice.

12

13  MR. WHITE:            Mark this, please.

14

15                       (Whereupon, Plaintiff's Responses to

16                       Defendant's First Set of

17                       Interrogatories was then marked

18                       Exhibit 14 for identification.)

19

20  BY MR. WHITE:

21  Q.    Sir, again you are not here, but we are having a

22        document marked number 14, it's your Plaintiff's

23        Responses to Defendant Shah's First Set of

1        Interrogatories meaning, what I referred to earlier,

2        when I said that you were sent a bunch of questions,

3        that was the interrogatories and your replies are

4        apparently set forth in this number 14 which are

5        your responses, okay, so I will refer to the

6        questions and your responses, it states in

7        interrogatory one that you and your counsel answered

8        the interrogatories?

9  A.     Okay.

10

11  MR. WHITE:         Just a minute.  We are going to take

12                   a break, a two minute break.

13

14                   (Whereupon, a short recess was then

15                   taken.)

16

17  BY MR. WHITE:

18  Q.     Now as to this interrogatory number 5, this is on

19        page 5 of 12 of Exhibit 14 and your answer contains

20        the following reference, e-mails, that's plural

21        e-mails, was it one or more than one e-mail that you

22        sent to Shah to stop doing the replica work?

23

1    MR. KEYHANI:            Could you please read the question

2                           number 5 to him and then he can

3                           reference the question.

4

5    BY MR. WHITE:

6    Q.      Did you send one or more e-mails to Mr. Shah?

7

8    MR. KEYHANI:            Objection to form.  You can answer

9                           the question if you want to.  I mean,

10                          you can answer the question if you

11                          can.

12

13   THE WITNESS:            From my recollection, I had only sent

14                          one e-mail which I provided as well

15                          as I disclosed.

16

17   BY MR. WHITE:

18   Q.      Okay.  Now in interrogatory number 12, here's the

19           question, state the amount of sales of six shooters

20           which the Plaintiff claims were lost, i.e., which

21           the Plaintiff would have made but for the ultra

22           vires acts of the defendants, as the result of acts

23           and/or omissions of the defendants in piece quantity

1       for the entire term of the period over which

2       Plaintiff claims the defendant made ultra vires

3       sales and state the time period. (Example 1,000 six

4       shooters over 23 months) and after on objection was

5       made to that question by your attorney, the answer

6       came like this, Plaintiff, you, Jake Lee, will

7       obtain information through the course of discovery

8       that will be analyzed by an economic expert to

9       calculate damages for the defendant's unlawful acts.

10      Did you understand what I was after, the amount of

11      sales of six shooters which were lost in that

12      interrogatory?  That's a question, Mr. Lee.

13  A.    No, I did not.

14  Q.    In interrogatory 13 I asked you the following

15      question, state the profits lost as a result of the

16      defendant's alleged ultra vires acts and/or

17      omissions and the method employed by reaching those

18      conclusions.

19  A.    Are you referring to profits/loss from sales of all

20      my merchandise that I sell along with the six

21      shooter pipe or just the six shooter pipe?

22  Q.    Hey, I will take it any way I can get it.  And what

23      I am implying by saying that, show me where you

```
1          provided that information, if ever?
2   A.     I believe that I have supplied the numbers for one
3          store on the East coast of many that I have sold to
4          from 2003 until the present during this conversation
5          that we have had regarding the numbers of the gross
6          sales that went from $6,800 to $6,200 to zero to
7          zero to zero to 940 some dollars in gross sales from
8          the one store in New York that notified me they were
9          buying knockoffs or sorry, the replicas from
10         Mr. Shah.
11
12  MR. KEYHANI:          We can produce his sales records, but
13                        calculations of loss profits is
14                        something that an expert has to do.
15                        That's not something that his
16                        accounting sales will produce.  We
17                        can produce our sales records, that's
18                        not a problem.
19
20  MR. WHITE:            Later I will make a point of that.
21
22  BY MR. WHITE:
23  Q.     I also asked in Interrogatory 14, the period of time
```

1    over which you claim sales diminished as a result of

2    replica six shooters being sold by Shah and

3    Accessories by Peak and the answer came you didn't

4    know, analyzed by economic expert, but well do you

5    know what periods of time it was over which the

6    replica six shooters effected your sales, the years,

7    the time periods, the months?

8  A.    Well sure, from March 2003 until the time Mr. Shah

9    was either served with a lawsuit or realized that a

10   phantom sale had occurred, throughout that whole

11   period, knockoffs were being sold of my patented

12   pipe.

13 Q.    By the way, after the lawsuit was commenced, did you

14   experience any knockoffs or so-called replica sales

15   that effected your business that you know of?

16 A.    No, as a matter of fact, I believe my sales started

17   to increase, once the lawsuit was served on

18   Mr. Shah.   I know for a fact I started getting sales

19   from Village Cadeau.

20 Q.    Okay, now I ask you in interrogatory 16 the number

21   of customers to whom you were selling the six

22   shooters was -- strike that.   I asked you if you

23   know how many customers Rajesh Shah sold six

1      shooters to and you say that that will be obtained

2      later.  Do you have any information about that

3      today?

4  A.    I don't know for certain myself as to how many, but

5      I am sure my lawyer might have some information

6      regarding that.  I also don't know to which extent

7      Mr. Shah was upfront, honest and sincere regarding

8      the actual invoices that he submitted that actually

9      showed or reflected the sale of the six shooters

10     pipe, so --

11  Q.    Now let's talk a little bit about pricing and then I

12      will let you go.  The six shooter that you have

13      sold, since you sold it, has it changed its price?

14  A.    Yes.

15  Q.    How many times has it changed its price?

16  A.    It has gone up in price approximately three times.

17  Q.    What were the prices that you have sold the six

18      shooters at?

19  A.    $20, $22 and $23.  That's the wholesale price, by

20      the way.

21  Q.    That's wholesale?

22  A.    Yes.

23  Q.    Now are you familiar with the manner in which your

50

1      six shooter pipe is sold by retailers, meaning the

2      type of markup?

3  A.   I don't know what you mean by manner?

4  Q.   Markup.

5  A.   The markup, retail stores normally mark it up 100

6      percent, so they probably sell it for $40 and

7      higher.

8  Q.   Do you have any information about how much Mr. Shah

9      was selling the replica six shooter for?

10 A.   He was selling them for approximately $13 which is

11     how much it cost me to manufacture them in the

12     United States with quality materials and

13     workmanship.

14

15 MR. WHITE:          I don't have any further questions,

16                     sir.   Thank you.

17

18                     (Whereupon, proceedings concluded.)

19

20

21

22

23

1

2

### CERTIFICATE OF REPORTER

4

5   I, **WENDY ROYCE McCANN**, hereby certify that I did report in

6   machine shorthand the foregoing proceeding had in the

7   above-entitled matter, at the time and place hereinbefore

8   set forth; I do further certify that the transcript

9   consisting of 50 pages, is a true and correct transcript of

10  my said stenographic notes.

11

12

13

14   *Wendy Royce McCann*

15   WENDY ROYCE/McCANN

16

17

18

19

20

21

22

23

## $

$13 [1] - 50:10
$20 [1] - 49:19
$22 [1] - 49:19
$225,000 [3] -
16:16, 16:18, 19:5
$23 [1] - 49:19
$40 [1] - 50:6
$6,200 [2] - 36:22,
47:6
$6,800 [4] - 25:21,
36:18, 36:20, 47:6

'

'04 [1] - 36:22

## 0

07-CV.0338C(SR
[1] - 1:6

## 1

1 [1] - 16:10
1,000 [1] - 46:3
100 [1] - 50:5
10017 [1] - 2:3
12 [5] - 3:3, 39:13,
39:16, 44:19, 45:18
12/31/07 [1] - 16:11
13 [4] - 3:4, 40:14,
42:21, 46:14
14 [6] - 3:5, 43:18,
43:22, 44:4, 44:19,
47:23
14221 [1] - 2:6
16 [2] - 1:15, 48:20
1999 [1] - 6:21

## 2

2000 [1] - 19:3
2003 [5] - 22:6,
32:5, 36:17, 47:4,
48:8
2004 [1] - 27:17
2005 [2] - 6:10,
37:2

2006 [3] - 25:17,
26:3, 37:3
2007 [6] - 16:10,
16:11, 25:12, 25:16,
26:18, 27:7
2008 [1] - 1:15
23 [1] - 46:4
25 [2] - 11:13,
20:13
2:00 [1] - 1:16

## 3

330 [1] - 2:2
38 [1] - 5:12
39 [1] - 3:3

## 4

4 [1] - 25:15
40 [1] - 3:4
43 [1] - 3:5
4th [1] - 25:12

## 5

5 [3] - 44:18, 44:19,
45:2
50 [1] - 51:9
5662 [2] - 1:14, 2:5

## 6

60's [1] - 13:17
6th [1] - 2:2

## 7

70's [1] - 13:17
7911 [1] - 4:20

## 8

800 [1] - 9:5

## 9

90046 [1] - 4:22
940 [1] - 47:7

## A

abiding [1] - 27:23
ability [1] - 29:19
able [1] - 38:22
above-entitled [1]
- 51:7
absolutely [1] -
7:12
Accessories [13] -
22:16, 24:17, 26:2,
26:15, 26:21, 27:13,
27:14, 28:14, 28:19,
31:21, 32:2, 38:18,
48:3
accessories [3] -
5:18, 7:19, 13:19
ACCESSORIES [1]
- 1:7
accessory [1] -
17:18
accountant [3] -
10:13, 10:16, 11:6
accounting [3] -
15:10, 19:10, 47:16
accounts [4] -
8:16, 9:6, 13:5,
13:11
accurate [1] -
16:21
accuse [1] - 32:14
action [5] - 28:1,
31:20, 31:21, 32:1,
32:4
actions [2] - 32:9,
32:10
activities [1] -
35:23
activity [1] - 24:8
acts [4] - 45:22,
46:9, 46:16
actual [3] - 10:17,
29:10, 49:8
address [7] - 4:19,
4:20, 24:14, 28:11,
29:7, 29:8, 30:1
ads [1] - 9:2
advertisements
[1] - 8:17
advice [1] - 30:12
afterwards [2] -
28:21, 28:22
agreed [1] - 27:22

ahead [7] - 12:22,
13:2, 13:3, 15:19,
34:23, 36:12, 42:5
air [1] - 15:3
alibaba.com [3] -
3:3, 39:18
alleged [1] - 46:16
almost [1] - 25:21
America [3] -
22:22, 41:14, 42:11
American [1] -
11:16
amount [2] - 36:23,
45:19, 46:10
analyzed [2] -
46:8, 48:4
Angeles [4] - 5:1,
6:6, 14:2, 27:3
annually [1] - 11:5
Answer [1] - 15:21
answer [26] -
11:22, 12:19, 12:23,
13:2, 15:19, 15:23,
16:3, 18:6, 19:8,
20:16, 21:19, 34:20,
35:1, 36:10, 36:11,
37:21, 38:15, 38:22,
42:3, 42:4, 42:5,
44:19, 45:8, 45:10,
46:5, 48:3
answered [2] -
38:21, 44:7
anyway [1] - 30:6
APPEARANCES
[1] - 2:1
applied [3] - 17:22,
18:15, 21:7
appreciate [1] -
42:18
appropriate [1] -
9:6
aroma [1] - 15:2
article [1] - 17:14
ASD [5] - 22:3,
22:4, 27:12, 27:22,
32:5
aside [1] - 17:13
aspect [1] - 16:6
associate [1] -
24:2
associated [1] -
21:5
associates [1] -
22:14

Association [1] -
5:9
assumed [2] -
6:13, 6:15
attention [2] -
21:17, 22:2
Attorney [1] - 2:6
attorney [6] - 29:9,
30:14, 30:19, 38:16,
38:23, 46:5
Attorneys [1] - 2:3
attorneys [1] -
38:20
attracts [1] - 35:18
authorized [6] -
23:21, 33:17, 33:18,
33:21, 33:22, 39:23
Avenue [2] - 2:2,
4:21
aware [3] - 32:17,
32:19, 32:20

## B

basis [1] - 15:11
battery [1] - 27:2
beginning [1] -
27:17
behalf [1] - 30:14
best [1] - 40:22
between [2] - 4:3,
14:17
bit [1] - 49:11
bonafide [1] - 40:4
bookkeeper [1] -
9:23
bookkeeping [3] -
9:17, 10:2, 35:8
books [3] - 10:19,
15:12, 15:14
booth [5] - 22:6,
22:7, 22:13, 22:15,
24:1
born [1] - 4:23
brain [1] - 35:12
bread [1] - 35:17
break [2] - 44:12
breakdown [2] -
19:9, 19:16
brother [2] - 26:21,
27:6
Brought [1] - 32:11
brought [3] -

21:17, 22:2, 35:22
**bunch** [1] - 44:2
**business** [12] -
5:13, 5:14, 5:16,
6:19, 7:18, 7:21,
20:7, 24:15, 37:5,
37:14, 43:3, 48:15
**butter** [1] - 35:17
**buy** [6] - 19:22,
19:23, 20:5, 20:9,
25:20, 37:8
**buying** [6] - 20:8,
25:22, 26:14, 36:16,
37:10, 47:9
**BY** [27] - 1:7, 2:1,
4:16, 7:14, 12:15,
13:23, 14:11, 16:9,
17:9, 18:11, 21:3,
22:1, 25:1, 28:8,
30:3, 35:10, 37:18,
38:14, 39:15, 40:21,
41:10, 42:9, 43:20,
44:17, 45:5, 45:17,
47:22

**C**

**C-a-d-e-a-u** [1] -
26:6
**Cadeau** [3] - 26:5,
26:14, 48:19
**cadeau** [1] - 26:10
**cake** [2] - 26:7,
26:8
**Cake** [1] - 26:9
**calculate** [1] - 46:9
**calculations** [1] -
47:13
**calendar** [2] - 15:9,
15:11
**California** [6] -
4:22, 5:1, 6:6, 6:7,
14:2, 34:2
**cannot** [2] - 16:20,
23:2
**car** [2] - 31:16,
31:17
**card** [1] - 24:15
**care** [1] - 10:19
**case** [2] - 30:13,
38:7
**catalog** [3] - 6:23,
7:3, 7:10

**catalogs** [2] - 8:17,
20:2
**caused** [1] - 27:13
**cease** [3] - 31:1,
32:6, 32:12
**certain** [6] - 11:9,
11:18, 12:16, 13:16,
38:15, 49:4
**CERTIFICATE** [1] -
51:3
**certification** [1] -
4:7
**certify** [2] - 51:5,
51:8
**chain** [1] - 15:6
**changed** [2] -
49:13, 49:15
**chiropractor** [1] -
34:7
**Christmas** [1] -
26:3
**Christmastime** [1]
- 25:17
**city** [1] - 14:1
**City** [1] - 5:5
**Civil** [2] - 1:6, 1:13
**claim** [2] - 34:16,
48:1
**claimed** [1] - 35:23
**claiming** [2] -
23:12, 34:13
**claims** [3] - 32:11,
45:20, 46:2
**cleaner** [1] - 34:10
**client** [1] - 27:19
**close** [1] - 15:13
**clothing** [1] -
12:16
**co** [1] - 7:21
**co-shareholder** [1]
- 7:21
**coast** [3] - 25:18,
34:1, 47:3
**COD** [1] - 27:3
**collect** [1] - 9:8
**college** [2] - 5:3,
5:4
**College** [1] - 5:5
**commenced** [1] -
48:13
**commencing** [1] -
1:16
**commercially** [2] -
41:17, 42:10

**communication**
[2] - 28:3, 28:10
**communications**
[1] - 38:5
**company** [10] -
5:21, 5:22, 6:5,
6:17, 16:7, 28:2,
28:9, 34:11, 35:13,
35:16
**compliment** [1] -
34:23
**comprised** [1] -
19:5
**concluded** [1] -
50:18
**conclusion** [1] -
36:9
**conclusions** [1] -
46:18
**conduct** [1] - 26:20
**confidential** [1] -
27:19
**confused** [1] -
23:20
**connection** [1] -
6:22
**consisting** [1] -
51:9
**contact** [2] - 30:21,
32:13
**contacted** [1] -
30:15
**containers** [3] -
15:3, 15:4, 15:6
**contains** [1] -
44:19
**continued** [1] -
31:5
**contract** [1] -
24:17
**conversation** [1] -
47:4
**conversations** [1]
- 38:9
**convicted** [1] -
18:13
**convoluted** [1] -
34:21
**copy** [7] - 7:9,
22:11, 28:16, 28:17,
29:10, 33:5, 39:16
**Corporation** [1] -
5:23
**corporation** [2] -

6:7, 6:10
**Correct** [3] - 30:23,
36:2, 41:15
**correct** [9] - 6:8,
8:11, 18:1, 18:2,
26:16, 26:18, 26:19,
30:9, 51:9
**cost** [1] - 50:11
**counsel** [2] - 4:4,
44:7
**counter** [1] - 13:18
**counter-culture**
[1] - 13:18
**countries** [1] -
42:14
**country** [3] -
41:18, 41:20, 42:12
**couple** [1] - 29:3
**course** [2] - 37:7,
46:7
**COURT** [1] - 1:1
**CPA** [2] - 10:13,
10:17
**crime** [1] - 18:13
**culture** [2] - 12:7,
13:18
**customer** [8] -
11:14, 25:4, 25:5,
31:9, 31:12, 31:13,
31:14, 39:18
**customers** [4] -
22:7, 23:20, 48:21,
48:23

**D**

**d/b/a** [2] - 5:21,
6:13
**daily** [1] - 11:6
**damages** [3] -
36:9, 38:6, 46:9
**DARIUSH** [1] - 2:1
**days** [2] - 29:2,
33:4
**December** [1] -
15:14
**dedicated** [1] -
10:1
**defendant** [2] -
40:9, 46:2
**Defendant** [1] -
43:23
**defendant's** [2] -

46:9, 46:16
**Defendant's** [1] -
43:16
**Defendants** [2] -
1:9, 2:6
**defendants** [2] -
45:22, 45:23
**define** [2] - 12:2,
12:5
**definition** [2] -
12:17, 13:1
**demand** [2] - 7:7,
7:8
**demands** [1] -
38:19
**deposition** [2] -
29:16, 38:21
**deprived** [1] - 24:8
**description** [1] -
13:21
**design** [6] - 7:23,
8:1, 8:4, 8:5, 8:6,
8:7
**designed** [1] - 8:8
**designing** [2] -
5:16, 7:20
**desist** [3] - 31:1,
32:7, 32:12
**despite** [2] - 12:7,
12:10
**Despite** [1] - 12:13
**determine** [2] -
33:2, 33:16
**device** [10] - 17:10,
17:13, 18:20, 19:6,
21:14, 21:15, 31:6,
31:8, 32:15, 33:13
**devices** [1] - 12:3
**different** [7] -
17:20, 17:21, 17:23,
19:9, 20:13, 35:20,
41:18
**diminished** [1] -
48:1
**direct** [2] - 8:18,
9:2
**disclosed** [1] -
45:15
**discovery** [1] -
46:7
**display** [1] - 8:20
**displayed** [1] -
23:11
**distribute** [4] -

8:15, 9:3, 9:7, 42:16
distributors [3] -
33:17, 33:21, 33:22
DISTRICT [2] - 1:1,
1:2
doctor [2] - 34:7,
34:10
document [4] -
7:7, 7:8, 39:11,
43:22
dollars [1] - 47:7
done [3] - 32:4,
37:21, 38:8
down [1] - 24:14
Dr [3] - 34:2, 34:3,
34:12
drive [1] - 29:5
drop [1] - 9:8
drug [1] - 12:7
duly [1] - 4:13
during [3] - 18:23,
24:1, 47:4
dye [1] - 13:18

**E**

e-communication
[1] - 28:3
e-mail [13] - 27:18,
27:21, 28:2, 28:9,
28:11, 28:13, 29:7,
29:10, 29:11, 30:1,
32:6, 44:21, 45:14
e-mailed [1] - 30:7
e-mails [4] - 29:6,
44:20, 44:21, 45:6
East [3] - 25:18,
34:1, 47:3
easy [1] - 33:4
economic [2] -
46:8, 48:4
effected [3] -
37:13, 48:6, 48:15
Eg [1] - 32:11
either [3] - 6:22,
40:4, 48:9
elaborate [1] -
38:17
electronically [2] -
11:8, 29:4
employ [1] - 10:2
employed [3] -
5:19, 5:20, 46:17

enforce [3] - 31:22,
32:3, 32:11
engaged [1] - 11:3
engaging [1] -
27:20
England [3] -
22:14, 24:2, 33:23
entered [1] - 4:2
entire [1] - 46:1
entitled [1] - 51:7
entity [1] - 32:14
equipment [1] -
17:15
erase [1] - 29:6
ESQ [2] - 2:1, 2:5
established [1] -
6:10
establishment [2]
- 12:3, 12:5
establishments [1]
- 14:1
estimate [4] -
16:14, 16:16, 16:17,
20:12
Europe [1] - 42:16
exact [1] - 22:17
EXAMINATION
- 4:16
Examination [1] -
1:12
examined [1] -
4:14
Example [1] - 46:3
except [2] - 4:9,
33:8
exhibit [3] - 29:20,
39:2, 39:3
EXHIBIT [1] - 3:2
Exhibit [5] - 39:12,
39:16, 40:14, 43:18,
44:19
exhibits [1] - 29:15
existence [1] - 6:9
expect [1] - 35:4
experience [2] -
24:12, 48:14
expert [3] - 46:8,
47:14, 48:4
explain [1] - 34:12
export [4] - 41:18,
42:11, 42:14, 42:15
extent [4] - 36:7,
36:10, 38:4, 49:6

**F**

fact [4] - 19:19,
33:2, 48:16, 48:18
fake [1] - 40:6
familiar [4] - 11:23,
12:1, 33:14, 49:23
far [1] - 5:2
father's [1] - 27:2
feasible [2] -
41:17, 42:10
Federal [1] - 1:13
Female [1] - 27:9
few [1] - 22:8
fiancée [1] - 10:23
fifteen [1] - 43:1
figure [1] - 34:15
file [2] - 15:13,
15:14
filing [1] - 4:6
finances [1] - 11:5
fine [1] - 26:13
First [2] - 43:16,
43:23
first [5] - 4:13,
18:23, 22:2, 25:10,
25:11
fiscal [1] - 15:11
five [4] - 14:16,
27:1, 27:3, 30:11
Floor [1] - 2:2
folder [2] - 22:11,
22:19
following [3] - 4:1,
44:20, 46:14
follows [1] - 4:14
foregoing [1] -
51:6
form [9] - 4:9, 8:17,
15:17, 18:4, 20:16,
21:19, 28:5, 34:18,
45:8
formed [2] - 6:5,
6:20
forth [2] - 44:4,
51:8
French [3] - 26:7,
26:8, 26:12
freshness [1] -
15:5
friends [1] - 31:15
front [1] - 22:11
full [1] - 4:17

**G**

Garden [1] - 34:2
gas [1] - 31:19
gentleman [1] -
34:9
genuine [1] - 41:19
gift [1] - 11:15
gifts [1] - 12:6
girlfriend [1] -
10:23
google [1] - 32:21
graduate [2] - 5:6,
5:7
Greens [5] - 34:2,
34:4, 34:5, 34:9,
34:12
GREENS [1] - 34:5
gross [7] - 16:11,
16:15, 16:17, 36:17,
36:23, 47:5, 47:7
guess [4] - 10:16,
17:3, 35:19, 40:22
guy [9] - 19:21,
21:9, 22:8, 22:15,
25:23, 26:1, 37:7,
37:13, 37:15

**H**

handicapped [1] -
29:18
handle [1] - 15:12
hard [3] - 29:5,
33:2, 33:16
head [11] - 11:23,
12:1, 12:17, 12:18,
13:8, 13:9, 13:13,
13:15, 13:21, 14:5,
14:15
helping [1] - 22:15
herbal [3] - 5:18,
7:19, 15:1
herbs [1] - 15:5
hereby [2] - 4:3,
51:5
hereinbefore [1] -
51:7
hereto [1] - 4:5
higher [1] - 50:7
hold [1] - 41:3
Hollywood [1] -

4:21
home [1] - 8:7
honest [1] - 49:7
hopefully [1] -
19:19
horizontal [4] -
20:11, 21:1, 21:7,
21:10
hundred [1] -
36:20
hurt [1] - 20:7
hypothetical [2] -
41:22, 42:1

**I**

i.e [1] - 45:20
idea [1] - 27:9
identical [1] - 22:8
identification [3] -
39:13, 40:15, 43:18
identify [1] - 39:22
identity [1] - 27:9
illegal [1] - 12:10
illustration [1] -
23:2
immediately [1] -
30:12
impact [1] - 35:5
imply [1] - 23:13
implying [1] -
46:23
Inc [7] - 6:3, 6:4,
6:20, 6:23, 7:16,
11:12, 16:12
incense [2] - 12:8,
13:19
income [2] - 15:13,
15:14
increase [1] -
48:17
independent [1] -
38:8
indication [1] -
33:15
infoatsixshooter
pipes.com [1] -
28:12
information [9] -
10:4, 10:7, 11:7,
38:19, 46:7, 47:1,
49:2, 49:5, 50:8
inside [1] - 15:8

instance [1] - 14:23
instant [1] - 31:20
institution [1] - 30:22
intended [1] - 14:7
interested [1] - 32:8
internet [7] - 8:21, 8:22, 8:23, 9:1, 32:18, 33:4, 39:4
Internet [1] - 39:11
Interrogatories [5] - 3:4, 3:5, 40:13, 43:17, 44:1
interrogatories [5] - 40:3, 40:9, 42:21, 44:3, 44:8
interrogatory [7] - 41:5, 44:7, 44:18, 45:18, 46:12, 46:14, 48:20
Interrogatory [1] - 47:23
introduced [1] - 22:18
inventions [1] - 5:17
invoice [1] - 27:4
invoices [1] - 49:8
involved [2] - 16:6, 35:7
involves [1] - 38:4
item [3] - 21:17, 23:20, 33:15
items [6] - 9:9, 12:16, 13:18, 20:5, 33:19, 37:9

**J**

Jake [4] - 4:18, 21:20, 22:21, 46:6
JAKE [4] - 1:4, 1:12, 4:13, 4:18
January [5] - 16:10, 25:12, 25:15, 26:18, 27:7
Japan [1] - 42:17
Justin [1] - 1:14
JUSTIN [1] - 2:5

**K**

keep [4] - 19:9, 22:10, 23:19, 33:18
key [1] - 15:6
Keyhani [1] - 7:9
KEYHANI [28] - 2:1, 2:1, 7:12, 12:10, 12:21, 14:7, 15:17, 15:21, 16:3, 16:20, 18:4, 20:16, 21:19, 24:21, 28:5, 29:14, 30:1, 34:18, 36:6, 38:3, 41:3, 41:22, 42:3, 43:7, 43:11, 45:1, 45:8, 47:12
kind [2] - 36:8, 38:4
knocking [2] - 20:4, 21:6
knockoff [3] - 23:1, 23:13, 25:22
knockoffs [4] - 20:6, 47:9, 48:11, 48:14
knowing [1] - 19:21

**L**

L-e-e [1] - 4:18
L.A [1] - 14:13
largest [1] - 22:5
Las [2] - 24:16, 27:12
last [2] - 15:9, 20:12
Last [2] - 16:10, 19:4
Law [1] - 1:14
lawsuit [7] - 30:22, 32:2, 35:22, 38:18, 48:9, 48:13, 48:17
lawyer [5] - 30:16, 31:1, 39:17, 42:22, 49:5
layperson [1] - 36:12
least [1] - 37:22
leaves [1] - 39:17
Lee [8] - 4:18,

16:20, 34:20, 36:12, 38:6, 38:10, 46:6, 46:12
LEE [3] - 1:4, 1:12, 4:13
left [1] - 22:12
legal [6] - 12:7, 12:11, 12:13, 28:1, 30:12, 36:9
legally [1] - 40:5
letter [3] - 28:3, 31:1, 39:6
letters [1] - 32:12
liability [1] - 5:22
limited [1] - 5:21
line [1] - 20:13
linked [1] - 12:7
list [2] - 8:16, 14:4
listen [1] - 32:8
locally [1] - 25:23
located [2] - 9:13, 9:14
locations [1] - 8:2
London [1] - 42:15
look [6] - 29:20, 30:6, 36:17, 37:6, 40:3, 41:6
looked [1] - 23:3
Los [4] - 5:1, 6:6, 14:2, 27:2
lose [4] - 20:3, 20:4, 20:8, 34:16
loss [3] - 21:4, 21:7, 47:13
losses [1] - 37:22
lost [5] - 34:14, 36:1, 36:3, 45:20, 46:11, 46:15
lunch [1] - 43:4
lunchtime [1] - 43:4

**M**

M-a-c-k-e-y [1] - 10:12
machine [4] - 8:2, 8:9, 8:12, 51:6
Machinists [1] - 5:10
Mackey [3] - 10:12, 10:18, 11:7
Madison [1] - 2:2

mail [14] - 9:2, 27:18, 27:21, 28:2, 28:9, 28:11, 28:13, 29:7, 29:10, 29:11, 30:1, 32:6, 44:21, 45:14
mailed [1] - 30:7
mailing [1] - 8:18
mails [4] - 29:6, 44:20, 44:21, 45:6
Main [2] - 1:14, 2:5
maintain [2] - 11:4, 15:4
maintained [2] - 19:17, 19:18
majority [1] - 11:19
male [1] - 27:9
Mall [1] - 34:2
manilla [2] - 22:10, 22:19
manner [2] - 49:23, 50:3
manufacture [6] - 5:18, 7:23, 8:1, 8:9, 8:13, 50:11
manufactured [2] - 8:14, 9:8
manufacturing [1] - 42:18
March [3] - 22:6, 32:5, 48:8
marijuana [1] - 12:4
Mark [2] - 40:11, 43:13
mark [5] - 29:20, 39:1, 39:9, 40:8, 50:5
marked [8] - 39:3, 39:6, 39:12, 39:16, 40:14, 42:21, 43:17, 43:22
market [1] - 5:17
marketing [1] - 11:11
markup [2] - 50:2, 50:5
Markup [1] - 50:4
married [1] - 11:2
material [1] - 15:1
materials [1] - 50:12
Matt [1] - 34:9
matter [4] - 26:13,

29:2, 48:16, 51:7
McCann [3] - 1:16, 51:5, 51:14
McCloud [4] - 24:2, 24:5, 24:7, 33:23
mean [5] - 26:8, 30:16, 35:16, 45:9, 50:3
Meaning [1] - 30:22
meaning [7] - 7:19, 13:9, 18:12, 24:13, 41:19, 44:1, 50:1
means [2] - 22:23, 37:4
meant [1] - 20:23
meantime [1] - 30:6
medical [1] - 34:7
medication [1] - 15:7
medicine [1] - 15:7
mentioned [2] - 13:20, 33:23
merchandise [5] - 20:1, 20:9, 22:5, 25:20, 46:20
merchant [1] - 25:6
MEREDITH [1] - 2:1
method [1] - 46:17
might [1] - 49:5
mills [1] - 14:23
mine [2] - 26:21, 27:19, 31:15
minute [2] - 44:11, 44:12
minutes [1] - 43:1
money [2] - 36:1, 36:3
Monica [1] - 5:5
monitor [1] - 32:21
monthly [1] - 11:6
months [2] - 29:2, 29:3, 46:4, 48:7
most [1] - 42:23
MR [53] - 4:16, 7:7, 7:12, 7:14, 12:10, 12:13, 12:15, 12:21, 13:23, 14:7, 14:11, 15:17, 15:19, 15:21, 16:3, 16:9, 16:20,

17:9, 18:4, 18:11,
20:16, 21:3, 21:19,
22:1, 24:21, 25:1,
28:5, 28:8, 29:14,
29:18, 30:1, 30:3,
34:18, 34:23, 35:10,
36:6, 37:18, 38:3,
38:14, 39:9, 39:15,
40:11, 40:21, 41:3,
41:10, 41:22, 42:1,
42:3, 42:9, 43:7,
43:11, 43:13, 43:20,
44:11, 44:17, 45:1,
45:5, 45:8, 45:17,
47:12, 47:20, 47:22,
50:15

## N

name [10] - 4:17,
6:1, 6:13, 6:15,
10:11, 13:6, 22:21,
33:23, 34:9, 34:11
named [2] - 24:2,
34:1
namely [2] - 31:3,
31:21
names [2] - 13:10,
35:15
National [1] - 5:9
need [1] - 38:17
NEW [1] - 1:2
New [5] - 1:15, 2:3,
2:6, 47:8
nice [3] - 20:20,
43:7, 43:11
NO [1] - 3:2
noise [1] - 31:16
non [1] - 21:16
none [1] - 13:7
normally [2] - 20:5,
50:5
Norton [1] - 4:20
NORTON [1] - 4:21
notarized [1] -
38:22
note [2] - 7:8,
24:13
notes [1] - 51:10
notified [1] - 47:8
notifies [1] - 36:15
notifying [1] -
27:18

novelty [1] - 11:15
number [16] - 9:5,
16:13, 16:21, 16:22,
19:13, 20:22, 22:22,
24:14, 36:22, 37:3,
43:22, 44:4, 44:18,
45:2, 45:18, 48:20
numbers [2] -
47:2, 47:5

## O

oath [1] - 4:5
object [5] - 12:21,
12:23, 36:6, 38:3,
42:4
Objection [10] -
15:17, 18:4, 20:16,
21:19, 24:21, 28:5,
34:18, 41:22, 45:8
objection [1] - 46:4
objections [1] - 4:8
objects [1] - 15:1
observed [2] -
31:8, 32:23
obtain [2] - 21:13,
46:7
obtained [4] -
18:21, 21:15, 31:4,
49:1
obviously [1] -
35:15
occasion [1] -
27:11
Occasionally [1] -
32:21
occupation [1] -
5:13
occurred [2] -
30:21, 48:10
OF [2] - 1:2, 51:3
offer [1] - 20:2
offhand [3] -
16:13, 20:19, 29:9
office [3] - 8:5, 8:7,
10:6
Offices [1] - 1:14
old [1] - 5:11
omissions [2] -
45:23, 46:17
Once [1] - 23:23
once [4] - 8:8,
8:14, 9:2, 48:17

one [26] - 4:20,
17:23, 18:12, 22:6,
22:12, 22:14, 23:17,
24:4, 24:11, 25:19,
26:5, 29:14, 33:22,
34:1, 36:6, 36:14,
36:19, 37:2, 41:13,
44:7, 44:21, 45:6,
45:14, 47:2, 47:8
One [2] - 12:21,
26:13
online [1] - 33:19
opened [1] - 22:19
operating [1] -
6:11
opinion [1] - 13:12
order [3] - 27:1,
27:6, 32:7
orders [6] - 8:20,
9:5, 9:6, 20:1,
23:22, 42:17
original [3] -
23:21, 33:5, 42:19
originator [1] -
19:21
outgoing [1] - 29:6
own [1] - 22:23
owner [1] - 25:19
owners [2] - 26:5,
26:14
owns [1] - 22:16

## P

P.M [1] - 1:16
page [2] - 22:11,
44:19
PAGE [1] - 3:2
pages [1] - 51:9
paper [1] - 37:22
paraphernalia [1] -
12:6
part [2] - 10:2, 10:3
parties [1] - 4:4
partner [1] - 7:21
parts [1] - 8:3
patent [26] - 17:11,
17:14, 17:16, 17:23,
18:7, 18:8, 18:12,
18:15, 18:16, 18:17,
18:21, 19:1, 19:2,
19:6, 21:13, 21:15,
22:11, 22:20, 23:2,

31:4, 31:22, 32:3,
32:11, 35:14, 35:15
patented [3] -
27:21, 35:16, 48:11
PEAK [1] - 1:7
Peak [13] - 22:17,
24:17, 26:2, 26:15,
26:22, 27:13, 27:14,
28:14, 28:19, 31:21,
32:2, 38:18, 48:3
Peak's [1] - 38:20
pending [2] -
17:16, 18:12
people [6] - 19:20,
19:22, 20:6, 21:8,
35:18, 42:17
percent [1] - 50:6
percentage [2] -
20:13, 20:20
perfumes [1] -
12:8
period [5] - 31:3,
46:1, 46:3, 47:23,
48:11
periods [2] - 48:5,
48:7
person [6] - 5:19,
7:18, 26:3, 32:12,
32:13, 42:10
personal [2] - 28:2,
28:9
persons [1] - 32:23
perspective [1] -
37:6
phantom [12] -
24:19, 24:22, 25:2,
25:6, 25:8, 25:11,
25:15, 26:17, 26:20,
30:8, 30:10, 48:10
PhD [1] - 34:8
phone [3] - 8:18,
24:14, 27:13
phoned [1] - 27:12
phrase [1] - 21:6
picture [2] - 33:3,
33:5
piece [2] - 17:14,
45:23
pipe [25] - 3:3,
22:9, 22:18, 22:23,
23:21, 26:22, 26:23,
27:21, 32:22, 33:1,
34:10, 35:14, 35:16,
35:17, 37:1, 39:12,

39:21, 39:22, 40:18,
41:18, 46:21, 48:12,
49:10, 50:1
pipes [4] - 27:4,
35:13, 36:21, 41:13
Pipes [4] - 6:16,
6:17, 6:19, 6:22
place [2] - 5:17,
20:1, 27:1, 51:7
placed [1] - 37:8
places [1] - 42:17
Plaintiff [6] - 1:5,
2:3, 45:20, 45:21,
46:2, 46:6
Plaintiff's [3] - 3:5,
43:15, 43:22
PLLC [1] - 2:1
plural [1] - 44:20
pocket [1] - 15:6
point [2] - 42:20,
47:20
portion [1] - 19:4
pose [2] - 19:8,
35:19
possibilities [1] -
9:10
prepare [2] - 10:8,
10:9
prepares [1] -
10:10
present [3] - 4:19,
4:20, 47:4
presently [1] - 7:10
pretend [1] - 25:4
previously [1] -
37:14
price [4] - 49:13,
49:15, 49:16, 49:19
prices [1] - 49:17
pricing [1] - 49:11
print [4] - 11:5,
28:13, 28:18, 28:23
printed [1] - 28:21
printout [2] -
29:12, 39:4
problem [2] - 7:12,
47:18
Procedure [1] -
1:13
proceeding [1] -
51:6
proceedings [1] -
50:18
process [2] - 24:3,

30:18
  produce [4] -
16:22, 47:12, 47:16,
47:17
  product [4] - 8:8,
12:18, 20:13, 20:14
  products [17] -
5:16, 5:18, 6:23,
7:3, 7:20, 8:1, 8:15,
8:20, 9:2, 11:10,
11:11, 11:17, 11:21,
14:18, 20:14, 21:8,
35:6
  professional [1] -
10:21
  Professional [1] -
1:17
  profit [2] - 16:17,
17:5
  profits [3] - 34:15,
46:15, 47:13
  profits/loss [1] -
46:19
  prompted [3] -
25:13, 25:15, 26:17
  proof [1] - 37:11
  proprietorship [1]
- 6:12
  prototype [1] -
8:11
  provide [2] - 16:21,
38:19
  provided [2] -
45:14, 47:1
  Psychedelic [1] -
12:16
  psychiatrist [1] -
34:8
  pun [1] - 14:7
  purposes [1] -
12:2
  pursuant [1] - 1:13
  put [8] - 8:17, 12:4,
15:7, 24:4, 27:4,
27:21, 33:5, 41:4

Q

  quality [2] - 42:18,
50:12
  quantity [1] - 45:23
  quarter [1] - 4:20
  questions [6] -

4:10, 38:16, 38:21,
44:2, 44:6, 50:15
  Quickbooks [3] -
9:20, 11:4, 11:5
  quite [1] - 18:4
  quote [1] - 39:22

R

  RAJESH [1] - 1:7
  Rajesh [7] - 22:16,
23:9, 24:8, 29:15,
31:22, 32:3, 48:23
  re [1] - 39:11
  reaching [1] -
46:17
  read [2] - 30:1,
45:1
  readily [1] - 25:19
  realize [1] - 19:19
  realized [1] - 48:9
  really [2] - 22:9,
25:5
  reason [4] - 8:23,
9:1, 41:11, 41:16
  receive [1] - 38:15
  received [3] -
18:15, 27:11, 27:19
  recess [1] - 44:14
  recollection [1] -
45:13
  record [2] - 4:2,
7:8
  records [5] -
16:22, 19:10, 19:12,
47:12, 47:17
  refer [1] - 44:5
  Referee [1] - 4:5
  reference [3] -
21:10, 44:20, 45:3
  referred [4] - 13:8,
13:16, 18:7, 44:1
  referring [2] - 18:8,
46:19
  reflected [1] - 49:9
  reflects [1] - 37:1
  regarding [6] -
20:23, 36:9, 38:6,
47:5, 49:6, 49:7
  Regarding [2] -
38:17, 38:18
  Registered [1] -
1:17

  relate [1] - 19:12
  related [1] - 14:19
  relation [1] - 10:20
  relationship [1] -
10:21
  Relative [1] - 10:23
  relevance [1] -
13:1
  remember [1] -
23:17
  repeat [2] - 31:23,
42:7
  replaced [1] -
24:10
  replica [18] -
22:18, 23:8, 23:11,
23:13, 23:17, 24:9,
32:17, 33:6, 33:15,
34:14, 36:1, 37:23,
40:19, 44:22, 48:2,
48:6, 48:14, 50:9
  replicas [9] -
23:16, 27:3, 30:11,
32:14, 33:1, 33:3,
36:16, 39:5, 47:9
  replied [3] - 25:22,
26:2, 26:23
  replies [1] - 44:3
  report [2] - 36:14,
51:5
  Reporter [1] - 1:17
  REPORTER [1] -
51:3
  representing [2] -
30:16, 30:20
  request [1] - 38:15
  reserved [1] - 4:10
  residence [1] -
9:14
  respective [1] - 4:4
  responses [4] -
41:3, 41:5, 44:5,
44:6
  Responses [3] -
3:5, 43:15, 43:23
  restate [1] - 28:5
  result [5] - 35:23,
37:23, 45:22, 46:15,
48:1
  retail [4] - 12:3,
12:5, 14:1, 50:5
  retailers [1] - 50:1
  returns [4] - 10:8,
10:9, 10:10, 10:17

  revenue [3] - 21:4,
21:7, 34:14
  revenues [1] -
36:20
  rights [1] - 22:23
  Robert [2] - 24:2,
33:23
  rows [1] - 22:8
  ROYCE [2] - 51:5,
51:14
  Royce [1] - 1:16
  Rules [1] - 1:13
  run [2] - 9:21,
22:15
  runs [1] - 9:21

S

  safe [1] - 40:17
  sale [13] - 7:20,
11:17, 20:9, 21:16,
23:21, 27:20, 30:11,
39:21, 40:4, 40:5,
40:6, 48:10, 49:9
  sales [30] - 16:11,
16:15, 16:18, 19:5,
20:3, 20:4, 25:18,
25:21, 35:6, 36:17,
36:23, 37:1, 37:4,
37:8, 37:23, 45:19,
46:3, 46:11, 46:19,
47:6, 47:7, 47:12,
47:16, 47:17, 48:1,
48:6, 48:14, 48:16,
48:18
  salesman [2] -
8:18, 22:13
  salesmen [1] - 9:3
  Santa [1] - 5:5
  satisfy [1] - 40:4
  save [1] - 29:4
  saw [1] - 24:5
  school [3] - 5:2,
5:3, 5:8
  search [1] - 32:21
  second [3] - 12:21,
36:6, 40:8
  see [4] - 19:7, 24:4,
36:21, 41:4
  seeing [2] - 23:17,
40:23
  seek [1] - 28:1
  seeking [1] - 30:12

  self [1] - 5:20
  self-employed [1]
- 5:20
  sell [32] - 7:4, 8:9,
12:18, 13:5, 13:11,
13:14, 14:1, 14:12,
14:18, 14:22, 14:23,
15:3, 18:17, 18:19,
18:20, 19:10, 20:6,
21:8, 23:3, 31:5,
33:8, 33:11, 33:12,
33:17, 33:18, 33:19,
33:20, 41:19, 41:20,
42:12, 46:20, 50:6
  seller [2] - 33:13,
33:14
  selling [14] - 19:5,
20:6, 22:8, 23:1,
23:19, 27:22, 32:22,
32:23, 33:6, 35:23,
37:12, 48:21, 50:9,
50:10
  sells [2] - 12:3,
12:6
  send [13] - 8:16,
9:10, 10:6, 11:17,
11:20, 28:3, 28:10,
29:8, 39:2, 40:2,
41:19, 45:6
  sending [1] - 28:22
  sense [1] - 37:15
  sent [11] - 27:3,
27:18, 28:14, 28:19,
29:11, 30:10, 38:23,
42:22, 44:2, 44:22,
45:13
  separate [3] -
10:17, 11:10, 17:21
  September [1] -
1:15
  served [4] - 30:19,
38:19, 48:9, 48:17
  Set [2] - 43:16,
43:23
  set [2] - 44:4, 51:8
  several [2] - 24:3
  SHAH [1] - 1:7
  Shah [27] - 22:16,
24:12, 24:17, 24:19,
27:18, 28:10, 30:15,
30:19, 31:22, 32:3,
34:12, 34:13, 34:15,
35:4, 35:22, 36:16,
38:1, 44:22, 45:6,

**47:**10, 48:2, 48:8, 48:18, 48:23, 49:7, 50:8

**Shah's** [4] - 23:9, 24:8, 29:15, 43:23

**share** [1] - 26:1

**shareholder** [2] - 7:15, 7:21

**ship** [3] - 9:5, 9:8, 9:16

**shipped** [1] - 27:2

**shipping** [1] - 9:15

**Shooter** [4] - 6:16, 6:17, 6:19, 6:22

**shooter** [46] - 3:3, 17:10, 17:13, 17:19, 18:17, 18:20, 19:1, 19:6, 19:20, 19:22, 19:23, 20:3, 20:8, 20:14, 21:9, 21:14, 21:15, 21:17, 23:13, 26:23, 27:4, 31:5, 31:8, 32:15, 32:17, 33:13, 35:13, 35:14, 36:21, 37:1, 37:23, 39:5, 39:12, 39:21, 39:22, 40:18, 41:12, 41:18, 41:19, 42:11, 46:21, 49:12, 50:1, 50:9

**shooters** [17] - 19:13, 20:11, 21:5, 37:8, 37:10, 37:12, 42:14, 42:15, 45:19, 46:4, 46:11, 48:2, 48:6, 48:22, 49:1, 49:9, 49:18

**shop** [11] - 11:15, 11:23, 12:1, 13:6, 13:8, 13:9, 13:15, 13:21, 35:18

**shopper** [1] - 25:6

**shopping** [10] - 24:19, 24:22, 25:2, 25:8, 25:11, 25:15, 26:17, 26:20, 30:8, 30:10

**shops** [8] - 8:2, 8:9, 8:13, 12:17, 12:18, 13:13, 14:12, 25:19

**short** [1] - 44:14

**shorthand** [1] - 51:6

**show** [10] - 22:3, 22:4, 22:5, 23:22, 24:1, 24:4, 27:12, 27:22, 32:5, 46:23

**showed** [3] - 22:19, 23:1, 49:9

**shows** [4] - 8:19, 9:3, 22:9, 35:14

**shred** [1] - 15:1

**signing** [1] - 4:6

**similar** [1] - 17:19

**sincere** [1] - 49:7

**single** [1] - 11:2

**site** [4] - 28:9, 33:6, 39:4, 39:17

**Six** [6] - 3:3, 6:16, 6:17, 6:19, 6:22, 39:11

**six** [62] - 17:10, 17:13, 17:19, 18:17, 18:20, 19:1, 19:5, 19:13, 19:20, 19:22, 19:23, 20:3, 20:8, 20:11, 20:14, 21:5, 21:9, 21:14, 21:15, 21:16, 23:13, 26:23, 27:4, 31:5, 31:8, 32:15, 32:17, 33:13, 35:13, 35:14, 36:21, 37:1, 37:8, 37:10, 37:12, 37:23, 39:5, 39:21, 39:22, 40:17, 41:11, 41:12, 41:17, 41:19, 42:11, 42:14, 42:15, 45:19, 46:3, 46:11, 16:20, 46:21, 48:2, 48:6, 48:21, 48:23, 49:9, 49:12, 49:17, 50:1, 50:9

**size** [2] - 15:6

**smaller** [1] - 42:16

**smoke** [3] - 11:15, 13:6, 14:21

**smoking** [8] - 5:18, 7:19, 12:3, 12:4, 13:19, 14:19, 15:3, 17:18

**so-called** [1] - 48:14

**sold** [22] - 7:1, 9:2, 13:17, 18:23, 19:1, 19:13, 19:14, 20:12, 32:18, 34:14, 36:20, 37:14, 39:5, 41:13,

**47:**3, 48:2, 48:11, 48:23, 49:13, 49:17, 50:1

**sole** [2] - 6:11, 7:15

**someone** [7] - 9:21, 10:1, 10:8, 27:13, 33:4, 41:17

**Sometime** [1] - 19:3

**sometimes** [1] - 20:2

**sorry** [10] - 12:10, 18:19, 19:1, 20:22, 26:11, 28:20, 31:13, 31:23, 33:10, 47:9

**Sounds** [1] - 31:19

**sounds** [2] - 43:7, 43:11

**specifically** [1] - 19:20

**spice** [1] - 14:23

**spices** [2] - 15:2, 15:5

**spoken** [1] - 25:18

**SSP** [8] - 6:2, 6:3, 6:4, 6:20, 6:23, 7:15, 11:11, 16:12

**stab** [1] - 16:14

**stands** [1] - 22:4

**started** [3] - 30:12, 48:16, 48:18

**state** [3] - 45:19, 46:3, 46:15

**State** [2] - 4:17, 34:2

**States** [4] - 22:22, 40:19, 41:14, 50:12

**states** [5] - 11:16, 11:19, 11:20, 44:6

**STATES** [1] - 1:1

**station** [1] - 31:19

**stenographic** [1] - 51:10

**step** [3] - 11:10, 39:1, 41:12

**still** [2] - 27:20, 29:5

**stipulated** [1] - 4:3

**stipulation** [1] - 4:1

**stop** [4] - 27:22, 28:1, 32:5, 44:22

**storage** [2] - 15:3,

15:4

**store** [4] - 27:2, 36:15, 47:3, 47:8

**stores** [4] - 13:14, 13:16, 33:20, 50:5

**Street** [2] - 1:14, 2:5

**strictly** [1] - 33:3

**strike** [2] - 27:5, 48:22

**studio** [1] - 8:5

**study** [1] - 37:21

**sub** [1] - 8:3

**submitted** [1] - 49:8

**suffered** [1] - 37:22

**suitcase** [1] - 22:10

**supplied** [1] - 47:2

**sustained** [1] - 38:7

**sworn** [1] - 4:13

**system** [3] - 9:17, 9:19, 9:21

---

## T

**table** [5] - 22:17, 23:8, 23:9, 23:16

**tax** [4] - 10:8, 10:9, 10:10, 10:17

**taxes** [2] - 15:13, 15:14

**TELEPHONE** [1] - 4:16

**telephone** [1] - 27:6

**Telephonic** [1] - 1:12

**ten** [5] - 14:16, 14:17, 29:21, 30:4, 43:1

**Teresa** [1] - 10:12

**term** [4] - 11:23, 12:1, 24:21, 46:1

**testified** [1] - 4:14

**testify** [1] - 38:9

**THE** [15] - 13:5, 14:9, 15:23, 16:5, 17:3, 20:19, 21:22, 35:4, 36:14, 38:12, 40:17, 41:8, 42:7,

**43:**9, 45:13

**themselves** [1] - 13:8

**therapy** [1] - 15:2

**third** [2] - 36:19, 37:2

**three** [2] - 33:16, 49:16

**throughout** [3] - 24:3, 31:3, 48:10

**throw** [1] - 29:5

**tie** [1] - 13:18

**tie-dye** [1] - 13:18

**tight** [2] - 15:3, 15:4

**today** [12] - 5:11, 7:3, 11:11, 19:12, 28:16, 29:18, 31:4, 31:16, 39:2, 39:6, 40:8, 49:3

**today's** [1] - 12:2

**Tokyo** [1] - 42:17

**took** [6] - 22:12, 22:13, 23:7, 23:18, 23:19, 24:15

**Tooling** [1] - 5:9

**top** [2] - 14:4, 14:15

**track** [2] - 11:4, 33:18

**trade** [5] - 5:3, 5:8, 8:19, 9:3, 22:3

**Trading** [4] - 6:4, 6:20, 7:15, 11:11

**TRADING** [1] - 6:4

**transcript** [3] - 4:7, 51:8, 51:9

**travel** [1] - 15:8

**Trial** [1] - 1:12

**trial** [1] - 4:11

**true** [1] - 51:9

**Tuesday** [1] - 1:15

**turn** [1] - 42:15

**twelve** [1] - 14:17

**twice** [1] - 8:19

**two** [2] - 14:16, 44:12

**type** [2] - 15:6, 50:2

**types** [1] - 12:16

**typical** [1] - 11:14

## U

ultra [4] - 40:5, 45:21, 46:2, 46:16
unauthorized [2] - 39:23, 40:1
unfair [1] - 40:23
unit [2] - 33:7, 33:17
United [4] - 22:22, 40:19, 41:14, 50:12
UNITED [1] - 1:1
unlawful [1] - 46:9
up [9] - 11:10, 13:13, 17:22, 22:7, 22:8, 22:19, 26:21, 49:16, 50:5
upfront [1] - 49:7
UPS [1] - 9:16
uttered [2] - 23:4, 23:5

## V

varies [2] - 17:5
various [5] - 5:16, 8:2, 15:5, 31:15
Vegas [3] - 22:3, 24:16, 27:12
verbally [1] - 32:4
version [1] - 32:6
vertical [4] - 20:11, 21:1, 21:4, 21:10
VIA [1] - 4:16
Village [3] - 26:5, 26:14, 48:19
vires [4] - 40:5, 45:22, 46:2, 46:16
vitamins [1] - 15:7
vs [1] - 1:6

## W

wait [1] - 36:6
waived [2] - 4:6, 4:8
walk [3] - 22:12, 22:13, 24:3
walked [3] - 22:7, 23:8, 23:23
warehouse [2] - 9:9, 9:12

water [1] - 15:4
web [2] - 39:4, 39:17
weekly [1] - 11:6
weeks [1] - 29:2
WENDY [2] - 51:5, 51:14
Wendy [1] - 1:16
West [1] - 4:21
WESTERN [1] - 1:2
whatsoever [1] - 37:5
WHITE [38] - 2:5, 4:16, 7:7, 7:14, 12:13, 12:15, 13:23, 14:11, 15:19, 16:9, 17:9, 18:11, 21:3, 22:1, 25:1, 28:8, 29:18, 30:3, 34:23, 35:10, 37:18, 38:14, 39:9, 39:15, 40:11, 40:21, 41:10, 42:1, 42:9, 43:13, 43:20, 44:11, 44:17, 45:5, 45:17, 47:20, 47:22, 50:15
White [1] - 1:14
whole [2] - 20:8, 48:10
wholesale [2] - 49:19, 49:21
Williamsville [2] - 1:15, 2:6
willing [1] - 26:1
wish [1] - 8:8
WITNESS [15] - 13:5, 14:9, 15:23, 16:5, 17:3, 20:19, 21:22, 35:4, 36:14, 38:12, 40:17, 41:8, 42:7, 43:9, 45:13
word [7] - 13:9, 13:15, 23:4, 23:5, 23:13, 27:19, 27:23
workmanship [1] - 50:13
world [1] - 22:5
written [1] - 32:12

## Y

year [15] - 8:19, 15:9, 15:10, 15:11,

16:10, 17:5, 17:6, 18:23, 19:3, 19:4, 19:16, 20:12, 25:21, 27:17
years [4] - 29:2, 29:21, 30:4, 48:6
YORK [1] - 1:2
York [5] - 1:15, 2:3, 2:6, 47:8
yourself [2] - 9:9, 40:4

## Z

zero [5] - 25:21, 37:3, 47:6, 47:7

1

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NEW YORK

3   ------------------------------------------------------

4   JAKE LEE,

5                                    Plaintiff,

6

     -vs-                      Civil No. 07-CV.0338C(SR)

7   ACCESSORIES BY PEAK, RAJESH SHAH,

8

9                                    Defendants.

10  ------------------------------------------------------

11

12      Examination Before Trial of **RAJESH SHAH**, taken

13  pursuant to the Federal Rules of Civil Procedure, at the

14  Law Offices of Justin S. White, 5662 Main Street,

15  Williamsville, New York on Tuesday, March 18, 2008

16  commencing at 11:40 A.M., before Wendy Royce McCann,

17  Registered Professional Reporter.

18

19

20

21

22

23

*WENDY ROYCE McCANN - COURT REPORTER*

EXHIBIT __B__ PAGE __1__ OF __90__

2

1  APPEARANCES:            MEREDITH & KEYHANI, PLLC.
                           BY:  DARIUSH KEYHANI, ESQ.
2                          330 Madison Avenue
                           6th Floor
3                          New York, New York  10017
                           Attorneys for the Plaintiff.

4

5                          JUSTIN S. WHITE, ESQ.
                           5662 Main Street
6                          Williamsville, New York  14221
                           Attorney for the Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

3

1                           **E X H I B I T S**

2   **PLAINTIFF'S EXHIBIT NO:**                              **PAGE**

3   1  - Response to Interrogatories                      36

4   2  - Silver metal piece                               48

5   3  - E-mail dated 2/24/04                             56

6   4  - Packing List 12/11/05                            65

7   5  - Invoice dated 10/9/03                            67

8   6  - Invoice dated 1/15/04                            68

9   7  - Letter dated 11/8/05                             69

10  8  - Sahaj Imports dated 8/10/04                      69

11  9  - Packing List/Weight List                        70

12  10 - Invoice dated 1/4/07                             72

13  11 - Invoice dated 7/15/05                            74

14

15

16

17

18

19

20

21

22

23

*WENDY ROYCE McCANN - COURT REPORTER*

4

1                           (Whereupon, the following stipulation

2                           was entered upon the record:  "It is

3                           hereby stipulated by and between

4                           counsel for the respective parties

5                           hereto that the oath of the Referee

6                           is waived, that signing, filing and

7                           certification of the transcript are

8                           waived; and that all objections

9                           except as to the form of the

10                          questions are reserved until the time

11                          of the trial.")

12

13   Whereupon, **RAJESH SHAH**, after first being duly sworn, was

14   examined and testified as follows:

15

16   THE STENOGRAPHER:       Please state your name and address

17                           for the record.

18

19   THE WITNESS:            Rajesh Shah, 33 Crest Hollow Lane,

20                           Albertson, New York 11507.

21

22   **EXAMINATION BY MR. KEYHANI:**

23   Q.     Good morning.

1   A.      Good morning.

2   Q.      Mr. Shah?

3   A.      Yes sir.

4   Q.      How did you prepare for this deposition this

5           morning?

6   A.      How did I what?

7   Q.      Prepare for the deposition this morning?

8   A.      How did I prepare?

9   Q.      Yes.

10  A.      I did not prepare anything.  I just now flew here

11          and came here.

12  Q.      Did you meet with your lawyer?

13  A.      Yeah, I met before you came here, yes.

14  Q.      How long did you meet with your lawyer?

15  A.      30 minutes.

16  Q.      Did you review any documents in preparation for this

17          deposition?

18  A.      Not really.  I know everything, so there is nothing

19          to review.

20  Q.      When you say not really, do you mean not at all or a

21          few documents, what do you mean by that?

22  A.      Yeah, a few documents.

23  Q.      Which documents did you review?

1   A.      Which documents -- that's all I reviewed.

2   Q.      Let the record reflect that Mr. Shah is referring to

3           an envelope with a couple of dozen documents.   They

4           are not bate numbered, but they have Accessories by

5           Peak, the letterhead and address at the top, and

6           they appear to be receipts for purchase of products.

7   A.      Sales, it's not purchase.

8   Q.      Okay.   Why don't you describe these documents to me,

9           what type of documents are they?

10  A.      These are sales, sales invoices.

11  Q.      Sales invoices to who?

12  A.      To customers.

13  Q.      Are these customers individuals or other entities?

14  A.      They are companies.

15  Q.      Which companies are they?

16  A.      Which companies are they, I don't know.

17  Q.      Take a look at the documents and let me know.

18  A.      I mean, this is like Happy Heart.

19  Q.      Who is Happy Heart?

20  A.      That's the company name.

21

22  MR. WHITE:              H-u-t.

23

**WENDY ROYCE McCANN - COURT REPORTER**

1  BY MR. KEYHANI:

2  Q.    Where is Happy Hut?

3  A.    Listen, I don't know everything where they are

4         located.  They are the customers and they have the

5         customer names and that's how we make the invoices.

6         If you ask me where they are located, I have to go

7         in the record and look where they are located

8         because I do business all over United States, so if

9         somebody is from which town I don't remember.  So

10        it's very hard to remember, but these documents have

11        company names on there.

12 Q.    You sell your products all over the United States?

13 A.    That's correct.

14 Q.    Do you sell your products all over the State of New

15        York?

16 A.    I think State of New York comes in United States, so

17        wherever a customer comes from, I do sell, yes.

18 Q.    My question is do you sell your products all over

19        the State of New York?

20 A.    All over United States, United States of New York

21        comes in United States, that's what I understand.

22 Q.    I am asking a little different question.  Do you

23        sell your products within the State of New York?

8

1    A.    Within the State of New York, if customer comes,
2          yes.
3    Q.    Have you sold products to customers within the State
4          of New York?
5    A.    Have I sold, yes, because listen, again, I don't
6          remember who I sell, customer comes to me and they
7          buy it.  When they buy it, I make the invoice and
8          give it to them.
9    Q.    Are any of your customers located within the State
10         of New York?
11   A.    Yes.
12   Q.    Can you name some of the customers that are located
13         within the State of New York?
14   A.    No, I don't remember anything.  I don't remember
15         anything, I mean, they come, I sell them and I make
16         invoice.  I don't remember which customer comes to
17         me.
18   Q.    Are your customers mostly all stores?
19   A.    Yes.
20   Q.    Are there any other types of entities that you sell
21         your products to?
22   A.    Not really.  We always try to check resale numbers
23         so there should be incorporation companies

1    registered with the state.

2  Q.  A particular state?

3  A.  Any state.

4  Q.  If you were to look at your sales over the past few

5      years, would there be a distribution of sales in

6      particular states in the United States?

7  A.  No, we don't keep that kind of record.  We don't

8      keep that kind of record that what a state buy what,

9      but we just sell whosoever calls us and whosoever

10     customer stock.  I mean, I don't go by state by

11     state, no.

12 Q.  At the top of this first sheet that we were talking

13     about, it says Accessories by Peak, Incorporated.

14     What is the relationship of Accessories by Peak,

15     Incorporated and you?

16 A.  I am president.

17 Q.  Are you the owner of the company?

18 A.  I am president.

19 Q.  Do you own the company?

20 A.  I am president, means I own the company, of course.

21 Q.  Well, not necessarily, but you do own it and you are

22     the president?

23 A.  Yes.

1  Q.    Are there any other owners of this company?

2  A.    Not at this time.

3  Q.    When was Accessories by Peak, Incorporated founded?

4  A.    I don't remember, but it should be eight years now,

5        eight years.

6  Q.    Approximately 2000?

7  A.    Yeah, approximately.

8  Q.    Where is the company Accessories by Peak,

9        Incorporated in, in what state?

10 A.    New York.

11 Q.    Do you have any employees?

12 A.    No.

13 Q.    Anybody else working with you?

14 A.    No.

15 Q.    You are the sole employee and owner of the company?

16 A.    That's correct.

17 Q.    What is the business purpose of Accessories by Peak,

18        Incorporated?

19 A.    Business purpose, I mean like you are a lawyer, you

20        make money, I make money from trading.  I import, I

21        sell, I distribute, that's what I do.

22 Q.    That's my question, I want to get into a little more

23        details what your business plan exactly is?

1    A.    What my business plan, there is no business plan, I

2          just want to sell product and I make money by

3          selling product.

4    Q.    What type of products do you sell?

5    A.    Jewelry, handy crafts, those kind of things, smoking

6          accessories.

7    Q.    And smoking accessories?

8    A.    Yes.

9    Q.    What kind of smoking accessories?

10   A.    Smoking accessories mean Hookah pipes, but that's

11         not the only thing, I have 500 different things.  I

12         sell incense, I sell cone holders, I sell boxes, I

13         sell boom boxes, I sell skirts, I sell a lot of

14         things.

15   Q.    Do you have your own store that people could come

16         into and buy products?

17   A.    I have office, 800 square feet office.

18   Q.    In Manhattan?

19   A.    In Manhattan, that's correct.

20   Q.    So you don't actually have a store, but you have a

21         business office?

22   A.    That's correct.

23   Q.    Do you display your products in your office?

**WENDY ROYCE McCANN - COURT REPORTER**

1   A.   No.

2   Q.   How do people know what products you have?

3   A.   When I do the shows, I do trade shows.

4   Q.   How often do you do trade shows?

5   A.   Twice a year.

6   Q.   Where do you do them?

7   A.   Las Vegas.

8   Q.   Do you do any other trade shows?

9   A.   Not really.

10  Q.   Do you sell your products on the internet?

11  A.   No.

12  Q.   Do you have a website?

13  A.   No.

14  Q.   Besides the trade shows, how else do customers or

15       potential customers find your business?

16  A.   No other way.

17  Q.   So you meet all your customers at trade shows?

18  A.   Yeah, basically.

19  Q.   And at the trade shows you display your products?

20  A.   That's correct.

21  Q.   Do you sell products at the trade shows?

22  A.   No.

23  Q.   Do you take orders for products?

**WENDY ROYCE McCANN - COURT REPORTER**

```
 1   A.      Yes.

 2   Q.      What's the distinction between taking orders and

 3           selling products at trade shows?

 4   A.      Order means you take order, write orders and go to

 5           office and ship them.  We don't sell one by one

 6           piece, two pieces.

 7   Q.      What percentage of your products sold every year

 8           approximately do you take orders for at the trade

 9           shows?

10   A.      Say that again.

11

12   MR. KEYHANI:          Read back the question.

13

14                        (Whereupon, the last question was

15                        then read back by the reporter.)

16

17   THE WITNESS:          Just a guess, 90 percent.

18

19   BY MR. KEYHANI:

20   Q.      So most of the products you sell are orders that you

21           have taken at trade shows?

22   A.      Say it again, I am sorry.

23   Q.      That's okay.  Most of the products you sell are
```

14

1      through orders that you take at the trade shows?

2   A.  Correct.

3   Q.  What is your home address?

4   A.  I just gave it to her, 33 Crest Hollow Lane.

5   Q.  Oh okay, that is where?

6   A.  Albertson.

7   Q.  New Jersey?

8   A.  New York State.

9   Q.  Where is Albertson, New York?

10  A.  Long Island.

11  Q.  Mr. Shah, have you ever been deposed before?

12  A.  Yes.

13  Q.  Can you explain the context of the deposition?

14  A.  Yes, I sued somebody and he owes me money, so it was

15      kind of same kind of deposition.

16  Q.  What did you sue the person for?

17  A.  Money.

18  Q.  Who did you sue?

19  A.  Who did I sue?

20  Q.  Yes.

21  A.  A friend, he owes me money and I sue him.

22  Q.  How long ago was this case?

23  A.  One year ago.

1  Q.     What's the case -- strike that.  What's the name of

2         the person that you sued, if it was a person?

3  A.     Does it matter?

4  Q.     Yes.

5

6  MR. WHITE:            Well, I am going to make an objection

7                        on the record.  You can answer.

8

9  THE WITNESS:          I mean, why should I say who I should

10                       sue.

11

12 MR. WHITE:            Off the record.

13

14                       (Whereupon, a discussion was then

15                       held off the record.)

16

17 BY MR. KEYHANI:

18 Q.     On the record.

19 A.     Okay, his name Kanak, K-a-n-a-k.

20 Q.     And what was the subject matter of the lawsuit?

21 A.     I told you he owes me money.

22 Q.     For what?

23 A.     I lend him money and he owes me money.

1  Q.    Was it a personal loan or was it in association

2        with --

3  A.    Company.

4  Q.    With a company?

5  A.    Yeah.

6  Q.    And your Accessories by Peak?

7  A.    That's correct.

8  Q.    Did you go to trial for that case?

9  A.    No.

10 Q.    Was it settled?

11 A.    Yes.

12 Q.    Did he pay you money?

13 A.    Yes.

14 Q.    Where was the case brought?

15 A.    Where was that?

16 Q.    Where was the case brought, in what court?

17 A.    New York.

18 Q.    What court in New York?

19 A.    Manhattan, Center Street.

20 Q.    State trial court?

21 A.    I think so, yes.  It's a big court.  That was the

22        first thing, so I don't know much about it.

23 Q.    Any other cases that you have been involved in?

1   A.    No.

2   Q.    As you know you have been administered an oath today

3         to tell the truth, you understand that?

4   A.    Yes sir.

5   Q.    It is the same as testifying in the court before a

6         judge and jury?

7   A.    Yes sir.

8   Q.    You understand that if you fail to tell the truth

9         you could be held liable for perjury?

10  A.    Yes sir.

11  Q.    You understand what perjury means?

12  A.    I understand.

13  Q.    What does perjury mean?

14  A.    I understand I can be liable and can go to jail is

15        what it is.

16  Q.    All questions and answers will be taken down by a

17        court reporter as they have been and --

18  A.    Is that right?

19  Q.    Okay.  Please answer my questions verbally and not

20        by head nods because the court reporter cannot write

21        that down.  If you don't understand one of my

22        questions, please ask me to clarify the question or

23        do whatever else necessary for you to understand the

**WENDY ROYCE McCANN - COURT REPORTER**

18

1        question and can you do that?

2  A.    Yes.

3  Q.    Your attorney may object from time to time, you

4        should nonetheless answer the question unless your

5        attorney specifically directs you not to answer the

6        question.

7  A.    Say that again.

8  Q.    Your attorney may object to my questions from time

9        to time, he may say objection.  You should answer

10       the question unless your lawyer says don't answer

11       the question.

12 A.    Okay.

13 Q.    Then we will talk about that.

14 A.    That's okay.

15 Q.    You may take all the time you need.  We are entitled

16       to your best recollection of the events.

17 A.    Sure.

18 Q.    Please wait until I finish the question, then

19       answer.  I will also extend that courtesy to you,

20       wait until you finish you answer before I ask the

21       next question.  If you need to take a recess, please

22       do so after you have answered a question or after a

23       lot of questions, by all means you can use the

1        restroom or whatever you need to do.

2 A.   Okay.

3 Q.   Do you have any questions?

4 A.   Yes, I would like glass of water first.

5 Q.   Mr. Shah, are you on any medications today that

6        might impair or impact your ability to testify

7        truthfully at the deposition today?

8 A.   No.

9 Q.   Have you ever been convicted of any crimes?

10 A.   No.

11 Q.   In India?

12 A.   No.

13 Q.   In the U.S.?

14 A.   No.

15 Q.   Can you tell me about your educational background?

16 A.   I graduated from college.

17 Q.   Where did you attend college?

18 A.   India.

19 Q.   And what college did you attend?

20 A.   Jodhpur, J-o-d-h-p-u-r, University.

21 Q.   What did you study in college, Mr. Shah?

22 A.   What did I study or what --

23 Q.   What did you study?

1   A.      Commence, Bachelor of Commence.

2   Q.      What year did you graduate?

3   A.      What year?

4   Q.      Yes.

5   A.      I don't know, 1975.

6   Q.      What city is your college located in India?

7   A.      Jodhpur, same place.

8   Q.      How long far is that from New Delhi?

9   A.      New Delhi is how far --

10  Q.      By car.

11  A.      By car, 15 hours.

12  Q.      That far.  What's the closest largest city to you?

13  A.      Jodhpur is the largest city.

14  Q.      What's the population?

15  A.      I don't know, I am here 28 years.  I don't know much

16          about India anymore.

17  Q.      How often do you go back to India?

18  A.      I go every two years or three years.

19  Q.      For how long of a period?

20  A.      Seven days, six days.

21  Q.      Did you say when you graduated from college what

22          year was that?

23  A.      '75.

1   Q.   And what did you do after that?

2   A.   Then I came here, in '82 I came here and after that

3        seven year I was working for somebody.

4   Q.   Who did you work for?

5   A.   Oh, I was in gold and silver business.

6   Q.   Who did you work for?

7   A.   In gold and silver business, a company.

8   Q.   Do you remember the company's name?

9   A.   Rajmallakhiscand.

10  Q.   How long did you work with them for?

11  A.   Eight years.

12  Q.   And then you left?

13  A.   Yeah, then I came here.

14  Q.   When you say you came here, what do you mean?

15  A.   I left and came here, yeah.  I got green card and I

16       came here, New York City.

17  Q.   So it was about 19 --

18  A.   '82.

19  Q.   What did you do when you first came to New York?

20  A.   I work for somebody.

21  Q.   Who did you work?

22  A.   Globusgafts.

23  Q.   What kind of job did you have with them?

1    A.    I was just working in the store as a sales agent.

2    Q.    Is that company located in New York?

3    A.    Yes.

4    Q.    Did you work at the store?

5    A.    Yes.

6    Q.    How long did you work with them?

7    A.    Six months.

8    Q.    Then what happen?

9    A.    Nothing, I mean, I quit.

10   Q.    Why did you quit?

11   A.    Because somebody else working with me, I have

12         somebody, he hired me, I have somebody else, he gave

13         me good offer and I work for him.

14   Q.    Who offered you a job?

15   A.    His name was Naveen Gupta.

16   Q.    What kind of business did Naveen have?

17   A.    Jewelry.

18   Q.    In Manhattan?

19   A.    Yes.

20   Q.    What was the business name?

21   A.    Peak Overseas.

22   Q.    What was your job responsibilities at Peak Overseas?

23   A.    Everything.  I was doing everything, sales,

1        purchase, banking, everything.

2   Q.   How long did you work with them?

3   A.   Almost 20 years.

4   Q.   Until what year?

5   A.   Until I will say -- well, actually I work with him

6        only two years, but then he left and I was, you

7        know, handling the company, so I don't know how you

8        would say that, but I was handling the company.

9   Q.   Did you have an ownership interest in the company?

10  A.   Yes, I have shareholder.

11  Q.   What happened to the company?

12  A.   Nothing, we dissolved.

13  Q.   You dissolved the company?

14  A.   Yeah.

15  Q.   Why?

16  A.   Why we dissolve, I don't know why we dissolve, there

17       was no specific reason, we just dissolve.  I don't

18       know, we just decided to, but there was no reason.

19  Q.   Was the company profitable?

20  A.   Not really.

21  Q.   What do you mean by not really?

22  A.   We never have profitable company.  We just survive.

23       That's it.  We make our living.  That's it.  We

1   never have profitable companies.

2 Q. After you dissolved the company, you started

3   Accessories by Peak?

4 A. Yes.

5 Q. You don't have a partner at Accessories by Peak

6   though, right?

7 A. No.

8 Q. Mr. Shah, how much revenue did you make last year?

9 A. $400,000 approximately, I don't remember, but that's

10   the ballpark.

11 Q. Is that the same that you made in 2006?

12 A. Yeah, more or less, I don't go up, yes.  I mean,

13   this is what I do, I mean, I am one person, I can't

14   do more.

15 Q. So approximately $400,000?

16 A. More or less, yes.

17 Q. How much profit did you make last year?

18 A. I don't remember, but --

19 Q. Approximately, I am speaking.

20 A. Gross or the net?

21 Q. What do you put in your pocket?

22 A. I don't know, $40,000, 40, $50,000 approximately.  I

23   have to look with my accountant, but approximate.

1   Q.      Did you file your 2006 taxes?

2   A.      Of course I file taxes, yes.

3   Q.      And how much income did you have on your 2006 tax

4           returns?

5   A.      I don't remember.  I have to look and answer you

6           back, but it should be what I am telling you.

7   Q.      Around $40,000?

8   A.      Around 40 or 30, that's it.

9   Q.      Mr. Shah, do you know a guy named Jake Lee?

10  A.      I know by papers you sent me.  I don't know him

11          before.

12  Q.      You have never met a guy named Jake Lee?

13  A.      No.

14  Q.      Have you ever met Jake Lee in person?

15  A.      No.

16  Q.      You don't recall meeting Jake Lee in person?

17  A.      No.

18  Q.      When was your first contact with Jake Lee?

19  A.      I said I didn't meet him, so how there was contact I

20          don't know.

21  Q.      Maybe you didn't meet him, but contact could be some

22          other contact, by telephone or some other --

23  A.      I don't remember exactly, somebody was calling me

**WENDY ROYCE McCANN - COURT REPORTER**

1      from Los Angeles, he never tells his name.  I heard

2      first time when he send me notice, Jack Lee.

3  Q.  So you never knew of a guy named Jake Lee until you

4      were served with the papers?

5  A.  That's correct.

6  Q.  The papers of the lawsuit that you are being deposed

7      in regards to?

8  A.  That's correct.

9  Q.  Do you remember the Las Vegas trade show in 2003?

10  A.  Yeah, I remember.

11  Q.  Do you remember somebody approaching you at the show

12      with regard to patent infringement?

13  A.  I mean, two people came to my booth, yes, two people

14      came to my booth and I have a lot of customers come

15      to my booth, it's a trade show, 5,000, 10,000,

16      50,000 people come to the trade show, so I mean,

17      yes, people come, and what do you -- I say yes two

18      people came to my booth.

19  Q.  Do you who recall who those two people were?

20  A.  No, anybody, anybody can come to my booth and they

21      were like anybody to me.

22  Q.  How do you know who I am referring to?

23  A.  Who -- because when he bring the case, you know, I

1        thought about it and that came to my mind, that

2        those two people can be the people who was telling

3        me all these things and that's all I remember.

4   Q.   What were they telling you?

5   A.   Nothing, they were actually fighting with me.  They

6        were fighting with me and they came and they say how

7        can you sell this product, blah, blah, blah, and I

8        say what do you mean how I can sell, I have 500

9        products here, you can sell anything, how I can sell

10       this, how I can sell this, I am displaying, I am not

11       selling number one.  This is display and who are you

12       to tell me what to sell and what not to sell.  In

13       the show, there are five million products there.  I

14       mean, you cannot go to any booth and say hey you

15       cannot sell this glass.  I mean, you don't have any

16       authority to say what I can do or what I can not do,

17       that's what I told them.

18  Q.   Which product were they referring to?

19  A.   What you are suing me for, same product.

20  Q.   What product is that?

21  A.   The 6 shooter.

22  Q.   What did they say about the 6 shooter?

23  A.   They told me I cannot sell, that's what they say.

**WENDY ROYCE McCANN - COURT REPORTER**

1   Q.   Did they point it out to you which product it is?

2   A.   They didn't point it out, they just took it and ran

3        away with it.   They stole it from my booth and they

4        took it away.

5   Q.   Do you know exactly which product they took away?

6   A.   Same thing.

7   Q.   The 6 shooter?

8   A.   Yes.

9   Q.   Is that a pipe?

10  A.   I don't know what it is because see, as far as I am

11       concerned, I get the product before the show from

12       India, a lot of product, incense holders, incense,

13       cone holders, right, jewelry, bangle cuff, boxes,

14       they sent me everything in the box, they put the

15       style number, they put the price, I go to the shows

16       with that, I display everything, and then I take the

17       order, I send them orders, India, and I get the

18       purchase slip, I ship them, that's how I make my

19       profits and this guy, two guys, they came to my

20       booth and just took a sample.   First they give me

21       order, first they give me order, then they took my

22       sample of it.

23  Q.   What order did they give you?

1   A.      I have order here, I gave you the copy.   Twelve

2           pieces order they give me.   They didn't give me

3           address, they didn't give me anything.   Then they

4           took the sample away.

5   Q.      Was that the only sample you had with you at the

6           show?

7   A.      Yes.   Well, I get only one sample each because I

8           don't know which one, like 50 things are here, I

9           don't know which one are going to sell, so we only

10          bring one piece of each.

11  Q.      One piece of each product.

12  A.      Everything, one piece of each.   If I bring and not

13          sell them, what I do?   I don't take chances.   I

14          bring samples and then if I get orders, I order them

15          India and as I get order, I order India.

16  Q.      Can you describe these two fellows that you met at

17          the show that were fighting with you you say?

18  A.      Describe means?

19  Q.      Physically describe, what do they look like?

20  A.      They were young guys.

21  Q.      About how old?

22  A.      I don't know 25, 26, 28.

23  Q.      Were they Caucasian?

**WENDY ROYCE McCANN - COURT REPORTER**

1   A.    What is Caucasian?

2   Q.    Were they white?

3   A.    White.

4   Q.    Dark hair, blonde hair?

5   A.    I don't know, blonde, it should be blonde, I don't

6          remember really.  I just remember blurry right now,

7          it's like five years, six years.

8   Q.    Were they tall or short?

9   A.    Yeah, same like you.

10  Q.    About 5'10 maybe?

11  A.    Yeah.

12  Q.    About 170 pounds?

13  A.    Yeah, something like that.

14  Q.    Did they approach you first or did you approach

15         them?

16  A.    No, no, why should I approach them?  They came to me

17         and they start fighting.  That's it.

18  Q.    What did they say when they approached you?

19  A.    I told already.

20  Q.    Exactly what did they say?

21  A.    I don't remember everything, but the wordings I

22         remember that this our product, you cannot sell.

23         That's it.  I asked them, I told you again, I will

1    repeat again, that they told me that this is our

2    product, you cannot sell.  I say who the hell are

3    they, I mean, anybody cannot tell me what do I have

4    to do, you must have reason to say and they did not

5    give me reason.  They say it is out product.  I have

6    booth there, I am selling it.  I say you have booth,

7    I mean, I have same glass, next door is selling same

8    glass, so why I cannot sell it and you can sell it,

9    there should be reason.  And first thing, if you

10    want to place the order, place the order.  If you

11    don't want to place the order, just go away.  I am

12    here to make business, I am not here to fight with

13    anybody and they were just mad at me and then they

14    took my sample away.  That's it.

15  Q.  Did they tell you you were infringing their patent?

16  A.  No.

17  Q.  Did they mention any patent?

18  A.  No.

19  Q.  You are certain about that?

20  A.  100 percent.

21  Q.  What was the first time you heard about the patent

22       that is the subject of this case?

23  A.  Your letter.

32

1    Q.      Which letter?

2    A.      Your case.  And then I saw all this thing.

3    Q.      What did you do after that event took place in

4            Nevada?

5    A.      What did I do?

6    Q.      Yeah, what did you do with regard to this product?

7    A.      I didn't do anything.  I mean, I had sample that

8            they -- I didn't do anything.

9    Q.      Did you continue selling the product?

10   A.      Continue selling -- I didn't have the product.  How

11           I can sell, I told you that was only sample.

12   Q.      Did you order product?

13   A.      No, I never ordered the product, no, because I don't

14           have any sale, I don't have any customer, how I can

15           order the product?

16   Q.      Have you ever sold the 6 shooter?

17   A.      I sold 6 shooter.  I have three different 6

18           shooters.  I have candleholder 6 shooter, you put

19           six candles and we call that 6 shooter.  I have this

20           6 shooter.

21   Q.      What is this?

22   A.      This is 6 shooter.

23   Q.      What is this item?

**WENDY ROYCE McCANN - COURT REPORTER**

1   A.      I don't know.  See, I told you, I don't have to know

2           the product, whatever people ask me, all my supplies

3           say.  I am indicating everything.  If this is glass,

4           I don't even know this is glass.  I put it on the

5           table, the customer orders from me, I take the

6           order, I sent the order by style number to my

7           suppliers and they send me.  Sometimes a customer

8           asks me send me 6 shooter and sometimes we don't

9           know like pen, we send another pen, so sometimes

10          confusion also happens.

11  Q.      Let the record reflect that Mr. Shah is referring to

12          a metal item that looks like a 6 shooter in a gun,

13          it's not clear what part this is or if it's a part

14          of another thing or by itself.  What is this thing

15          supposed to do?

16  A.      I don't know.  For me it is just a part, because if

17          customer asks for 6 shooter, we just send them this

18          also and what they do is their business.

19

20  MR. WHITE:          He's asking is that part of something

21                      else, is that just one piece?

22

23  THE WITNESS:        Just one piece.

**WENDY ROYCE McCANN - COURT REPORTER**

1   BY MR. KEYHANI:

2   Q.     Do you sell a product, a pipe product that is called

3          a 6 shooter?

4   A.     Did I sell pipe product that is a 6 shooter.  This

5          is a pipe product too, I think.

6   Q.     I am asking you a different question.  Do you sell a

7          pipe called the 6 shooter?

8

9   MR. WHITE:              Object to the form of the question.

10                          Do you mean now or in general?

11

12  MR. KEYHANI:            Ever.

13

14  MR. WHITE:              That's the objection.  Did you ever

15                          sell a 6 shooter pipe, that's what he

16                          is asking.

17

18  THE WITNESS:            Did I write 6 shooter on invoice, so

19                          what is your question, we write 6

20                          shooter on the invoice, so what is

21                          your question really, we write 6

22                          shooter on the invoice, so this is

23                          what we sell, 6 shooter.

1    BY MR. KEYHANI:

2    Q.      Mr. Shah, you understand that you are testifying

3            under oath today?

4    A.      Yes.

5    Q.      And you understand the consequences of not telling

6            the truth.  I am asking a very simple and direct

7            question.  Have you ever sold a pipe product, a pipe

8            product called the 6 shooter, have you or have you

9            not?

10   A.      Pipe product.  This is a pipe, too.

11   Q.      No, a pipe that looks like a pipe.

12

13   MR. WHITE:              I object until we can get something

14                           perhaps marked, a diagram or what

15                           about the object itself, do you have

16                           any of those with you today?  Do you

17                           have any 6 shooters, Mr. Keyhani, I

18                           don't want to tell you how to do your

19                           job.

20

21   MR. KEYHANI:            That's okay.  We will get to the

22                           issue.

23

36

1   MR. WHITE:              Off the record.

2

3                          (Whereupon, a discussion was then

4                          held off the record.)

5

6   MR. KEYHANI:            Mark this, please.

7

8                          (Whereupon, a Response to

9                          Interrogatories was then marked

10                         Plaintiff's Exhibit 1 for

11                         identification.)

12

13  BY MR. KEYHANI:

14  Q.     Back on the record.  Mr. Shah, what I am showing you

15         right now is what has been marked as Plaintiff's

16         Exhibit 1 and this is responses to interrogatories

17         that we served on your counsel and I want you to

18         take a look at this and I want you to verify that

19         you signed under oath the last page of this.  Please

20         take a look at this document and it is marked as

21         Plaintiff's Exhibit 1.  Take a look at this.  Have

22         you seen this document before, Mr. Shah?

23  A.     Yes.

37

```
1   Q.      When did you see this document?

2   A.      When Mr. Justin send it to me.

3   Q.      I want to direct your attention to page 7 of this

4           exhibit.  There's a signature there.  Can you

5           identify that signature?

6   A.      Yeah, that's my signature.

7   Q.      This was before a notary on February 4?

8   A.      Yes.

9   Q.      And the contents and responses to these questions,

10          to these interrogatories is accurate?

11  A.      Yes.

12  Q.      Would you like to change anything, any answers that

13          you made to these interrogatories at this time?

14

15  MR. WHITE:              Objection to that question.  Go

16                          ahead, you can answer.

17

18  THE WITNESS:            I read everything if you are asking

19                          that question.

20

21  BY MR. KEYHANI:

22  Q.      Did you read this before?

23  A.      I did.
```

**WENDY ROYCE McCANN - COURT REPORTER**

1   Q.     Well, then I will direct your attention to a

2           particular question.

3   A.     Okay.

4   Q.     Interrogatory number 9, the question is, identify

5           and provide the total sales in U.S. dollars and/or

6           other relevant currency, from the date of first sale

7           to either the last date of sale or up to the last

8           available date for all sales generated from the sale

9           of all pipes sold by the Defendants.  Can you read

10          the answer?

11  A.     The Defendants object to the question insofar as the

12          phrase pipes is used herein.  If the Plaintiff seeks

13          information about the patented so-called Six Shooter

14          pipes, the Defendants assert that approximately 300

15          Six Shooter type pipes were sold over the course of

16          the Defendants' placement of the items into

17          commerce.  Approximately $3,000.

18  Q.     Is that statement correct?

19  A.     Yes.

20  Q.     Now when you say here, or in conjunction with your

21          lawyer you say, Six Shooter pipes?

22  A.     Type pipes.

23  Q.     And you say so called Six Shooter pipes here,

1   patented or so-called Six Shooter pipes.  When you

2   say that, are you referring to the items that you

3   were looking at and you presented to me a few

4   moments ago on the table here?

5   A.   As I told you --

6   Q.   Answer my question.  Are you referring to --

7   A.   Yes, yes and more because I got this and I got two

8   more different kind of 6 Shooters, got means what we

9   called 6 Shooters and we sold as a 6 Shooter.

10  Q.   What do you mean there is two other types.  Do they

11  look different than this?

12  A.   Yes.

13  Q.   What do the other two look like?

14  A.   What do they look like?

15  Q.   Yes, describe them for me?

16  A.   One we have same thing with the 6 holes and you can

17  put six candles and you can light six candles.  That

18  also we call 6 Shooters when we make invoices and

19  sell as six Shooters, okay, and one that you

20  describe in your picture.

21  Q.   Which picture?

22  A.   When you send me the lawsuit, so we got two kind of

23  6 Shooters from India.

40

1    Q.    And when you say picture, do you mean the picture in
2          the patent?
3    A.    Yes, something like that.
4    Q.    So you are referring to the patent that is the
5          subject of this lawsuit, is that correct?
6    A.    I think yes.
7    Q.    You are referring to the patent that was an exhibit
8          to the complaint that was served?
9    A.    Yes, we have similar.  I told you we have samples
10         from India.  They were all mixed.  We got those,
11         this and other ones, so everything we got at once
12         and we sold it time to time.
13   Q.    I want to direct your attention to the next page
14         after your signature page in Exhibit 1.  You see
15         this web site Alibaba.com?
16   A.    Yes.
17   Q..   And there's a couple of pictures?
18   A.    Yes.
19   Q.    On this page.  Do you note that?
20   A.    Yes, I know.
21   Q.    The picture at the bottom says, what does it say?
22   A.    It says Six Shooter pipe, smoking pipes.
23   Q.    Do you sell that product?

**WENDY ROYCE McCANN - COURT REPORTER**

1   A.      Something like that we got it, yes.

2   Q.      That's one of your Six Shooter products that you

3           sell?

4   A.      I don't sell.  I told you, I got samples and sold

5           it.  I don't sell, this is not my thing which I do

6           business with.  This I got samples and I sold.  I

7           got three different kind of samples and we call

8           everything Six Shooter.  This was one of them, this

9           was one of them and I don't have the other one

10          because I was finished.  I couldn't bring the

11          sample.

12

13  MR. WHITE:            When you say this, you pointed to the

14                        exhibit picture and this piece of

15                        metal?

16

17  THE WITNESS:          This sample piece of metal and we

18                        call Six Shooter candle holders, that

19                        also.

20

21  BY MR. KEYHANI:

22  Q.      So this product that we are referring to in the

23          picture, in the page in the exhibit?

1   A.      Yes.

2   Q.      It says at the top Alibaba.com?

3   A.      Yes.

4   Q.      What do you refer to this in your store or in your

5           business?

6   A.      People refer to Six Shooters, that's what we write

7           it.

8   Q.      I understand that.  What specifically do you call

9           this Six Shooters versus the other Six Shooters?

10  A.      We call every product Six Shooters.  It's a generic

11          name.  We see whatever customer say, if customer say

12          sometimes send us Six Shooter, we send them this and

13          they say we don't want this, you know, they want

14          candleholder Six Shooters, and if they send them

15          back and they want this, then you know, if we have

16          it, we send them.  If we don't have it, we don't

17          send them.

18  Q.      So you don't have a specific name for this Six

19          Shooter in the picture?

20  A.      What do you mean a specific name?

21  Q.      You don't call it something specific?

22  A.      No, we calling it that Six Shooter, that Six

23          Shooter, this Six Shooter, that picture we also call

1            Six Shooter.

2   Q.   You don't call it the Six Shooter pipe?

3   A.   Pipe, no we call it Six Shooter, we don't call it

4        Six Shooter pipe.

5   Q.   I would like to direct your attention to

6        Interrogatory 9, the answer again, the second

7        sentence, can you read that again or a so-called,

8        what does it say?

9   A.   Six Shooter.

10  Q.   Six Shooter what?

11  A.   If the Plaintiff seeks information about the

12       patented or so-called Six Shooter, it says pipes, I

13       am reading, pipes, we don't call them pipes because

14       it's just the answer.

15  Q.   So you don't call them, who calls them Six Shooter

16       pipes?

17  A.   Maybe Mr. Justin suggested this thing.

18  Q.   And the $3,000 in sales refers to the so-called Six

19       Shooter pipes?

20  A.   Yeah.

21  Q.   Correct?

22  A.   Yes.

23  Q.   Okay, I am trying to unwrap this.  A moment ago you

44

1          said you don't sell the Six Shooter pipes, is that

2          correct?

3    A.    I don't write Six Shooter pipes, we don't write six

4          Shooter pipes in the invoice.

5    Q.    I didn't ask you that question.

6    A.    Okay.

7    Q.    I asked a little different question.

8    A.    Okay, what the question?

9    Q.    I asked you do you sell, have you sold Six Shooter

10         pipes?

11

12   MR. WHITE:          Okay, that's where I want to object.

13                       I think the question needs to be

14                       asked both ways.  Does he sell Six

15                       Shooter pipes, has he sold Six

16                       Shooter pipes?

17

18   MR. KEYHANI:        Counsel, I will ask the questions.  I

19                       respect your attempt to make it more

20                       expedited.  But that's not the

21                       purpose here.  I am trying to get to

22                       the truth here.

23

**WENDY ROYCE McCANN - COURT REPORTER**

1    MR. WHITE:              But I can object to the form of a

2                           question that is using or --

3

4    MR. KEYHANI:            Okay, you can object on form, very

5                           well.  If that's your objection,

6                           fine.

7

8    BY MR. KEYHANI:

9    Q.     Have you sold Six Shooter pipes?

10   A.     We sell Six Shooters.

11

12   MR. WHITE:              He's asking a question, have you sold

13                          Six Shooter pipes or no?  Yes, right,

14                          you sold them.  I am tired of this

15                          going around and around, we'll be

16                          here all day long.

17

18   BY MR. KEYHANI:

19   Q.     Have you sold Six Shooter pipes, yes or no?

20   A.     Yes.

21   Q.     A moment ago you said that you didn't, is that true

22          or not?

23

```
 1   MR. WHITE:              Well okay, I am going to object to
 2                           that question.

 3

 4   BY MR. KEYHANI:
 5   Q.    You are under oath, you understand that?
 6   A.    I am not saying anything wrong.  I am not saying
 7         anything wrong under oath.
 8   Q.    It doesn't sound like you are being genuine here.
 9         Have you sold Six Shooter pipes, yes or no?
10   A.    We sold Six Shooter pipes.
11   Q.    How many Six Shooter pipes did you sell?
12   A.    300, not pipes even.  I am telling you again, all
13         together we sold 300 pieces, I don't remember how
14         many pipes we sold and how many Six Shooters we
15         sold.  We sold 300 pieces and that's the bottom
16         line.
17   Q.    Mr. Shah, I am asking a very specific question.   I
18         am asking about Six Shooter pipes?
19   A.    Yes.
20   Q.    You said that you sold Six Shooter pipes?
21   A.    Yes, we sold six shooter pipes.
22   Q.    Okay, are you selling Six Shooter pipes now?
23   A.    No.
```

**WENDY ROYCE McCANN - COURT REPORTER**

1   Q.      When did you stop selling Six Shooter pipes?

2   A.      When we finished the inventory of when we had it.

3   Q.      How many Six Shooter pipes have you sold from the

4           day you started selling Six Shooter pipes until the

5           day you stopped selling Six Shooter pipes?

6

7   MR. WHITE:              Don't answer until I object to the

8                           form of the question.  My objection

9                           is that the candle six shooter I hope

10                          we are not talking about what, but

11                          there is still this distinction

12                          between what is on the table there

13                          eventually that I want to have marked

14                          and the offending Six Shooter in

15                          question.

16

17  MR. KEYHANI:            Well, we'll have to get to that.  I

18                          want him to answer my question.

19                          Counsel just object to the form and

20                          it's noted and then if he can't

21                          answer, I will clarify the question.

22

23  BY MR. KEYHANI:

**WENDY ROYCE McCANN - COURT REPORTER**

48

1  Q.     I am speaking about, how many six shooter -- strike

2         that.

3

4  MR. KEYHANI:            What was my last question?

5

6                         (Whereupon, the last question was

7                         then read back by the reporter.)

8

9  THE WITNESS:            And I told you I sold all together

10                        300 in total which include all three

11                        kinds of six shooter pipes or

12                        candleholders, so there is no more

13                        than 300 period.  You can count

14                        pipes, you can count as the candle

15                        holder and you can count as this six

16                        shooter.

17

18  BY MR. KEYHANI:

19  Q.    This item on the table that Mr. Shah is referring

20        to.

21

22  MR. KEYHANI:            Mark this please.

23

**WENDY ROYCE McCANN - COURT REPORTER**

1                              (Whereupon, a silver metal part was

2                              then marked Plaintiff's Exhibit 2 for

3                              identification.)

4

5    BY MR. KEYHANI:

6    Q.     It's a metal silver colored part or piece that has

7           the characteristics or appearance of the six shooter

8           component in a gun.  This item now that we have

9           labeled Plaintiff's Exhibit 2, this metal piece, is

10          this sold alone or in conjunction with other parts?

11   A.     I don't remember.

12   Q.     Is it or is it not?

13   A.     I don't remember.  I mean, I don't remember what I

14          don't remember.  It's so long ago.  I mean, I have

15          plenty of items, I don't remember everything.

16   Q.     Is this Exhibit 2 a part of another item, is it not?

17   A.     I don't know.

18   Q.     Are you testifying under oath today that this is how

19          you sell the product by itself?

20   A.     Yes.

21   Q.     Is it not part of another product?

22   A.     How I suppose to know when customer asks something,

23          it is a part of another, it seems like it should be.

**WENDY ROYCE McCANN - COURT REPORTER**

1   Q.      It sure does.  And this is part of what?

2   A.      I don't know.  I told you I don't know because I

3           don't make or I don't use.  I just sell what

4           customer asks me, if customer ask me give me this, I

5           give them this.

6   Q.      What to you think this is a part of?

7   A.      I don't think, I just sell.  I don't think because I

8           don't ever think.  Thinking does not make me money.

9           If people say that I want this part, I don't think.

10          I just produce them and give it to them, produce

11          means I just bring and give it to them, if I can.

12  Q.      Who did you buy this Exhibit 2 from, Mr. Shah?

13  A.      I did not buy.  They send me 300 pieces and that's

14          what I sold.  I did not buy.  I did not order.

15  Q.      They sold you 300 pieces of this Exhibit 2?

16  A.      They send me mixed box.  I told you in the

17          beginning.  They send me mixed box of samples and in

18          that box I had this too.

19  Q.      And you never bought anymore of these?

20  A.      No.

21  Q.      You didn't buy any of these?

22  A.      No.

23  Q.      All of these 300 you got were free?

1  A.  Free means we do the business, so yeah, this is a
2      promotional thing, free means there is nothing free
3      in this world, but we buy like 200 or 300,000 from
4      them, so they send, time to time they send samples
5      to, you know, so they can get business like on
6      publicity day, they give a lot of items free, so
7      they publicity from that.
8  Q.  They send you 300 of these pieces, just like this?
9  A.  I am not saying -- see, I don't know why you are
10     asking same question.  They send me 300, three
11     different kind of six shooters.  I told you before,
12     also I am telling you again, they sold me, I mean
13     they send me 300 pieces and that's what I get rid of
14     later on by selling to my customers.  I never order,
15     I never produce, I never bring them, I never, I
16     mean, even after that show I never displaced.  I
17     mean, what more do you want me to tell you.
18 Q.  How many of this particular item, Exhibit 2?
19 A.  I don't remember.
20 Q.  More than one?
21 A.  Huh?
22 Q.  More than one of these?
23 A.  Yeah.

52

1   Q.    Is it typical for a business to send you identical

2         pieces, multiple ones as samples?

3   A.    Yeah, because they want you to give it to my

4         customers, so I can get orders.  Yeah, sometimes

5         they do.

6   Q.    They give you 100 identical samples?

7   A.    Yes, they do.  They do.  They send me 300, 400

8         pieces sometimes.

9   Q.    And you sell it?

10  A.    Because sometimes they don't sell.  You know,

11        sometimes what happens in India, they have it, they

12        cannot sell, so they just send me, okay, if you sell

13        it, pay them, if you don't sell it, forget it.

14        Sometimes what I do with my customers too.  If I

15        sell it, give them money, if don't sell it, don't

16        give me money.  It's garbage for me anyway.

17  Q.    So you sell it, and if you sell it, you pay them?

18  A.    If I order them, I pay them.

19  Q.    I am asking a different question.

20  A.    This specific, I don't remember that how it got

21        paid.  I don't remember because I don't remember.

22  Q.    When they send you these 300 items, when you sell

23        these 300 items, they expect you are going to pay

**WENDY ROYCE McCANN - COURT REPORTER**

53

1          them something, right?

2   A.     Not really, not really because it's a business.   We

3          just do business with them, not really.

4   Q.     Is that a yes or a no, not really?

5   A.     Not really.   It's true.

6

7   MR. WHITE:              What question are you answering not

8                           really?

9

10  THE WITNESS:            No, they don't I say no.  They don't

11                          expect because they send me samples

12                          without order.   If I order them and

13                          they send me, I am obliged to pay

14                          them.   If I don't order then and they

15                          send me, I am not obliged to pay

16                          them.   This is the bottom line.

17

18  BY MR. KEYHANI:

19  Q.     Just for clarification, you said that earlier in the

20         deposition that you had never been notified

21         specifically that any of these Six Shooter products

22         infringe a patent, is that correct?

23  A.     Yes.

54

1   Q.      You are absolutely certain about that?

2   A.      Notify me verbally or by --

3   Q.      In any form.  I am asking the question again.  You

4           are absolutely certain that you were never given

5           notice that these six shooter products, any of them,

6           infringed someone's patent, is that correct?

7   A.      Verbally they said, but not in written, no.

8   Q.      Verbally they said.

9   A.      Okay.

10  Q.      You don't need to look at anything.  When did they

11          verbally say that?

12  A.      Verbally they say I told you in 2003 two people

13          came, unknown people that I don't know and they say.

14  Q.      Said what?

15  A.      This is our product, that's what they say.

16  Q.      My question was a little different.  I asked you

17          specifically --

18  A.      I don't recall saying somebody that it was a patent,

19          I don't recall, no.

20  Q.      You don't recall if this was said at the show?

21  A.      At the show they did not say.

22  Q.      Did anybody ever inform you that this six shooter

23          product that you were selling, any of them,

1      infringed on someone's patent?

2   A.    I do not recall that somebody said it, no.

3   Q.    You do not recall or so you are not certain if

4      somebody gave you notice or are you certain?

5   A.    Nobody gave me notice, I think, but I don't recall

6      giving me, anybody giving me notice at the same

7      time.  As far as my memory goes, I did not get any

8      notice in writing or verbally even, saying me that

9      this is patent, no.

10   Q.    Do you use e-mail?

11   A.    Do I use e-mail?

12   Q.    Yes.

13   A.    Yeah, I do sometimes.

14   Q.    How many e-mails accounts do you have?

15   A.    How many e-mail accounts?

16   Q.    Yes.

17   A.    I have one.

18   Q.    Who hosts your e-mail account?

19   A.    Hot mail.

20   Q.    What is your e-mail account?

21   A.    Rajesh33@hotmail.com.

22

23   MR. KEYHANI:     Mark this, please.

1        (Whereupon, an e-mail dated 2/24/04

2        was then marked Plaintiff's Exhibit 3

3        for identification.)

4

5 BY MR. KEYHANI:

6 Q.  I will show you what is marked as Plaintiff's

7    Exhibit 3.  Take a look at this Exhibit 3 for a few

8    moments please.  In the to section is says

9    rajesh33@hotmail.com, is that your e-mail address?

10 A.  That's correct.

11 Q.  The subject says fake six shooter pipes, right?

12 A.  That's correct.

13 Q.  And who signed at the bottom?

14 A.  Jake Lee.

15 Q.  What's the date of this e-mail?

16 A.  February 24, 2004.

17 Q.  Is this an e-mail that you received, Mr. Shah?

18 A.  No, I don't recall receiving this e-mail.

19 Q.  So as you are testifying today, you are stating that

20    you never received this e-mail in Exhibit 3?

21

22 MR. WHITE:    Object to the form of the question.

23        You can answer.

57

1  THE WITNESS:              Okay, see in the e-mail, 100 e-mails

2                            comes every day.  If you don't know

3                            the people, you just delete.  Okay.

4                            It might, he might have sent me, I

5                            might have deleted it because I don't

6                            look each and every e-mail.  If I

7                            look at each and every e-mail, then

8                            it would take five hours and six

9                            hours every day.  It might have gone

10                           to junk e-mail too.  So it's not

11                           necessary that I got this e-mail.

12                           That's my answer.

13

14  BY MR. KEYHANI:

15  Q.    Well, we will deal with that later.  What does the

16        e-mail say?

17  A.    E-mail say I just received word that you are still

18        selling knockoffs of my patented pipe.  You agreed

19        that you would stop selling them and you are not

20        keeping to your agreement.  Therefore, you leave me

21        no choice but to take legal action against you.  You

22        will be receiving a letter from my attorney and a

23        lawsuit will soon follow.  In America, we take

1        patent infringement very seriously.  Sincerely, Jake

2        Lee.

3  Q.    And you are testifying under oath today that you

4        have never seen this e-mail in your entire life

5        until today?

6  A.    Yes sir.

7  Q.    Would you be surprised if the sender of this e-mail

8        could confirm that this e-mail was opened on your

9        end?

10

11  MR. WHITE:        Objection to the form of the

12                    question.  You can answer.

13

14  THE WITNESS:      Ask me again.

15

16  MR. KEYHANI:      Could you read it back.

17

18                   (Whereupon, the last question was

19                   then read back by the reporter.)

20

21  THE WITNESS:      I don't know what to answer your

22                    question.

23

1    BY MR. KEYHANI:

2    Q.    Would you be surprised or not?

3    A.    Okay, I wouldn't be surprised.

4    Q.    Why wouldn't you be surprised?

5    A.    Because I don't open my e-mail, sometimes my son

6        open my e-mail, sometimes my daughter, my e-mail

7        opened by everybody in the family.  If somebody else

8        open, I am not good in computer, so if somebody else

9        open and he don't feel like telling me, then it

10       might be, you may be right it was open and not seen

11       by me or not informed to me.  I am not good in

12       computer, so it's possible what he's saying, so I

13       don't, I am not surprised in that.

14    Q.    So on February 24, 2004 after 6:07 P.M., the date of

15       this e-mail, you still claim here you were not aware

16       of a person named Jake Lee, is that correct?

17    A.    No, no, no, no.

18    Q.    In this e-mail it refers to an agreement that you

19       had with Mr. Lee to stop selling this patented pipe,

20       do you recall an agreement like that?

21    A.    Somebody called me as I said in the papers, that

22       somebody call me, I don't know who that was, Jake

23       Lee or any Lee or any John Lee, I don't know.

| | | |
|---|---|---|
| 1 | Q. | When did they call you? |
| 2 | A. | I don't remember. |
| 3 | Q. | Approximately, around 2004? |
| 4 | A. | I really don't remember. |
| 5 | Q. | Around the time of this e-mail? |
| 6 | A. | One or two times people called me I know. |
| 7 | Q. | Was it this year or a year ago before the lawsuit? |
| 8 | A. | Of course before the lawsuit. |
| 9 | Q. | How long before the lawsuit about? |
| 10 | A. | Oh, very long. |
| 11 | Q. | A couple years before the lawsuit? |
| 12 | A. | It may have been, yes. |
| 13 | Q. | So it may have been around 2004? |
| 14 | A. | I am telling you I don't remember.  I don't want to |
| 15 | | make any statement if I don't remember.  But |
| 16 | | somebody call me and told me something about it and |
| 17 | | that's what we had conversation, that's it.  He can |
| 18 | | say that we agreed.  He was asking me who was making |
| 19 | | in India, blah, blah, blah, I say I don't know |
| 20 | | people.  I am sitting here, somebody sent me samples |
| 21 | | and my job at this end I display, if I get order, I |
| 22 | | sell it. |
| 23 | Q. | During this conversation, this individual that you |

1   believe now to be Mr. Lee, right?

2 A. I don't believe you are saying it.

3 Q. I am asking if you now believe the guy that called

4   you was Mr. Lee?

5 A. If you say so, yes.  No, I don't believe it was Jake

6   Lee.  I don't know who was he.

7 Q. Somebody on behalf of Jake Lee?

8 A. I don't know, maybe somebody else, I don't know.

9 Q. In that conversation that predated the lawsuit, was

10   the subject of a patent brought up?

11 A. I don't remember, I don't remember.  Somebody call

12   me and I have conversation with him.  What

13   conversation about it, I don't remember.

14 Q. Did they talk about a pipe?

15 A. They talk about six shooter pipe, yes.

16 Q. Did they say that you were doing something wrong?

17 A. I mean everybody can say I am doing everything

18   wrong.  It doesn't mean anything.

19 Q. I understand.

20 A. The authority can say what I am doing is right or

21   wrong.

22 Q. I understand that.  My question is, did the person

23   that called you inform you or indicate to you that

62

1       you were violating patent rights?

2  A.   No.

3  Q.   Do you know that for certain?

4  A.   As far as I remember.  I am not certain but I told

5       you I don't remember everything.

6  Q.   A moment ago you said you don't recall the

7       conversation.  Now you are saying --

8  A.   I don't remember everything, that's what I am

9       telling you.  Again, I don't know what you are

10      trying to ask me again.

11  Q.   So you are not sure whether the subject of a patent

12      was brought up during that conversation?

13  A.   I don't remember the conversation.  I just recall

14      that he call, somebody called me.

15  Q.   Regarding the --

16  A.   Regarding the six shooter pipes.

17  Q.   And they had some complaint?

18  A.   They say they wanted to know who was making in India

19      since I displayed there, they wanted to know who was

20      making in India, I know that much, and I said I

21      don't know who is making in India.  That's not my

22      business.

23  Q.   Remember a conversation that you and I had?

**WENDY ROYCE McCANN - COURT REPORTER**

63

1  A.       Conversation, we had a lot of conversations.

2  Q.       Prior to your lawyer, prior to you hiring your

3           lawyer?

4  A.       Yeah, what conversation.  I remember everything.

5           Most of the thing I remember with you.

6  Q.       Do you remember calling me a few times?

7  A.       Yes.

8  Q.       Do you remember telling me that you sold five or six

9           of these pipes?

10  A.      No, I did not say that.  I said five or six pipes we

11          sold to this company, Jake Lee or Jack Lee, whatever

12          company.  I didn't say five or six pipes.

13  Q.      Do you remember me asking you how many six shooter

14          pipes in total you sold and what did you say?

15  A.      50, that's what I said, I remember correctly.

16  Q.      Do you still say that was true today?

17

18  MR. WHITE:              Object to the form.  What was true?

19

20  MR. KEYHANI:            That you sold 50.

21

22  THE WITNESS:            Can I answer now?

23

**WENDY ROYCE McCANN - COURT REPORTER**

64

1   MR. WHITE:               Of course.

2

3   THE WITNESS:             I thought he was saying something.  I

4                            told you 50 I sold six shooter like

5                            this.  That's my ballpark memory, but

6                            in total when you ask me 300, in

7                            total we sold 300, but I told you at

8                            that time 50 and I still stand for

9                            that, that approximately 50 six

10                           shooters I sold, yes.

11

12  BY MR. KEYHANI:

13  Q.    You said approximately you sold --

14  A.    You see they come mix.  See, I don't remember.  If

15        you come to my office, you will see how I open.  I

16        can not remember how many each item I sell.  I have

17        box lying everything, so I don't remember which

18        piece I sold how many, but as far as my memory goes,

19        I got 50 those kind of things and I sold 50, that's

20        what I told you.  I did not say five.

21  Q.    Did you recall that your daughter had accidently

22        sold them?

23  A.    It is no accidentally.  She sold them because she

1          doesn't know my business.  It's not accidentally.

2          She sold them, yes, it's black and white.

3    Q.    Did she sell them with your permission?

4    A.    I was not in town.  I was not in country.  How is

5          she take permission.  She was there.

6    Q.    Besides those that your daughter sold, were there

7          any other six shooters sold at any time?

8    A.    I do not remember, but I told you I got

9          approximately 300 pieces and we said sold 300

10         pieces.  Which piece was how many I don't remember.

11

12   MR. KEYHANI:            Mark this, please.

13

14                          (Whereupon, a packing list dated

15                          12/11/05 was then marked Plaintiff's

16                          Exhibit 4 for identification.)

17

18   BY MR. KEYHANI:

19   Q.    I am going to show you what has been marked as

20         Exhibit 4, a packing list.  Do you recognize this?

21         What is this?

22   A.    This import invoice.

23   Q.    For what?

1    A.      Packing list for bangles.

2    Q.      I am sorry, for what?

3    A.      Bangles, bracelets.

4    Q.      This was produced to my firm from your counsel.  Do

5            you know what the purpose of the production this

6            was?

7    A.      Purpose of production, what do you mean?

8

9    MR. WHITE:              Why did we give that to him?

10

11   THE WITNESS:            Okay, oh okay, I wanted to show you

12                           this is everything what I do.  I

13                           don't do only pipes.  I have 5-600 or

14                           10,000 items I import and I sell and

15                           this is all I import.  You can see

16                           anywhere if I imported any pipes or

17                           six shooter pipes.  This is what I

18                           mean to say.  I do lot of things you

19                           know, I try to make my living, so I

20                           sell bracelets, I sell jewelry, I

21                           sell a lot of things.

22

23   MR. KEYHANI:            Mark this, please.

1                              (Whereupon, an invoice dated 10/9/03

2                              was then marked Plaintiff's Exhibit 5

3                              for identification.)

4

5    BY MR. KEYHANI:

6    Q.      Showing you Exhibit 5.

7    A.      Yeah, what do you want to ask?

8    Q.      Do you recognize this document?  I am just going

9            over some of the documents that were produced.

10   A.      Yes, I do.

11   Q.      What is this document?

12   A.      It's purchase invoice.

13   Q.      From who?

14   A.      Metomic Gearon Company.

15   Q.      What is Metomic Company?

16   A.      Where we buy some parts from.

17   Q.      Parts for what?

18   A.      Parts for people ask me, parts for what I don't

19           know.  Again, I sell only product what people ask

20           me, so I don't, I never ask what are you ordering

21           this, they say okay I want this, I order whatever I

22           can get and I sell them.  So I don't know for what.

23   Q.      These parts you don't combine them, you just sell

68

1          them?

2    A.    Yes.

3    Q.    So they are things that you sell?

4    A.    Yes.

5    Q.    You don't manufacture anything?

6    A.    No sir.

7

8    MR. KEYHANI:          Mark this, please.

9

10                        (Whereupon, an invoice dated 1/15/04

11                        was then marked Plaintiff's Exhibit 6

12                        for identification.)

13

14   BY MR. KEYHANI:

15   Q.    Showing you Exhibit 6, could you please identify

16         this?

17   A.    It's from Awesome Wholesale.

18   Q.    Who is that?

19   A.    Another vendor where I buy from.

20   Q.    Where are they located?

21   A.    In Vincennes, Indiana.

22

23   MR. KEYHANI:          Mark this, please.

**WENDY ROYCE McCANN - COURT REPORTER**

69

```
 1                              (Whereupon, a letter dated 11/8/05
 2                              was then marked Plaintiff's Exhibit 7
 3                              for identification.)
 4
 5   BY MR. KEYHANI:
 6   Q.      Do you recall that?
 7   A.      Yes.
 8   Q.      What is that?
 9   A.      B.V. Aswathiah & Brothers.
10   Q.      Who are they?
11   A.      I don't know.  I don't even know them.  They just
12           send me some samples.  Sometimes people know of our
13           company and they have marketing calls, they send
14           samples.
15
16   MR. KEYHANI:            Mark this, please.
17
18                              (Whereupon, an invoice dated 8/10/04
19                              was then marked Plaintiff's Exhibit 8
20                              for identification.)
21
22   BY MR. KEYHANI:
23   Q.      Do you recognize this document?
```

**WENDY ROYCE McCANN - COURT REPORTER**

1  A.      Yes sir.

2  Q.      What is this company?

3  A.      He's in New York.

4  Q.      And you also buy product from them?

5  A.      Yes, we buy jewelry.

6  Q.      Mr. Shah, where do you purchase the six shooter

7          pipes that is the subject of this case, from who?

8  A.      Okay, we did not purchase, as I told you before,

9          they sent us as a samples by Korea and if I recall

10         right, somebody send me in Korea some time, few

11         years ago, and that's about it.  Who send it, I

12         think, I think Wrist India.

13

14 MR. KEYHANI:            Mark this, please.

15

16                        (Whereupon, a packing list/weight was

17                        then marked Plaintiff's Exhibit 9 for

18                        identification.)

19

20 BY MR. KEYHANI:

21 Q.      Showing you Exhibit 9. This is Wrist, India, is that

22         the one that you are referring to?

23 A.      Yes sir.

**WENDY ROYCE McCANN - COURT REPORTER**

71

1    Q.      They are in Mumbai, India?

2    A.      Yes sir.  And again, I am not 100 percent, I think

3            this is what he send me.  I had a lot of people

4            sending me samples.

5    Q.      What price do you sell these pipes, the six shooter

6            pipes at?

7    A.      7 to $15 depending on the customer to customer and

8            product to product.  Like I have three different

9            kind of six shooters, so I don't remember, but I

10           think 7 to $13 each.  We don't have set prices.

11   Q.      What does the price depend on?

12   A.      My mood.

13   Q.      What's the average total purchase value of a

14           particular invoice from one of your, from one of the

15           stores that you sell to?

16   A.      Say again.

17   Q.      What is the average value of products that they

18           purchase at one time?

19   A.      Oh, that's not set.  Anybody buy 100, anybody buy

20           1,000 and anybody buy 500, whatever the order is,

21           how many orders, it all depend.  You can see on my

22           note, it's not a big amount.  I have very small

23           customers.  My customers are retail customers.

72

1   Q.     Are you familiar with a store called Village Cadeau,

2         C-a-d-e-a-u, in New York?

3   A.     No.

4   Q.     Have you ever sold six shooter pipes to that store?

5   A.     I don't even remember this name.

6   Q.     Village Cadeau, you don't recognize it?

7   A.     No.  He must have invoice.  Does he have invoice?

8   Q.     I don't know, I am just curious if you are familiar

9         with that store?

10   A.     No, no, I don't remember all of the customers.

11   Q.     You may have, but you don't know?

12   A.     No, I don't remember at all this customer.  That's a

13         new name for me.

14

15   MR. KEYHANI:        Mark this, please.

16

17                  (Whereupon, invoice dated 1/4/07 was

18                  then marked Plaintiff's Exhibit 10

19                  for identification.)

20

21   BY MR. KEYHANI:

22   Q.     Do you recognize Exhibit 10?

23   A.     Yes.

73

1    Q.    You provided this invoice?

2    A.    Yes.

3    Q.    What is this invoice?

4    A.    This is the guy you are suing me for.

5    Q.    I am sorry, what do you mean by that?

6    A.    This is Jake Lee's father.

7    Q.    This is Jake Lee's father?

8    A.    That's correct.  That's how you are getting me here.

9    Q.    Where is that located?

10   A.    California.

11   Q.    What is the invoice for?

12   A.    Five six shooters and five dugouts.

13   Q.    And what's the price of the six shooter here?

14   A.    $13.

15   Q.    What kind of six shooter were these, do you know?

16   A.    No, I don't.

17   Q.    You are not sure?

18   A.    No.

19   Q.    Could it have been the six shooter pipes?

20   A.    I mean, they are all pipes.  This is pipe, that is

21         pipe, I mean, all we call pipes.

22   Q.    When you say this is pipe, Exhibit 2 you believe is

23         a pipe also?

1  A.    I believe it is pipe, it may be pipes.  I believe,
2        people use it, so I don't use it.
3  Q.    Well, I asked you earlier what you thought that was?
4  A.    It's a part I sell, which we call six shooter, I
5        told you.
6  Q.    Well, you said earlier you didn't know what this was
7        and now you said this was a pipe, I am not sure.
8  A.    You are telling me pipe, I have to, I mean,
9        understand this way that this is what we are here
10       for.
11 Q.    And this is the type of sales invoice that you use?
12 A.    Yes.
13 Q.    When you sell a product, is this authenticate, this
14       copy of this which says invoice?
15 A.    Yes.
16
17 MR. KEYHANI:          Mark this, please.
18
19                       (Whereupon, invoice dated 7/15/05 was
20                       then marked Plaintiff's Exhibit 11
21                       for identification.)
22
23 BY MR. KEYHANI:

1  Q.    Now this is Exhibit 11.   Do you recognize this sir?

2  A.    Yes.

3  Q.    What is Exhibit 11?   Is this an invoice of yours?

4  A.    That's correct, it's mine.

5  Q.    And this is authentic?

6  A.    Yes.

7  Q.    And are there any six shooters being sold here?

8  A.    It says six shooters.

9  Q.    What's the price?

10 A.    $13.

11 Q.    So both on Exhibit 11 and Exhibit 10, the price of a

12       six shooter is sold for $13.   Is that about the

13       average price for a six shooter, would you say?

14 A.    I tell you that we sell 7 to $13, that's what I

15       remember, yes.

16 Q.    I am just asking.

17 A.    Yes, yes.

18 Q.    How much profit do you make off of that $13?

19 A.    Profit?

20 Q.    Yes.

21 A.    There was 100 percent profit because I never paid

22       it.

23 Q.    Oh really.

76

1   A.    I told you that we never imported it, so there is no

2          cost involved in it.

3   Q.    So for all of the six shooters you sold, you made

4          100 percent profit?

5   A.    Well, I did not pay, so if I remember correctly, I

6          did not pay.  I am not saying I did not pay, but I

7          think I did not pay.

8   Q.    You said earlier that you didn't pay, right?

9   A.    If I remember correctly I did not pay them for 300

10         pieces.

11  Q.    So then the profit was 100 percent?

12  A.    100 percent means if you don't pay anything and you

13         get money, means all the money is yours.  You call

14         them profit or whatever you call them, but they

15         don't give you anything free.  The charge you have

16         somewhere else.  Nothing is free.

17  Q.    Mr. Shah, do you have any distributors that you use

18         to distribute your products?

19  A.    No.

20  Q.    So you only sell your products through the stores

21         that we have looked at some samples?

22  A.    Yes.

23  Q.    Sales invoices for?

77

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And most of the representatives from these stores |
| 3 | | that you sell your products, you meet at the trade |
| 4 | | shows in Las Vegas? |
| 5 | A. | Yes, more or less, yes.  Not in Las Vegas, I don't |
| 6 | | say in Las Vegas, in the trade shows.  That's what I |
| 7 | | do, yes, I mean yes. |
| 8 | Q. | Do you attend other trade shows other than the ones |
| 9 | | in Las Vegas? |
| 10 | A. | No, no, that's why I go into that, yes. Some people |
| 11 | | come like you offer to somebody that person is not |
| 12 | | from show, that's what I was trying to say, yes. |
| 13 | Q. | I understand.  Since the lawsuit began, I am talking |
| 14 | | about the lawsuit that you are being deposed for |
| 15 | | with regard to, had you had any communications with |
| 16 | | Jake Lee or somebody affiliated with him? |
| 17 | A. | You mean I talk to him directly? |
| 18 | Q. | Yes. |
| 19 | A. | So when I got your notice, I think I tried once, I |
| 20 | | think, but I never reach him because he's never |
| 21 | | there.  His father is there. |
| 22 | Q. | You talked to his father? |
| 23 | A. | No. |

78

1  Q.    Have you spoken to Mr. Lee or his father at any time
2        after being sued?
3  A.    I didn't speak, no.  I call once.  But I never was
4        able to speak because this guy is never there.
5  Q.    Do you know when you sold your last six shooter
6        product?
7  A.    I think this was it.  I think.  Okay, I don't
8        remember.
9  Q.    When you say this, are you referring to Exhibit 10?
10 A.    Okay, I don't remember.  Don't take my word on it,
11       but I think around that time, around this time.  You
12       have all the invoices, you can check it.
13 Q.    Around January of 2007?
14 A.    I think I sold after that, too.  I think we sold but
15       whatever inventory we have we sold and you have all
16       the invoices, so you can check all the dates.  I
17       don't remember.
18 Q.    Did you sell products after you were -- strike that.
19       Did you sell any six shooter products after you were
20       sued in this case?
21 A.    All the invoices you have sir, so everything can not
22       be in my memory, no.  I don't remember.  I can not
23       say yes, I can not say no.  Every invoice is here.

**WENDY ROYCE McCANN - COURT REPORTER**

1       Most of the invoices I have what I have given to

2       you.

3  Q.   Did you change any of your sales decisions after

4       being sued in this case?

5  A.   Did I change any of my sales decisions?

6  Q.   I will rephrase it.  It's not a very good question.

7       Did you stop selling any particular product after

8       you were sued in this case?

9  A.   Stop means whatever inventory I had I sold it and I

10      stop it.  I don't sell actually.  I told you we

11      mostly work by order.  Only left over inventory we

12      sell.

13  Q.   So, if the word sell bothers you, did you take

14      orders or sell, did you stop taking orders or

15      selling any products in your inventory?

16  A.   After I get sued?

17  Q.   After you get sued.

18  A.   If you are referring to six shooters, I was not

19      selling, I was not ordering, I was not displaying,

20      other than that, no.

21  Q.   Did you continue to sell six shooter pipes from your

22      inventory after you were sued in this case?

23  A.   I don't think so, but you have all the invoices.

80

1      You can look.  You can look at the dates.  I give

2      you all the invoices.  I try to give you all the

3      invoices.

4  Q.    So you are not sure whether you did or did not?

5  A.    I think I did not, but I am not sure, no.  After I

6      got notice, I should not, no.  I should not.  I

7      don't want to say anything.

8

9  MR. KEYHANI:      Off the record.

10

11         (Whereupon, a brief recess was then

12         taken.)

13

14  BY MR. KEYHANI:

15  Q.    Just take a look at Exhibit 11.  I just want to

16      confirm, I think we have already authenticated this.

17      Do you recognize this?

18  A.    Yes, I recognize this.  We did it already.

19  Q.    And this is an authentic exhibit?

20  A.    Yes.

21  Q.    And sales receipt?

22  A.    Yes.

23

1    MR. KEYHANI:            I think that's all the questions that

2                           I have for today.   Thank you for your

3                           time.

4

5                           (Whereupon, proceedings concluded.)

6

7

8                    **CERTIFICATE OF REPORTER**

9

10   I, **WENDY ROYCE McCANN**, hereby certify that I did report in

11   machine shorthand the foregoing proceeding had in the

12   above-entitled matter, at the time and place hereinbefore

13   set forth; I do further certify that the transcript

14   consisting of 80 pages, is a true and correct transcript of

15   my said stenographic notes.

16

17

18

19                                    **WENDY ROYCE McCANN**

20

21

22

23

*WENDY ROYCE McCANN - COURT REPORTER*

**$**

$13 [6] - 71:10, 73:14, 75:10, 75:12, 75:14, 75:18
$15 [1] - 71:7
$3,000 [2] - 38:17, 43:18
$40,000 [2] - 24:22, 25:7
$400,000 [2] - 24:9, 24:15
$50,000 [1] - 24:22

**'**

'75 [1] - 20:23
'82 [2] - 21:2, 21:18

**0**

07-CV.0338C(SR [1] - 1:6

**1**

1 [5] - 3:3, 36:10, 36:16, 36:21, 40:14
1,000 [1] - 71:20
10 [5] - 3:12, 72:18, 72:22, 75:11, 78:9
10,000 [2] - 26:15, 66:14
10/9/03 [2] - 3:7, 67:1
100 [9] - 31:20, 52:6, 57:1, 71:2, 71:19, 75:21, 76:4, 76:11, 76:12
10017 [1] - 2:3
11 [6] - 3:13, 74:20, 75:1, 75:3, 75:11, 80:15
11507 [1] - 4:20
11:40 [1] - 1:16
12/II/05 [2] - 3:6, 65:15
14221 [1] - 2:6
15 [1] - 20:11
170 [1] - 30:12
18 [1] - 1:15

19 [1] - 21:17
1975 [1] - 20:5

**2**

2 [8] - 3:4, 49:2, 49:9, 49:16, 50:12, 50:15, 51:18, 73:22
2/24/04 [2] - 3:5, 56:1
20 [1] - 23:3
200 [1] - 51:3
2000 [1] - 10:6
2003 [2] - 26:9, 54:12
2004 [4] - 56:16, 59:14, 60:3, 60:13
2006 [3] - 24:11, 25:1, 25:3
2007 [1] - 78:13
2008 [1] - 1:15
24 [2] - 56:16, 59:14
25 [1] - 29:22
26 [1] - 29:22
28 [2] - 20:15, 29:22

**3**

3 [5] - 3:5, 56:2, 56:7, 56:20
30 [2] - 5:15, 25:8
300 [20] - 38:14, 46:12, 46:13, 46:15, 48:10, 48:13, 50:13, 50:15, 50:23, 51:8, 51:10, 51:13, 52:7, 52:22, 52:23, 64:6, 64:7, 65:9, 76:9
300,000 [1] - 51:3
33 [2] - 4:19, 14:4
330 [1] - 2:2
36 [1] - 3:3

**4**

4 [4] - 3:6, 37:7, 65:16, 65:20
40 [2] - 24:22, 25:8
400 [1] - 52:7
48 [1] - 3:4

**5**

5 [3] - 3:7, 67:2, 67:6
5'10 [1] - 30:10
5,000 [2] - 26:15
5-600 [1] - 66:13
50 [8] - 29:8, 63:15, 63:20, 64:4, 64:8, 64:9, 64:19
50,000 [1] - 26:16
500 [3] - 11:11, 27:8, 71:20
56 [1] - 3:5
5662 [2] - 1:14, 2:5

**6**

6 [32] - 3:8, 27:21, 27:22, 28:7, 32:16, 32:17, 32:18, 32:19, 32:20, 32:22, 33:8, 33:12, 33:17, 34:3, 34:4, 34:7, 34:15, 34:18, 34:19, 34:21, 34:23, 35:8, 35:17, 39:8, 39:9, 39:16, 39:18, 39:23, 68:11, 68:15
65 [1] - 3:6
67 [1] - 3:7
68 [1] - 3:8
69 [2] - 3:9, 3:10
6:07 [1] - 59:14
6th [1] - 2:2

**7**

7 [6] - 3:9, 37:3, 69:2, 71:7, 71:10, 75:14
7/I5/05 [2] - 3:13, 74:19
70 [1] - 3:11
72 [1] - 3:12
74 [1] - 3:13

**8**

8 [2] - 3:10, 69:19
8/I0/04 [2] - 3:10,

69:18
80 [1] - 81:14
800 [1] - 11:17

**9**

9 [5] - 3:11, 38:4, 43:6, 70:17, 70:21
90 [1] - 13:17

**A**

A.M [1] - 1:16
ability [1] - 19:6
able [1] - 78:4
above-entitled [1] - 81:12
absolutely [2] - 54:1, 54:4
ACCESSORIES [1] - 1:7
Accessories [9] - 6:4, 9:13, 9:14, 10:3, 10:8, 10:17, 16:6, 24:3, 24:5
accessories [4] - 11:6, 11:7, 11:9, 11:10
accidentally [2] - 64:23, 65:1
accidently [1] - 64:21
account [2] - 55:18, 55:20
accountant [1] - 24:23
accounts [2] - 55:14, 55:15
accurate [1] - 37:10
action [1] - 57:21
address [4] - 4:16, 6:5, 14:3, 29:3, 56:9
administered [1] - 17:2
affiliated [1] - 77:16
agent [1] - 22:1
ago [9] - 14:22, 14:23, 39:4, 43:23, 45:21, 49:14, 60:7, 62:6, 70:11

agreed [2] - 57:18, 60:18
agreement [3] - 57:20, 59:18, 59:20
ahead [1] - 37:16
Albertson [3] - 4:20, 14:6, 14:9
Alibaba.com [2] - 40:15, 42:2
Almost [1] - 23:3
alone [1] - 49:10
America [1] - 57:23
amount [1] - 71:22
Angeles [1] - 26:1
Answer [1] - 39:6
answer [21] - 15:7, 17:19, 18:4, 18:5, 18:9, 18:10, 18:19, 18:20, 25:5, 37:16, 38:10, 43:6, 43:14, 47:7, 47:18, 47:21, 56:23, 57:12, 58:12, 58:21, 63:22
answered [1] - 18:22
answering [1] - 53:7
answers [2] - 17:16, 37:12
anyway [1] - 52:16
appear [1] - 6:6
appearance [1] - 49:7
APPEARANCES [1] - 2:1
approach [3] - 30:14, 30:16
approached [1] - 30:18
approaching [1] - 26:11
approximate [1] - 24:23
assert [1] - 38:14
association [1] - 16:1
Aswathiah [1] - 69:9
attempt [1] - 44:19
attend [3] - 19:17, 19:19, 77:8
attention [4] - 37:3, 38:1, 40:13, 43:5

Attorney [1] - 2:6
attorney [4] - 18:3,
18:5, 18:8, 57:22
Attorneys [1] - 2:3
authentic [2] -
75:5, 80:19
authenticate [1] -
74:13
authenticated [1] -
80:16
authority [2] -
27:16, 61:20
available [1] - 38:8
Avenue [1] - 2:2
average [3] -
71:13, 71:17, 75:13
aware [1] - 59:15
Awesome [1] -
68:17

**B**

B.V [1] - 69:9
Bachelor [1] - 20:1
background [1] -
19:15
ballpark [2] -
24:10, 64:5
bangle [1] - 28:13
bangles [1] - 66:1
Bangles [1] - 66:3
banking [1] - 23:1
bate [1] - 6:4
began [1] - 77:13
beginning [1] -
50:17
behalf [1] - 61:7
best [1] - 18:16
between [3] - 4:3,
13:2, 47:12
big [2] - 16:21,
71:22
black [1] - 65:2
blah [6] - 27:7,
60:19
blonde [3] - 30:4,
30:5
blurry [1] - 30:6
boom [1] - 11:13
booth [10] - 26:13,
26:14, 26:15, 26:18,
26:20, 27:14, 28:3,
28:20, 31:6

bothers [1] - 79:13
bottom [4] - 40:21,
46:15, 53:16, 56:13
bought [1] - 50:19
box [5] - 28:14,
50:16, 50:17, 50:18,
64:17
boxes [3] - 11:12,
11:13, 28:13
bracelets [2] -
66:3, 66:20
brief [1] - 80:11
bring [7] - 26:23,
29:10, 29:12, 29:14,
41:10, 50:11, 51:15
Brothers [1] - 69:9
brought [4] -
16:14, 16:16, 61:10,
62:12
business [22] -
7:8, 10:17, 10:23,
11:1, 11:21, 12:15,
21:5, 21:7, 22:16,
22:20, 31:12, 33:18,
41:6, 42:5, 51:1,
51:5, 52:1, 53:2,
53:3, 62:22, 65:1
Business [1] -
10:19
buy [16] - 8:7, 9:8,
11:16, 50:12, 50:13,
50:14, 50:21, 51:3,
67:16, 68:19, 70:4,
70:5, 71:19, 71:20
BY [31] - 1:7, 2:1,
4:22, 7:1, 13:19,
15:17, 34:1, 35:1,
36:13, 37:21, 41:21,
45:8, 45:18, 46:4,
47:23, 48:18, 49:5,
53:18, 56:5, 57:14,
59:1, 64:12, 65:18,
67:5, 68:14, 69:5,
69:22, 70:20, 72:21,
74:23, 80:14

**C**

Cadeau [2] - 72:1,
72:6
CADEAU [1] - 72:2
California [1] -
73:10

candle [3] - 41:18,
47:9, 48:14
candleholder [2] -
32:18, 42:14
candleholders [1]
- 48:12
candles [3] -
32:19, 39:17
cannot [9] - 17:20,
27:14, 27:15, 27:23,
30:22, 31:2, 31:3,
31:8, 52:12
car [2] - 20:10,
20:11
card [1] - 21:15
case [13] - 14:22,
15:1, 16:8, 16:14,
16:16, 26:23, 31:22,
32:2, 70:7, 78:20,
79:4, 79:8, 79:22
cases [1] - 16:23
Caucasian [2] -
29:23, 30:1
Center [1] - 16:19
certain [7] - 31:19,
54:1, 54:4, 55:3,
55:4, 62:3, 62:4
CERTIFICATE [1] -
81:8
certification [1] -
4:7
certify [1] - 81:10,
81:13
chances [1] -
29:13
change [3] - 37:12,
79:3, 79:5
characteristics [1]
- 49:7
charge [1] - 76:15
check [3] - 8:22,
78:12, 78:16
choice [1] - 57:21
city [3] - 20:6,
20:12, 20:13
City [1] - 21:16
Civil [2] - 1:6, 1:13
claim [1] - 59:15
clarification [1] -
53:19
clarify [2] - 17:22,
47:21
clear [1] - 33:13
closest [1] - 20:12

college [6] - 19:16,
19:17, 19:19, 19:21,
20:6, 20:21
colored [1] - 49:6
combine [1] -
67:23
Commence [2] -
20:1
commencing [1] -
1:16
commerce [1] -
38:17
communications
[1] - 77:15
companies [5] -
6:14, 6:15, 6:16,
8:23, 24:1
Company [3] -
16:3, 67:14, 67:15
company [23] -
6:20, 7:11, 9:17,
9:19, 9:20, 10:1,
10:8, 10:15, 16:4,
21:7, 22:2, 23:7,
23:8, 23:9, 23:11,
23:13, 23:19, 23:22,
24:2, 63:11, 63:12,
69:13, 70:2
company's [1] -
21:8
complaint [2] -
40:8, 62:17
component [1] -
49:8
computer [2] -
59:8, 59:12
concerned [1] -
28:11
concluded [1] -
81:5
cone [2] - 11:12,
28:13
confirm [2] - 58:8,
80:16
confusion [1] -
33:10
conjunction [2] -
38:20, 49:10
consequences [1]
- 35:5
consisting [1] -
81:14
contact [4] - 25:18,
25:19, 25:21, 25:22

contents [1] - 37:9
context [1] - 14:13
continue [2] -
32:9, 79:21
Continue [1] -
32:10
conversation [10] -
60:17, 60:23, 61:9,
61:12, 61:13, 62:7,
62:12, 62:13, 62:23,
63:4
Conversation [1] -
63:1
conversations [1]
- 63:1
convicted [1] -
19:9
copy [2] - 29:1,
74:14
correct [19] - 7:13,
10:16, 11:19, 11:22,
12:20, 16:7, 26:5,
26:8, 38:18, 40:5,
44:2, 53:22, 54:6,
56:10, 56:12, 59:16,
73:8, 75:4, 81:14
Correct [2] - 14:2,
43:21
correctly [3] -
63:15, 76:5, 76:9
cost [1] - 76:2
Counsel [2] -
44:18, 47:19
counsel [3] - 4:4,
36:17, 66:4
count [3] - 48:13,
48:14, 48:15
country [1] - 65:4
couple [3] - 6:3,
40:17, 60:11
course [5] - 9:20,
25:2, 38:15, 60:8,
64:1
COURT [1] - 1:1
court [7] - 16:16,
16:18, 16:20, 16:21,
17:5, 17:17, 17:20
courtesy [1] -
18:19
crafts [1] - 11:5
Crest [2] - 4:19,
14:4
crimes [1] - 19:9
cuff [1] - 28:13

*WENDY ROYCE McCANN - COURT REPORTER*

curious [1] - 72:8
currency [1] - 38:6
customer [18] -
7:5, 7:17, 8:1, 8:6,
8:16, 9:10, 32:14,
33:5, 33:7, 33:17,
42:11, 49:22, 50:4,
71:7, 72:12
customers [18] -
6:12, 6:13, 7:4, 8:3,
8:9, 8:12, 8:18,
12:14, 12:15, 12:17,
26:14, 51:14, 52:4,
52:14, 71:23, 72:10

**D**

DARIUSH [1] - 2:1
Dark [1] - 30:4
date [5] - 38:6,
38:7, 38:8, 56:15,
59:14
dated [15] - 3:5,
3:7, 3:8, 3:9, 3:10,
3:12, 3:13, 56:1,
65:14, 67:1, 68:10,
69:1, 69:18, 72:17,
74:19
dates [2] - 78:16,
80:1
daughter [3] -
59:6, 64:21, 65:6
days [2] - 20:20
deal [1] - 57:15
decided [1] - 23:18
decisions [2] -
79:3, 79:5
Defendants [5] -
1:9, 2:6, 38:9,
38:11, 38:14
Defendants' [1] -
38:16
delete [1] - 57:3
deleted [1] - 57:5
Delhi [2] - 20:8,
20:9
deposed [3] -
14:11, 26:6, 77:14
deposition [7] -
5:4, 5:7, 5:17,
14:13, 14:15, 19:7,
53:20
Describe [1] -

29:18
describe [5] - 6:8,
29:16, 29:19, 39:15,
39:20
details [1] - 10:23
diagram [1] - 35:14
different [12] -
7:22, 11:11, 32:17,
34:6, 39:8, 39:11,
41:7, 44:7, 51:11,
52:19, 54:16, 71:8
direct [5] - 35:6,
37:3, 38:1, 40:13,
43:5
directly [1] - 77:17
directs [1] - 18:5
discussion [2] -
15:14, 36:3
displaced [1] -
51:16
display [5] - 11:23,
12:19, 27:11, 28:16,
60:21
displayed [1] -
62:19
displaying [1] -
27:10, 79:19
dissolve [2] -
23:16, 23:17
dissolved [3] -
23:12, 23:13, 24:2
distinction [2] -
13:2, 47:11
distribute [2] -
10:21, 76:18
distribution [1] -
9:5
distributors [1] -
76:17
DISTRICT [2] - 1:1,
1:2
document [6] -
36:20, 36:22, 37:1,
67:8, 67:11, 69:23
documents [11] -
5:16, 5:21, 5:22,
5:23, 6:1, 6:3, 6:8,
6:9, 6:17, 7:10, 67:9
dollars [1] - 38:5
door [1] - 31:7
down [2] - 17:16,
17:21
dozen [1] - 6:3
dugouts [1] -

73:12
duly [1] - 4:13
During [1] - 60:23
during [1] - 62:12

**E**

E-mail [2] - 3:5,
57:17
e-mail [26] - 55:10,
55:11, 55:15, 55:18,
55:20, 56:1, 56:9,
56:15, 56:17, 56:18,
56:20, 57:1, 57:6,
57:7, 57:10, 57:11,
57:16, 58:4, 58:7,
58:8, 59:5, 59:6,
59:15, 59:18, 60:5
e-mails [2] - 55:14,
57:1
educational [1] -
19:15
Eight [1] - 21:11
eight [2] - 10:4,
10:5
either [1] - 38:7
employee [1] -
10:15
employees [1] -
10:11
end [2] - 58:9,
60:21
entered [1] - 4:2
entire [1] - 58:4
entities [2] - 6:13,
8:20
entitled [2] - 18:15,
81:12
envelope [1] - 6:3
ESQ [2] - 2:1, 2:5
event [1] - 32:3
events [1] - 18:16
eventually [1] -
47:13
exactly [3] - 10:23,
25:23, 28:5
Exactly [1] - 30:20
Examination [1] -
1:12
EXAMINATION [1]
- 4:22
examined [1] -
4:14

except [1] - 4:9
EXHIBIT [1] - 3:2
Exhibit [34] -
36:10, 36:16, 36:21,
40:14, 49:2, 49:9,
49:16, 50:12, 50:15,
51:18, 56:2, 56:7,
56:20, 65:16, 65:20,
67:2, 67:6, 68:11,
68:15, 69:2, 69:19,
70:17, 70:21, 72:18,
72:22, 73:22, 74:20,
75:1, 75:3, 75:11,
78:9, 80:15
exhibit [5] - 37:4,
40:7, 41:14, 41:23,
80:19
expect [2] - 52:23,
53:11
expedited [1] -
44:20
explain [1] - 14:13
extend [1] - 18:19

**F**

fail [1] - 17:8
fake [1] - 56:11
familiar [2] - 72:1,
72:8
family [1] - 59:7
far [7] - 20:8, 20:9,
20:12, 28:10, 55:7,
62:4, 64:18
father [5] - 73:6,
73:7, 77:21, 77:22,
78:1
February [3] -
37:7, 56:16, 59:14
Federal [1] - 1:13
feet [1] - 11:17
fellows [1] - 29:16
few [7] - 5:21,
5:22, 9:4, 39:3,
56:7, 63:6, 70:10
fight [1] - 31:12
fighting [4] - 27:5,
27:6, 29:17, 30:17
file [2] - 25:1, 25:2
filing [1] - 4:6
fine [1] - 45:6
finish [2] - 18:18,
18:20

finished [2] -
41:10, 47:2
firm [1] - 66:4
First [1] - 28:20
first [12] - 4:13,
9:12, 16:22, 19:4,
21:19, 25:18, 26:2,
28:21, 30:14, 31:9,
31:21, 38:6
five [6] - 27:13,
30:7, 57:8, 63:8,
63:10, 63:12, 64:20,
73:12
Five [1] - 73:12
flew [1] - 5:10
Floor [1] - 2:2
follow [1] - 57:23
following [1] - 4:1
follows [1] - 4:14
foregoing [1] -
81:11
forget [1] - 52:13
form [10] - 4:9,
34:9, 45:1, 45:4,
47:8, 47:19, 54:3,
56:22, 58:11, 63:18
forth [1] - 81:13
founded [1] - 10:3
free [6] - 50:23,
51:2, 51:6, 76:15,
76:16
Free [1] - 51:1
friend [1] - 14:21

**G**

garbage [1] - 52:16
Gearon [1] - 67:14
general [1] - 34:10
generated [1] -
38:8
generic [1] - 42:10
genuine [1] - 46:8
given [2] - 54:4,
79:1
glass [1] - 19:4,
27:15, 31:7, 31:8,
33:3, 33:4
Globusgafts [1] -
21:22
gold [2] - 21:5,
21:7
graduate [1] - 20:2

graduated [2] -
19:16, 20:21
green [1] - 21:15
Gross [1] - 24:20
guess [1] - 13:17
gun [2] - 33:12,
49:8
Gupta [1] - 22:15
guy [7] - 25:9,
25:12, 26:3, 28:19,
61:3, 73:4, 78:4
guys [2] - 28:19,
29:20

**H**

H-u-t [1] - 6:22
hair [1] - 30:4
handling [2] -
23:7, 23:8
handy [1] - 11:5
Happy [3] - 6:18,
6:19, 7:2
hard [1] - 7:10
head [1] - 17:20
heard [2] - 26:1,
31:21
Heart [2] - 6:18,
6:19
held [3] - 15:15,
17:9, 36:4
hell [1] - 31:2
hereby [2] - 4:3,
81:10
herein [1] - 38:12
hereinbefore [1] -
81:12
hereto [1] - 4:5
hired [1] - 22:12
hiring [1] - 63:2
holder [1] - 48:15
holders [4] - 11:12,
28:12, 28:13, 41:18
holes [1] - 39:16
Hollow [2] - 4:19,
14:4
home [1] - 14:3
Hookah [1] - 11:10
hope [1] - 47:9
hosts [1] - 55:18
Hot [1] - 55:19
hours [3] - 20:11,
57:8, 57:9

Hut [1] - 7:2

**I**

identical [2] - 52:1,
52:6
identification [11] -
36:11, 49:3, 56:3,
65:16, 67:3, 68:12,
69:3, 69:20, 70:18,
72:19, 74:21
identify [3] - 37:5,
38:4, 68:15
impact [1] - 19:6
impair [1] - 19:6
import [4] - 10:20,
65:22, 66:14, 66:15
imported [2] -
66:16, 76:1
Imports [1] - 3:10
incense [3] -
11:12, 28:12
include [1] - 48:10
income [1] - 25:3
Incorporated [5] -
9:13, 9:15, 10:3,
10:9, 10:18
incorporation [1] -
8:23
India [19] - 19:11,
19:18, 20:6, 20:16,
20:17, 28:12, 28:17,
29:15, 39:23, 40:10,
52:11, 60:19, 62:18,
62:20, 62:21, 70:12,
70:21, 71:1
Indiana [1] - 68:21
indicate [1] - 61:23
indicating [1] -
33:3
individual [1] -
60:23
individuals [1] -
6:13
inform [2] - 54:22,
61:23
information [2] -
38:13, 43:11
informed [1] -
59:11
infringe [1] - 53:22
infringed [2] -
54:6, 55:1

infringement [2] -
26:12, 58:1
infringing [1] -
31:15
insofar [1] - 38:11
interest [1] - 23:9
internet [1] - 12:10
interrogatories [3]
- 36:16, 37:10,
37:13
Interrogatories [2]
- 3:3, 36:9
Interrogatory [2] -
38:4, 43:6
inventory [6] -
47:2, 78:15, 79:9,
79:11, 79:15, 79:22
invoice [23] - 8:7,
8:16, 34:18, 34:20,
34:22, 44:4, 65:22,
67:1, 67:12, 68:10,
69:18, 71:14, 72:7,
72:17, 73:1, 73:3,
73:11, 74:11, 74:14,
74:19, 75:3, 78:23
Invoice [4] - 3:7,
3:8, 3:12, 3:13
invoices [12] -
6:10, 6:11, 7:5,
39:18, 76:23, 78:12,
78:16, 78:21, 79:1,
79:23, 80:2, 80:3
involved [2] -
16:23, 76:2
Island [1] - 14:10
issue [1] - 35:22
item [7] - 32:23,
33:12, 48:19, 49:8,
49:16, 51:18, 64:16
items [7] - 38:16,
39:2, 49:15, 51:6,
52:22, 52:23, 66:14
itself [3] - 33:14,
35:15, 49:19

**J**

Jack [2] - 26:2,
63:11
jail [1] - 17:14
Jake [16] - 25:9,
25:12, 25:14, 25:16,
25:18, 26:3, 56:14,

58:1, 59:16, 59:22,
61:5, 61:7, 63:11,
73:6, 73:7, 77:16
JAKE [1] - 1:4
January [1] - 78:13
Jersey [1] - 14:7
jewelry [3] - 28:13,
66:20, 70:5
Jewelry [2] - 11:5,
22:17
job [5] - 21:23,
22:14, 22:22, 35:19,
60:21
Jodhpur [3] -
19:20, 20:7, 20:13
JODHPUR [1] -
19:20
John [1] - 59:23
judge [1] - 17:6
junk [1] - 57:10
jury [1] - 17:6
Justin [1] - 1:14,
37:2, 43:17
JUSTIN [1] - 2:5

**K**

K-a-n-a-k [1] -
15:19
Kanak [1] - 15:19
keep [2] - 9:7, 9:8
keeping [1] - 57:20
Keyhani [1] - 35:17
KEYHANI [53] -
2:1, 2:1, 4:22, 7:1,
13:12, 13:19, 15:17,
34:1, 34:12, 35:1,
35:21, 36:6, 36:13,
37:21, 41:21, 44:18,
45:4, 45:8, 45:18,
46:4, 47:17, 47:23,
48:4, 48:18, 48:22,
49:5, 53:18, 55:23,
56:5, 57:14, 58:16,
59:1, 63:20, 64:12,
65:12, 65:18, 66:23,
67:5, 68:8, 68:14,
68:23, 69:5, 69:16,
69:22, 70:14, 70:20,
72:15, 72:21, 74:17,
74:23, 80:9, 80:14,
81:1
kind [15] - 9:7, 9:8,

11:5, 11:9, 14:15,
21:23, 22:16, 39:8,
39:22, 41:7, 51:11,
64:19, 71:9, 73:15
kinds [1] - 48:11
knockoffs [1] -
57:18
Korea [2] - 70:9,
70:10

**L**

l/4/07 [2] - 3:12,
72:17
l/15/04 [2] - 3:8,
68:10
labeled [1] - 49:9
Lane [2] - 4:19,
14:4
largest [2] - 20:12,
20:13
Las [6] - 12:7,
26:9, 77:4, 77:5,
77:6, 77:9
last [10] - 13:14,
24:8, 24:17, 36:19,
38:7, 48:4, 48:6,
58:18, 78:5
Law [1] - 1:14
lawsuit [12] -
15:20, 26:6, 39:22,
40:5, 57:23, 60:7,
60:8, 60:9, 60:11,
61:9, 77:13, 77:14
lawyer [7] - 5:12,
5:14, 10:19, 18:10,
38:21, 63:2, 63:3
leave [1] - 57:20
LEE [1] - 1:4
Lee [22] - 25:9,
25:12, 25:14, 25:16,
25:18, 26:2, 26:3,
56:14, 58:2, 59:16,
59:19, 59:23, 61:1,
61:4, 61:6, 61:7,
63:11, 77:16, 78:1
Lee's [2] - 73:6,
73:7
left [4] - 21:12,
21:15, 23:6, 79:11
legal [1] - 57:21
lend [1] - 15:23
less [3] - 24:12,

24:16, 77:5
letter [4] - 31:23,
32:1, 57:22, 69:1
Letter [1] - 3:9
letterhead [1] - 6:5
liable [2] - 17:9,
17:14
life [1] - 58:4
light [1] - 39:17
line [2] - 46:16,
53:16
List [2] - 3:6, 3:11
list [3] - 65:14,
65:20, 66:1
list/weight [1] -
70:16
List/Weight [1] -
3:11
Listen [1] - 7:3
listen [1] - 8:5
living [2] - 23:23,
66:19
ll/8/05 [2] - 3:9,
69:1
loan [1] - 16:1
located [9] - 7:4,
7:6, 7:7, 8:9, 8:12,
20:6, 22:2, 68:20,
73:9
look [19] - 6:17,
7:7, 9:4, 24:23,
25:5, 29:19, 36:18,
36:20, 36:21, 39:11,
39:13, 39:14, 54:10,
56:7, 57:6, 57:7,
80:1, 80:15
looked [1] - 76:21
looking [1] - 39:3
looks [2] - 33:12,
35:11
Los [1] - 26:1
lying [1] - 64:17

**M**

machine [1] -
81:11
mad [1] - 31:13
Madison [1] - 2:2
mail [29] - 3:5,
55:10, 55:11, 55:15,
55:18, 55:19, 55:20,
56:1, 56:9, 56:15,

56:17, 56:18, 56:20,
57:1, 57:6, 57:7,
57:10, 57:11, 57:16,
57:17, 58:4, 58:7,
58:8, 59:5, 59:6,
59:15, 59:18, 60:5
mails [2] - 55:14,
57:1
Main [2] - 1:14, 2:5
Manhattan [4] -
11:18, 11:19, 16:19,
22:18
manufacture [1] -
68:5
March [1] - 1:15
Mark [11] - 36:6,
48:22, 55:23, 65:12,
66:23, 68:8, 68:23,
69:16, 70:14, 72:15,
74:17
marked [17] -
35:14, 36:9, 36:15,
36:20, 47:13, 49:2,
56:2, 56:6, 65:15,
65:19, 67:2, 68:11,
69:2, 69:19, 70:17,
72:18, 74:20
marketing [1] -
69:13
matter [3] - 15:3,
15:20, 81:12
McCann [3] - 1:16,
81:10, 81:19
mean [41] - 5:20,
5:21, 6:18, 8:15,
9:10, 10:19, 11:10,
15:9, 17:13, 21:14,
22:9, 23:21, 24:12,
24:13, 26:13, 26:16,
27:8, 27:14, 27:15,
31:3, 31:7, 32:7,
34:10, 39:10, 40:1,
42:20, 49:13, 49:14,
51:12, 51:16, 51:17,
61:17, 61:18, 66:7,
66:18, 73:5, 73:20,
73:21, 74:8, 77:7,
77:17
means [12] - 9:20,
13:4, 17:11, 18:23,
29:18, 39:8, 50:11,
51:1, 51:2, 76:12,
76:13, 79:9
medications [1] -

19:5
meet [6] - 5:12,
5:14, 12:17, 25:19,
25:21, 77:3
meeting [1] - 25:16
memory [4] - 55:7,
64:5, 64:18, 78:22
mention [1] - 31:17
MEREDITH [1] -
2:1
met [4] - 5:13,
25:12, 25:14, 29:16
metal [7] - 3:4,
33:12, 41:15, 41:17,
49:1, 49:6, 49:9
Metomic [2] -
67:14, 67:15
might [6] - 19:6,
57:4, 57:5, 57:9,
59:10
million [1] - 27:13
mind [1] - 27:1
mine [1] - 75:4
minutes [1] - 5:15
mix [1] - 64:14
mixed [3] - 40:10,
50:16, 50:17
moment [3] -
43:23, 45:21, 62:6
moments [2] -
39:4, 56:8
money [14] - 10:20,
11:2, 14:14, 14:21,
15:21, 15:23, 16:12,
50:8, 52:15, 52:16,
76:13
Money [1] - 14:17
months [1] - 22:7
mood [1] - 71:12
morning [4] - 4:23,
5:1, 5:5, 5:7
most [2] - 13:20,
77:2
Most [3] - 13:23,
63:5, 79:1
mostly [2] - 8:18,
79:11
MR [72] - 4:22,
6:22, 7:1, 13:12,
13:19, 15:6, 15:12,
15:17, 33:20, 34:1,
34:9, 34:12, 34:14,
35:1, 35:13, 35:21,
36:1, 36:6, 36:13,

37:15, 37:21, 41:13,
41:21, 44:12, 44:18,
45:1, 45:4, 45:8,
45:12, 45:18, 46:1,
46:4, 47:7, 47:17,
47:23, 48:4, 48:18,
48:22, 49:5, 53:7,
53:18, 55:23, 56:5,
56:22, 57:14, 58:11,
58:16, 59:1, 63:18,
63:20, 64:1, 64:12,
65:12, 65:18, 66:9,
66:23, 67:5, 68:8,
68:14, 68:23, 69:5,
69:16, 69:22, 70:14,
70:20, 72:15, 72:21,
74:17, 74:23, 80:9,
80:14, 81:1
multiple [1] - 52:2
Mumbai [1] - 71:1
must [2] - 31:4,
72:7

**N**

name [14] - 4:16,
6:20, 8:12, 15:1,
15:19, 21:8, 22:15,
22:20, 26:1, 42:11,
42:18, 42:20, 72:5,
72:13
named [4] - 25:9,
25:12, 26:3, 59:16
names [2] - 7:5,
7:11
Naveen [2] - 22:15,
22:16
necessarily [1] -
9:21
necessary [2] -
17:23, 57:11
need [4] - 18:15,
18:21, 19:1, 54:10
needs [1] - 44:13
net [1] - 24:20
Nevada [1] - 32:4
never [23] - 23:22,
24:1, 25:12, 26:1,
26:3, 32:13, 50:19,
51:14, 51:15, 51:16,
53:20, 54:4, 56:20,
58:4, 67:20, 75:21,
76:1, 77:20, 78:3,

78:4
new [1] - 72:13
NEW [1] - 1:2
New [27] - 1:15,
2:3, 2:6, 4:20, 7:14,
7:16, 7:19, 7:20,
7:23, 8:1, 8:4, 8:10,
8:13, 10:10, 14:7,
14:8, 14:9, 16:17,
16:18, 20:8, 20:9,
21:16, 21:19, 22:2,
70:3, 72:2
next [3] - 18:21,
31:7, 40:13
NO [1] - 3:2
Nobody [1] - 55:5
nonetheless [1] -
18:4
notary [1] - 37:7
note [2] - 40:19,
71:22
noted [1] - 47:20
notes [1] - 81:15
Nothing [4] - 22:9,
23:12, 27:5, 76:16
nothing [2] - 5:18,
51:2
notice [8] - 26:2,
54:5, 55:4, 55:5,
55:6, 55:8, 77:19,
80:6
notified [1] - 53:20
Notify [1] - 54:2
number [4] -
27:11, 28:15, 33:6,
38:4
numbered [1] - 6:4
numbers [1] - 8:22

**O**

oath [8] - 4:5, 17:2,
35:3, 36:19, 46:5,
46:7, 49:18, 58:3
object [11] - 18:3,
18:8, 35:13, 35:15,
38:11, 44:12, 45:1,
45:4, 46:1, 47:7,
47:19
Object [3] - 34:9,
56:22, 63:18
Objection [2] -
37:15, 58:11

objection [5] - 15:6, 18:9, 34:14, 45:5, 47:8
objections [1] - 4:8
obliged [2] - 53:13, 53:15
OF [2] - 1:2, 81:8
offending [1] - 47:14
offer [2] - 22:13, 77:11
offered [1] - 22:14
office [6] - 11:17, 11:21, 11:23, 13:5, 64:15
Offices [1] - 1:14
often [2] - 12:4, 20:17
old [1] - 29:21
once [3] - 40:11, 77:19, 78:3
One [4] - 14:23, 29:11, 39:16, 60:6
one [24] - 13:5, 17:21, 24:13, 27:11, 29:7, 29:8, 29:9, 29:10, 29:12, 33:21, 33:23, 39:19, 41:2, 41:8, 41:9, 51:20, 51:22, 55:17, 70:22, 71:14, 71:18
ones [3] - 40:11, 52:2, 77:8
open [6] - 59:5, 59:6, 59:8, 59:9, 59:10, 64:15
opened [2] - 58:8, 59:7
Order [1] - 13:4
order [27] - 13:4, 28:17, 28:21, 28:23, 29:1, 29:2, 29:14, 29:15, 31:10, 31:11, 32:12, 32:15, 33:6, 50:14, 51:14, 52:18, 53:12, 53:14, 60:21, 67:21, 71:20, 79:11
ordered [1] - 32:13
ordering [2] - 67:20, 79:19
orders [13] - 12:23, 13:2, 13:4, 13:8, 13:20, 14:1, 28:17, 29:14, 33:5, 52:4,

71:21, 79:14
Overseas [2] - 22:21, 22:22
owes [4] - 14:14, 14:21, 15:21, 15:23
own [4] - 9:19, 9:20, 9:21, 11:15
owner [2] - 9:17, 10:15
owners [1] - 10:1
ownership [1] - 23:9

## P

P.M [1] - 59:14
Packing [3] - 3:6, 3:11, 66:1
packing [3] - 65:14, 65:20, 70:16
page [6] - 36:19, 37:3, 40:13, 40:14, 40:19, 41:23
PAGE [1] - 3:2
pages [1] - 81:14
paid [2] - 52:21, 75:21
papers [4] - 25:10, 26:4, 26:6, 59:21
part [13] - 33:13, 33:16, 33:20, 49:1, 49:6, 49:16, 49:21, 49:23, 50:1, 50:6, 50:9, 74:4
particular [6] - 9:2, 9:6, 38:2, 51:18, 71:14, 79:7
parties [1] - 4:4
partner [1] - 24:5
Parts [2] - 67:17, 67:18
parts [4] - 49:10, 67:16, 67:18, 67:23
past [1] - 9:4
patent [16] - 26:12, 31:15, 31:17, 31:21, 40:2, 40:4, 40:7, 53:22, 54:6, 54:18, 55:1, 55:9, 58:1, 61:10, 62:1, 62:11
patented [5] - 38:13, 39:1, 43:12, 57:18, 59:19

pay [14] - 16:12, 52:13, 52:17, 52:18, 52:23, 53:13, 53:15, 76:5, 76:6, 76:7, 76:8, 76:9, 76:12
PEAK [1] - 1:7
Peak [11] - 6:5, 9:13, 9:14, 10:3, 10:8, 10:17, 16:6, 22:21, 22:22, 24:3, 24:5
pen [2] - 33:9
People [1] - 42:6
people [23] - 11:15, 12:2, 26:13, 26:16, 26:17, 26:18, 26:19, 27:2, 33:2, 50:9, 54:12, 54:13, 57:3, 60:6, 60:20, 67:18, 67:19, 69:12, 71:3, 74:2, 77:10
percent [7] - 13:17, 31:20, 71:2, 75:21, 76:4, 76:11, 76:12
percentage [1] - 13:7
perhaps [1] - 35:14
period [2] - 20:19, 48:13
perjury [3] - 17:9, 17:11, 17:13
permission [2] - 65:3, 65:5
person [9] - 14:16, 15:2, 24:13, 25:14, 25:16, 59:16, 61:22, 77:11
personal [1] - 16:1
phrase [1] - 38:12
Physically [1] - 29:19
picture [9] - 39:20, 39:21, 40:1, 40:21, 41:14, 41:23, 42:19, 42:23
pictures [1] - 40:17
piece [13] - 3:4, 13:6, 29:10, 29:11, 29:12, 33:21, 33:23, 41:14, 41:17, 49:6, 49:9, 64:18, 65:10
pieces [13] - 13:6, 29:2, 46:13, 46:15, 50:13, 50:15, 51:8,

51:13, 52:2, 52:8, 65:9, 65:10, 76:10
pipe [25] - 28:9, 34:2, 34:4, 34:5, 34:7, 34:15, 35:7, 35:10, 35:11, 40:22, 43:2, 43:4, 57:18, 59:19, 61:14, 61:15, 73:20, 73:21, 73:22, 73:23, 74:1, 74:7, 74:8
Pipe [2] - 35:10, 43:3
pipes [57] - 11:10, 38:9, 38:12, 38:14, 38:15, 38:21, 38:22, 38:23, 39:1, 40:22, 43:12, 43:13, 43:16, 43:19, 44:1, 44:3, 44:4, 44:10, 44:15, 44:16, 45:9, 45:13, 45:19, 46:9, 46:10, 46:11, 46:12, 46:14, 46:18, 46:20, 46:21, 46:22, 47:1, 47:3, 47:4, 47:5, 48:11, 48:14, 56:11, 62:16, 63:9, 63:10, 63:12, 63:14, 66:13, 66:16, 66:17, 70:7, 71:5, 71:6, 72:4, 73:19, 73:20, 73:21, 74:1, 79:21
place [6] - 20:7, 31:10, 31:11, 32:3, 81:12
placement [1] - 38:16
Plaintiff [4] - 1:5, 2:3, 38:12, 43:11
PLAINTIFF'S [1] - 3:2
Plaintiff's [16] - 36:10, 36:15, 36:21, 49:2, 49:9, 56:2, 56:6, 65:15, 67:2, 68:11, 69:2, 69:19, 70:17, 72:18, 74:20
plan [3] - 10:23, 11:1
plenty [1] - 49:15
PLLC [1] - 2:1
pocket [1] - 24:21
point [2] - 28:1,

28:2
pointed [1] - 41:13
population [1] - 20:14
possible [1] - 59:12
potential [1] - 12:15
pounds [1] - 30:12
predated [1] - 61:9
preparation [1] - 5:16
prepare [3] - 5:4, 5:8, 5:10
Prepare [1] - 5:7
presented [1] - 39:3
president [4] - 9:16, 9:18, 9:20, 9:22
price [7] - 28:15, 71:5, 71:11, 73:13, 75:9, 75:11, 75:13
prices [1] - 71:10
Procedure [1] - 1:13
proceeding [1] - 81:11
proceedings [1] - 81:5
produce [3] - 50:10, 51:15
produced [2] - 66:4, 67:9
product [42] - 11:2, 11:3, 27:7, 27:18, 27:19, 27:20, 28:1, 28:5, 28:11, 28:12, 29:11, 30:22, 31:2, 31:5, 32:6, 32:9, 32:10, 32:12, 32:13, 32:15, 33:2, 34:2, 34:4, 34:5, 35:7, 35:8, 35:10, 40:23, 41:22, 42:10, 49:19, 49:21, 54:15, 54:23, 67:19, 70:4, 71:8, 74:13, 78:6, 79:7
production [2] - 66:5, 66:7
products [31] - 6:6, 7:12, 7:14, 7:18, 7:23, 8:3, 8:21, 11:4, 11:16, 11:23,

12:2, 12:10, 12:19,
12:21, 12:23, 13:3,
13:7, 13:20, 13:23,
27:9, 27:13, 41:2,
53:21, 54:5, 71:17,
76:18, 76:20, 77:3,
78:18, 78:19, 79:15
Professional [1] -
1:17
Profit [1] - 75:19
profit [6] - 24:17,
75:18, 75:21, 76:4,
76:11, 76:14
profitable [3] -
23:19, 23:22, 24:1
profits [1] - 28:19
promotional [1] -
51:2
provide [1] - 38:5
provided [1] - 73:1
publicity [2] - 51:6,
51:7
purchase [9] - 6:6,
6:7, 23:1, 28:18,
67:12, 70:6, 70:8,
71:13, 71:18
purpose [4] -
10:17, 10:19, 44:21,
66:5
Purpose [1] - 66:7
pursuant [1] - 1:13
put [6] - 24:21,
28:14, 28:15, 32:18,
33:4, 39:17

**Q**

questions [10] -
4:10, 17:16, 17:19,
17:22, 18:8, 18:23,
19:3, 37:9, 44:18,
81:1
quit [2] - 22:9,
22:10

**R**

RAJESH [3] - 1:7,
1:12, 4:13
Rajesh [1] - 4:19
Rajesh33@
hotmail.com [1] -
55:21

rajesh33@
hotmail.com [1] -
56:9
Rajmallakhiscan
d [1] - 21:9
ran [1] - 28:2
reach [1] - 77:20
Read [1] - 13:12
read [8] - 13:15,
37:18, 37:22, 38:9,
43:7, 48:7, 58:16,
58:19
reading [1] - 43:13
really [16] - 5:18,
5:20, 8:22, 12:9,
23:20, 23:21, 30:6,
34:21, 53:2, 53:3,
53:4, 53:5, 53:8,
60:4, 75:23
reason [5] - 23:17,
23:18, 31:4, 31:5,
31:9
receipt [1] - 80:21
receipts [1] - 6:6
received [3] -
56:17, 56:20, 57:17
receiving [2] -
56:18, 57:22
recess [2] - 18:21,
80:11
recognize [8] -
65:20, 67:8, 69:23,
72:6, 72:22, 75:1,
80:17, 80:18
recollection [1] -
18:16
record [15] - 4:2,
4:17, 6:2, 7:7, 9:7,
9:8, 15:7, 15:12,
15:15, 15:18, 33:11,
36:1, 36:4, 36:14,
80:9
refer [2] - 42:4,
42:6
Referee [1] - 4:5
referring [13] - 6:2,
26:22, 27:18, 33:11,
39:2, 39:6, 40:4,
40:7, 41:22, 48:19,
70:22, 78:9, 79:18
refers [2] - 43:18,
59:18
reflect [2] - 6:2,
33:11

regard [3] - 26:12,
32:6, 77:15
Regarding [2] -
62:15, 62:16
regards [1] - 26:7
Registered [1] -
1:17
registered [1] - 9:1
relationship [1] -
9:14
relevant [1] - 38:6
Remember [1] -
62:23
remember [63] -
7:9, 7:10, 8:6, 8:14,
8:16, 10:4, 21:8,
24:9, 24:18, 25:5,
25:23, 26:9, 26:10,
26:11, 27:3, 30:6,
30:21, 30:22, 46:13,
49:11, 49:13, 49:14,
49:15, 51:19, 52:20,
52:21, 60:2, 60:4,
60:14, 60:15, 61:11,
61:13, 62:4, 62:5,
62:8, 62:13, 63:4,
63:5, 63:6, 63:8,
63:13, 63:15, 64:14,
64:16, 64:17, 65:8,
65:10, 71:9, 72:5,
72:10, 72:12, 75:15,
76:5, 76:9, 78:8,
78:10, 78:17, 78:22
repeat [1] - 31:1
rephrase [1] - 79:6
report [1] - 81:10
Reporter [1] - 1:17
REPORTER [1] -
81:8
reporter [5] -
13:15, 17:17, 17:20,
48:7, 58:19
representatives
[1] - 77:2
resale [1] - 8:22
reserved [1] - 4:10
respect [1] - 44:19
respective [1] - 4:4
Response [2] -
3:3, 36:8
responses [2] -
36:16, 37:9
responsibilities
[1] - 22:22

restroom [1] - 19:1
retail [1] - 71:23
returns [1] - 25:4
revenue [1] - 24:8
review [3] - 5:16,
5:19, 5:23
reviewed [1] - 6:1
rid [1] - 51:13
rights [1] - 62:1
Royce [1] - 1:16
ROYCE [2] - 81:10,
81:19
Rules [1] - 1:13

**S**

Sahaj [1] - 3:10
sale [4] - 32:14,
38:6, 38:7, 38:8
Sales [3] - 6:7,
6:11, 76:23
sales [8] - 6:10,
9:4, 9:5, 22:1,
22:23, 38:5, 38:8,
43:18, 74:11, 79:3,
79:5, 80:21
sample [10] -
28:20, 28:22, 29:4,
29:5, 29:7, 31:14,
32:7, 32:11, 41:11,
41:17
samples [16] -
29:14, 40:9, 41:4,
41:6, 41:7, 50:17,
51:4, 52:2, 52:6,
53:11, 60:20, 69:12,
69:14, 70:9, 71:4,
76:21
saw [1] - 32:2
second [1] - 43:6
section [1] - 56:8
see [10] - 28:10,
37:1, 40:14, 42:11,
51:9, 57:1, 64:14,
64:15, 66:15, 71:21
See [2] - 33:1,
64:14
seeks [2] - 38:12,
43:11
sell [32] - 7:12,
7:14, 7:17, 7:18,
7:23, 8:6, 8:15,
8:20, 9:9, 10:21,

11:2, 11:4, 11:12,
11:13, 12:10, 12:21,
13:5, 13:20, 13:23,
27:7, 27:8, 27:9,
27:10, 27:12, 27:15,
27:23, 29:9, 29:13,
30:22, 31:2, 31:8,
32:11, 34:2, 34:4,
34:6, 34:15, 34:23,
39:19, 40:23, 41:3,
41:4, 41:5, 44:1,
44:9, 44:14, 45:10,
46:11, 49:19, 50:3,
50:7, 52:9, 52:10,
52:12, 52:13, 52:15,
52:17, 52:22, 60:22,
64:16, 65:3, 66:14,
66:20, 66:21, 67:19,
67:22, 67:23, 68:3,
71:5, 71:15, 74:4,
74:13, 75:14, 76:20,
77:3, 78:18, 78:19,
79:10, 79:12, 79:13,
79:14, 79:21
selling [19] - 11:3,
13:3, 27:11, 31:6,
31:7, 32:9, 32:10,
46:22, 47:1, 47:4,
47:5, 51:14, 54:23,
57:18, 57:19, 59:19,
79:7, 79:15, 79:19
send [33] - 26:2,
28:17, 33:7, 33:8,
33:9, 33:17, 37:2,
39:22, 42:12, 42:14,
42:16, 42:17, 50:13,
50:16, 50:17, 51:4,
51:8, 51:10, 51:13,
52:1, 52:7, 52:12,
52:22, 53:11, 53:13,
53:15, 69:12, 69:13,
70:10, 70:11, 71:3
sender [1] - 58:7
sending [1] - 71:4
sent [6] - 25:10,
28:14, 33:6, 57:4,
60:20, 70:9
sentence [1] - 43:7
seriously [1] - 58:1
served [3] - 26:4,
36:17, 40:8
set [3] - 71:10,
71:19, 81:13
settled [1] - 16:10

Seven [1] - 20:20
seven [1] - 21:3
SHAH [3] - 1:7, 1:12, 4:13
Shah [18] - 4:19, 5:2, 6:2, 14:11, 19:5, 19:21, 24:8, 25:9, 33:11, 35:2, 36:14, 36:22, 46:17, 48:19, 50:12, 56:17, 70:6, 76:17
shareholder [1] - 23:10
sheet [1] - 9:12
ship [2] - 13:5, 28:18
shooter [47] - 27:21, 27:22, 28:7, 32:16, 32:17, 32:18, 32:19, 32:20, 32:22, 33:8, 33:12, 33:17, 34:3, 34:4, 34:7, 34:15, 34:18, 34:20, 34:22, 34:23, 35:8, 46:21, 47:9, 48:1, 48:11, 48:16, 49:7, 54:5, 54:22, 56:11, 61:15, 62:16, 63:13, 64:4, 66:17, 70:6, 71:5, 72:4, 73:13, 73:15, 73:19, 74:4, 75:12, 75:13, 78:5, 78:19, 79:21
Shooter [45] - 38:13, 38:15, 38:21, 38:23, 39:1, 39:9, 40:22, 41:2, 41:8, 41:18, 42:12, 42:19, 42:22, 42:23, 43:1, 43:2, 43:3, 43:4, 43:9, 43:10, 43:12, 43:15, 43:19, 44:1, 44:3, 44:4, 44:9, 44:15, 44:16, 45:9, 45:13, 45:19, 46:9, 46:10, 46:11, 46:18, 46:20, 46:22, 47:1, 47:3, 47:4, 47:5, 47:14, 53:21
shooters [11] - 32:18, 35:17, 51:11, 64:10, 65:7, 71:9, 73:12, 75:7, 75:8, 76:3, 79:18

Shooters [12] - 39:8, 39:9, 39:18, 39:19, 39:23, 42:6, 42:9, 42:10, 42:14, 45:10, 46:14
short [1] - 30:8
shorthand [1] - 81:11
show [15] - 26:9, 26:11, 26:15, 26:16, 27:13, 28:11, 29:6, 29:17, 51:16, 54:20, 54:21, 56:6, 65:19, 66:11, 77:12
Showing [3] - 67:6, 68:15, 70:21
showing [1] - 36:14
shows [16] - 12:3, 12:4, 12:8, 12:14, 12:17, 12:19, 12:21, 13:3, 13:9, 13:21, 14:1, 28:15, 77:4, 77:6, 77:8
signature [4] - 37:4, 37:5, 37:6, 40:14
signed [2] - 36:19, 56:13
signing [1] - 4:6
silver [4] - 21:5, 21:7, 49:1, 49:6
Silver [1] - 3:4
similar [1] - 40:9
simple [1] - 35:6
Sincerely [1] - 58:1
site [1] - 40:15
sitting [1] - 60:20
Six [51] - 22:7, 38:13, 38:15, 38:21, 38:23, 39:1, 40:22, 41:2, 41:8, 41:18, 42:6, 42:9, 42:10, 42:12, 42:14, 42:18, 42:22, 42:23, 43:1, 43:2, 43:3, 43:4, 43:9, 43:10, 43:12, 43:15, 43:18, 44:1, 44:3, 44:9, 44:14, 44:15, 44:9, 45:10, 45:13, 45:19, 46:9, 46:10, 46:11, 46:14, 46:18, 46:20, 46:22, 47:1, 47:3, 47:4,

47:5, 47:14, 53:21
six [46] - 20:20, 30:7, 32:19, 39:17, 39:19, 44:3, 46:21, 47:9, 48:1, 48:11, 48:15, 49:7, 51:11, 54:5, 54:22, 56:11, 57:8, 61:15, 62:16, 63:8, 63:10, 63:12, 63:13, 64:4, 64:9, 65:7, 66:17, 70:6, 71:5, 71:9, 72:4, 73:12, 73:13, 73:15, 73:19, 74:4, 75:7, 75:8, 75:12, 75:13, 76:3, 78:5, 78:19, 79:18, 79:21
skirts [1] - 11:13
slip [1] - 28:18
small [1] - 71:22
smoking [4] - 11:5, 11:7, 11:9, 40:22
Smoking [1] - 11:10
so-called [5] - 38:13, 39:1, 43:7, 43:12, 43:18
sold [57] - 8:3, 8:5, 13:7, 32:16, 32:17, 35:7, 38:9, 38:15, 39:9, 40:12, 41:4, 41:6, 44:9, 44:15, 45:9, 45:12, 45:14, 45:19, 46:9, 46:10, 46:13, 46:14, 46:15, 46:20, 46:21, 47:3, 48:9, 49:10, 50:14, 50:15, 51:12, 63:8, 63:11, 63:14, 63:20, 64:4, 64:7, 64:10, 64:13, 64:18, 64:19, 64:22, 64:23, 65:2, 65:6, 65:7, 65:9, 72:4, 75:7, 75:12, 76:3, 78:5, 78:14, 78:15, 79:9
sole [1] - 10:15
Sometimes [3] - 33:7, 52:14, 69:12
sometimes [10] - 33:8, 33:9, 42:12, 52:4, 52:8, 52:10, 52:11, 55:13, 59:5, 59:6

somewhere [1] - 76:16
son [1] - 59:5
soon [1] - 57:23
sorry [3] - 13:22, 66:2, 73:5
sound [1] - 46:8
speaking [2] - 24:19, 48:1
specific [6] - 23:17, 42:18, 42:20, 42:21, 46:17, 52:20
specifically [4] - 18:5, 42:8, 53:21, 54:17
spoken [1] - 78:1
square [1] - 11:17
stand [1] - 64:8
start [1] - 30:17
started [2] - 24:2, 47:4
state [8] - 4:16, 9:1, 9:2, 9:3, 9:8, 9:10, 9:11, 10:9
State [10] - 7:14, 7:16, 7:19, 7:23, 8:1, 8:3, 8:9, 8:13, 14:8, 16:20
statement [2] - 38:18, 60:15
STATES [1] - 1:1
States [7] - 7:8, 7:12, 7:16, 7:20, 7:21, 9:6
states [1] - 9:6
stating [1] - 56:19
STENOGRAPHER [1] - 4:16
stenographic [1] - 81:15
still [5] - 47:11, 57:17, 59:15, 63:16, 64:8
stipulated [1] - 4:3
stipulation [1] - 4:1
stock [1] - 9:10
stole [1] - 28:3
stop [6] - 47:1, 57:19, 59:19, 79:7, 79:10, 79:14
Stop [1] - 79:9
stopped [1] - 47:5
store [8] - 11:15,

11:20, 22:1, 22:4, 42:4, 72:1, 72:4, 72:9
stores [4] - 8:18, 71:15, 76:20, 77:2
Street [3] - 1:14, 2:5, 16:19
strike [3] - 15:1, 48:1, 78:18
study [3] - 19:21, 19:22, 19:23
style [2] - 28:15, 33:6
subject [7] - 15:20, 31:22, 40:5, 56:11, 61:10, 62:11, 70:7
sue [5] - 14:16, 14:18, 14:19, 14:21, 15:10
sued [9] - 14:14, 15:2, 78:2, 78:20, 79:4, 79:8, 79:16, 79:17, 79:22
suggested [1] - 43:17
suing [2] - 27:19, 73:4
suppliers [1] - 33:7
supplies [1] - 33:2
suppose [1] - 49:22
supposed [1] - 33:15
surprised [5] - 58:7, 59:2, 59:3, 59:4, 59:13
survive [1] - 23:22
sworn [1] - 4:13

T

table [4] - 33:5, 39:4, 47:12, 48:19
tall [1] - 30:8
tax [1] - 25:3
taxes [2] - 25:1, 25:2
telephone [1] - 25:22
testified [1] - 4:14
testify [1] - 19:6
testifying [5] - 17:5, 35:2, 49:18,

56:19, 58:3
THE [16] - 4:16, 4:19, 13:17, 15:9, 33:23, 34:18, 37:18, 41:17, 48:9, 53:10, 57:1, 58:14, 58:21, 63:22, 64:3, 66:11
Therefore [1] - 57:20
Thinking [1] - 50:8
three [6] - 20:18, 32:17, 41:7, 48:10, 51:10, 71:8
tired [1] - 45:14
today [11] - 17:2, 19:5, 19:7, 35:3, 35:16, 49:18, 56:19, 58:3, 58:5, 63:16, 81:2
together [2] - 46:13, 48:9
took [8] - 28:2, 28:4, 28:5, 28:20, 28:21, 29:4, 31:14, 32:3
top [3] - 6:5, 9:12, 42:2
total [6] - 38:5, 48:10, 63:14, 64:6, 64:7, 71:13
town [2] - 7:9, 65:4
trade [17] - 12:3, 12:4, 12:8, 12:14, 12:17, 12:19, 12:21, 13:3, 13:8, 13:21, 14:1, 26:9, 26:15, 26:16, 77:3, 77:6, 77:8
trading [1] - 10:20
transcript [3] - 4:7, 81:13, 81:14
Trial [1] - 1:12
trial [3] - 4:11, 16:8, 16:20
tried [1] - 77:19
true [5] - 45:21, 53:5, 63:16, 63:18, 81:14
truth [4] - 17:3, 17:8, 35:6, 44:22
truthfully [1] - 19:7
try [3] - 8:22, 66:19, 80:2
trying [4] - 43:23,

44:21, 62:10, 77:12
Tuesday [1] - 1:15
Twelve [1] - 29:1
Twice [1] - 12:5
two [16] - 13:6, 20:18, 23:6, 26:13, 26:17, 26:19, 27:2, 28:19, 29:16, 39:7, 39:10, 39:13, 39:22, 54:12, 60:6
type [4] - 6:9, 11:4, 38:15, 74:11
Type [1] - 38:22
types [2] - 8:20, 39:10
typical [1] - 52:1

**U**

U.S [2] - 19:13, 38:5
under [6] - 35:3, 36:19, 46:5, 46:7, 49:18, 58:3
United [7] - 7:8, 7:12, 7:16, 7:20, 7:21, 9:6
UNITED [1] - 1:1
University [1] - 19:20
unknown [1] - 54:13
unless [2] - 18:4, 18:10
unwrap [1] - 43:23
up [4] - 24:12, 38:7, 61:10, 62:12

**V**

value [2] - 71:13, 71:17
Vegas [6] - 12:7, 26:9, 77:4, 77:5, 77:6, 77:9
vendor [1] - 68:19
Verbally [3] - 54:7, 54:8, 54:12
verbally [4] - 17:19, 54:2, 54:11, 55:8
verify [1] - 36:18
versus [1] - 42:9

Village [2] - 72:1, 72:6
Vincennes [1] - 68:21
violating [1] - 62:1
vs [1] - 1:6

**W**

wait [2] - 18:18, 18:20
waived [2] - 4:6, 4:8
water [1] - 19:4
ways [1] - 44:14
web [1] - 40:15
website [1] - 12:12
WENDY [2] - 81:10, 81:19
Wendy [1] - 1:16
WESTERN [1] - 1:2
white [2] - 30:2, 65:2
White [2] - 1:14, 30:3
WHITE [22] - 2:5, 6:22, 15:6, 15:12, 33:20, 34:9, 34:14, 35:13, 36:1, 37:15, 41:13, 44:12, 45:1, 45:12, 46:1, 47:7, 53:7, 56:22, 58:11, 63:18, 64:1, 66:9
Wholesale [1] - 68:17
whosoever [2] - 9:9
Williamsville [2] - 1:15, 2:6
WITNESS [15] - 4:19, 13:17, 15:9, 33:23, 34:18, 37:18, 41:17, 48:9, 53:10, 57:1, 58:14, 58:21, 63:22, 64:3, 66:11
word [3] - 57:17, 78:10, 79:13
wordings [1] - 30:21
world [1] - 51:3
Wrist [2] - 70:12, 70:21
write [8] - 13:4,

17:20, 34:18, 34:19, 34:21, 42:6, 44:3
writing [1] - 55:8
written [1] - 54:7

**Y**

year [12] - 12:5, 13:7, 14:23, 20:2, 20:3, 20:22, 21:3, 23:4, 24:8, 24:17, 60:7
years [13] - 9:5, 10:4, 10:5, 20:15, 20:18, 21:11, 23:3, 23:6, 30:7, 60:11, 70:11
YORK [1] - 1:2
York [24] - 1:15, 2:3, 2:6, 4:20, 7:15, 7:16, 7:19, 7:20, 7:23, 8:1, 8:4, 8:10, 8:13, 10:10, 14:8, 14:9, 16:17, 16:18, 21:16, 21:19, 22:2, 70:3, 72:2
young [1] - 29:20

Jake Lee

PLAINTIFF'S
EXHIBIT
3
3/18/08

**From:** "Six Shooter Pipes" <info@sixshooterpipes.com>
**To:** <rajesh33@hotmail.com>
**Sent:** Tuesday, February 24, 2004 6:07 PM
**Subject:** Fake Six Shooter Pipes

Dear Rajesh,

I just received word that you are still selling knockoffs of my "Patented" pipe. You agreed that you would stop selling them and you are not keeping to your agreement. Therefore, you leave me no choice but to take legal action against you. You will be receiving a letter from my attorney and a lawsuit will soon follow. In America, we take Patent infringment very seriously.

Sincerely,

Jake Lee

**0001**

EXHIBIT __C__ PAGE __1__ OF __1__          1/11/2007